UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROMAG FASTENERS, INC.,<br><br>      Plaintiff,<br><br>      v.<br><br>FOSSIL, INC., FOSSIL STORES I, INC.,<br>MACY'S, INC., and<br>MACY'S RETAIL HOLDINGS, INC.,<br><br>      Defendants,<br><br><br>ROMAG FASTENERS, INC.,<br><br>      v.<br><br>DILLARD'S, INC.,<br>NORDSTROM, INC.,<br>THE BON-TON STORES, INC.,<br>THE BON-TON DEPARTMENT STORES, INC.,<br>BELK, INC., ZAPPOS.COM, INC., and<br>ZAPPOS RETAIL, INC.,<br><br>      Defendants. | CONSOLIDATED<br>CIVIL ACTION<br>NO. 10-01827-WGY |

MEMORANDUM & ORDER

YOUNG, D.J.                                        October 23, 2013

## I.  INTRODUCTION

The instant case raises patent and trademark issues involving magnetic snap fasteners on handbags and other leather accessories.

1

The plaintiff Romag Fasteners, Inc. ("Romag") designs, causes to be manufactured, and sells magnetic snap fasteners used in handbags and other accessories. Compl. ¶ 8, ECF No. 1. Romag holds U.S. Patent No. 5,722,126 (the "'126 patent"). Compl., Ex. A, U.S. Patent, ECF No. 1. The '126 patent was issued on March 3, 1998 for an invention by Howard J. Reiter entitled "Magnetic Snap Fasteners." Id.; Compl. ¶ 7. Romag also owns a U.S. Trademark Registration No. 2,095,367 (the "'367 registration"). Compl., Ex. B, Trademark Principal Register, ECF No. 1. The '367 registration covers the mark "ROMAG" in connection with magnetic snap fasteners. Compl. ¶ 10.

Romag sued Fossil, Inc. and Fossil Stores I, Inc. (collectively "Fossil"), and Macy's, Inc. and Macy's Retail Holdings, Inc. (collectively "Macy's"). In a separate action, Romag sued Dillard's, Inc., Nordstrom, Inc., The Bon-Ton Stores, Inc., The Bon-Ton Department Stores, Inc., Belk, Inc., Zappos.com, Inc., and Zappos Retail, Inc. (altogether "the defendants"). See Mot. Consolidate Enter Consol. Case Mgm't Plan, ECF No. 81. The Court consolidated these two actions for patent infringement, trademark infringement, false designation of origin, and unfair competition. Order, ECF No. 82. Romag alleges inter alia that the defendants infringe the '126 patent "by making, using, importing, selling[,] and offering for sale

handbags, . . . containing magnetic snap fasteners which come within the claims of the '126 Patent," Compl. ¶ 26, and that the "defendants knowingly adopted and used the name and mark of ROMAG," id. ¶ 30, when selling certain handbags (the "Fossil Handbags") with snap fasteners, "bearing a reproduction, counterfeit, copy, or colorable imitation of the trademark ROMAG," id. ¶ 32.

The defendants move for partial summary judgment, declaring that Romag is not entitled to any of the defendants' profits as a remedy for the alleged trademark infringement.  Fossil and Macy's, the original defendants to this action, seek to have the Court declare the '126 patent invalid due to the alleged indefiniteness of the term "rotatable," the sole object of claim construction at a previous Markman Hearing.  This Court denied both motions on April 18, 2013.  Minute Entry, ECF No. 243. This memorandum explains the reasoning behind that order.

**A.    Procedural Posture**

Romag commenced this action against the defendants on November 22, 2010.  Compl.

On November 23, 2010, Romag filed a motion for temporary restraining order and preliminary injunction, seeking to enjoin the defendants' sale of handbags with counterfeit Romag magnetic snap fasteners and use of Romag's trademark, Pl.'s Mot. TRO &

3

Prelim. Inj. 1, ECF No. 10, and Judge Droney granted a temporary restraining order on November 30, 2010, Ruling Mot. TRO, ECF No. 20.   Judge Droney extended the temporary restraining order upon a consent motion through January 6, 2011.   Consented Mot. Extend Duration Court's TRO Dated Nov. 30, 2010, ECF No. 29; Order Granting Mot. Extend TRO, ECF No. 30.   On December 22, 2010, the parties agreed and stipulated to converting the temporary restraining order into a preliminary injunction until final judgment is reached, Stipulation & Order Converting TRO Into Prelim. Inj. Through Final J. 1, ECF No. 38, and Judge Droney approved this stipulation on December 29, 2010, Order Approving Stipulation, ECF No. 39.

Fossil and Macy's filed an answer, including affirmative defenses, and Fossil counterclaimed, seeking a declaratory judgment of noninfringement ("first counterclaim"), a declaratory judgment of invalidity ("second counterclaim"), and false patent marking ("third counterclaim"), on December 15, 2010.   Defs. Fossil Inc., Fossil Stores I, Inc., Macy's, Inc., & Macy's Retail Holdings, Inc.'s Answer, Affirmative Defenses & Defs. Fossil Inc. & Fossil Stores I, Inc.'s Countercls., ECF No. 31.   Romag filed an answer to Fossil's counterclaims on February 4, 2011.   Pl.'s Reply Countercls., ECF No. 53.

4

After a motion by Romag on September 30, 2011, Judge Droney consolidated this action with a second case Romag had pending before this court, <u>Romag Fasteners, Inc.</u> v. <u>Dillard's, Inc., et al.</u>, No. 3:11CV929(CFD).  Mot. Consolidate & Enter Consol. Case Mgmt. Plan, ECF No. 81; Order Granting Mot. Consolidate Cases & Enter Consol. Case Mgmt. Plan, ECF No. 82; Notice Consol., ECF No. 83.

On October 12, 2011, the parties stipulated to the dismissal of Fossil's third counterclaim (false patent marking), and Judge Droney approved the dismissal on October 13, 2011. Stipulation & [Proposed] Order Dismissing Defs.' Third Countercl. False Patent Marking, ECF No. 85; Order Approving Stipulation & Ordering Dismissal, ECF No. 86.

The parties submitted claim construction briefs, and requested a <u>Markman</u> ruling from the Court, on December 21, 2011. Pl.'s Cl. Constr. Br., ECF No. 97; Defs.' Opening Cl. Constr. Br., ECF No. 98.  Claim construction reply briefs were filed on January 27, 2012.  Defs.' Reply Cl. Constr. Br., ECF No. 103; Pl.'s Opp'n Cl. Constr. Br., ECF No. 104.

On September 19, 2012, the defendants moved for partial summary judgment as to whether Romag was entitled to the defendants' profits.  Defs.' Mot. Partial Summ. J. Declaring Matter Law Pl. Not Entitled Any Defs.' Profits ("Defs.' Profits

Mot."), ECF No. 153; Defs.' Mem. Law Supp. Mot. Partial Summ. J.
Declaring Matter Law Pl. Not Entitled Defs.' Profits ("Defs.'
Profits Mem. Supp."), ECF No. 153-1.  Furthermore, Fossil and
Macy's moved for partial summary judgment on patent invalidity.
Defs.' Mot. Partial Summ. J. Declaring Patent Invalid ("Patent
Invalidity Mot."), ECF No. 154; Defs.' Mem. Law Supp. Mot.
Partial Summ. J. Declaring Patent Invalid ("Patent Invalidity
Mem. Supp."), ECF No. 154-1.  The defendants further submitted a
statement of such facts as deemed material to their summary
judgment motion[1], Defs.' Local Rule 56(a)1 Statement Supp. Mots.
Partial Summ. J. Appropriate Measure Recoverable Damages &
Indefiniteness ("Statement Mat. Facts"), ECF No. 164, as well as
an affidavit of Defendants' counsel, Nicholas A. Geiger, in
support of Defendants' motions for partial summary judgment and
statement of material facts, Decl. Nicholas A. Geiger Supp.
Defs.' Mots. Summ. J. ("Geiger Decl."), ECF No. 156, & Exs. 1-
16, ECF Nos. 156-1 to 156-16.

On November 2, 2012, Romag submitted its memoranda in
opposition to the defendants' motions for partial summary

---

[1] The defendants' statement of material facts was first
issued ECF No. 155 but was later modified as sealed pursuant to
the defendants' motion to seal of Sept. 20, 2012, Defs.' Mot.
Seal Defs.' L.R. 56(a)1 Statement Supp. Mots. Partial Summ. J.
Appropriate Measure Recoverable Damages & Indefiniteness
("Defs.' Mot. Seal"), ECF No. 165, which the Court granted by
order dated Sept. 20, 2012, ECF No. 166.

judgment, including a statement of facts, and declaration of
Sean M. Fisher, Romag's attorney, and attached exhibits.  Pl.'s
Mem. Opp'n Defs.' Mot. Summ. J. Issue Patent Invalidity ("Opp'n
Patent Invalidity"), ECF No. 183; Pl.'s Opp'n Defs.' Mot. Summ.
J. Damages ("Opp'n Damages"), ECF No. 184; Pl.'s L.R. 56(a)(2)
Statement, ("Statement Mat. Facts Romag"), ECF No. 186; Decl.
Sean M. Fisher ("Fisher Decl."), ECF No. 187, & Exs. 1-13, ECF
Nos. 187-1 to 187-13.

The defendants replied on November 30, 2012.  Reply Mem.
Law Further Supp. Mot. Partial Summ. J. Declaring Matter Law Pl.
Not Entitled Any Defs. Profits, ECF No. 208; Reply Mem. Law
Further Supp. Defs. Mot. Partial Summ. J. Declaring Patent
Invalid, ECF No. 209.

On January 15, 2013, this case was transferred to this
session as a Visiting Judge.  Order Transfer Jan. 15, 2013, ECF
No. 222.

The Court held a Markman Hearing on April 9, 2013, and
construed the term "rotatable."  Minute Entry Markman Hearing
Apr. 9, 2013, ECF No. 231.

The Court heard argument on the two motions for partial
summary judgment on April 18, 2013, and promptly entered an oral
order denying both motions.  Minute Entry Motion Hearing Apr.
18, 2013, ECF No. 243.  This memorandum explains that order.

B.    **Factual Background**

Romag is a Connecticut corporation that designs, causes to be manufactured, and sells magnetic snap fasteners, including embodiments of the '126 patent, which were designed for use on handbags and other accessories. Compl. ¶¶ 2, 8. Fossil is a Delaware corporation with headquarters in Richardson, Texas. Statement Mat. Facts Romag ¶ 9. Fossil is a designer of consumer fashion accessories, including handbags and small leather goods, and sells these fashion accessories in its own retail stores, on its website, and <u>inter alia</u> to retailers Macy's, Dillard's, Inc., Nordstrom, Inc., The Bon-Ton Stores, Inc., The Bon-Ton Department Stores, Inc., Belk, Inc., Zappos.com, Inc., and Zappos Retail, Inc. (together the "Retailer Defendants"). <u>Id.</u> ¶¶ 9, 11. The Retailer Defendants, with the exception of Zappos, are department stores which purchased the Fossil Handbags from Fossil to resell to consumers. <u>Id.</u> ¶ 11.

The '126 patent was issued to Romag as assignee of Howard J. Reiter, the inventor of the patent, for an invention entitled "Magnetic Snap Fasteners" on March 3, 1998. Compl. ¶ 7; '126 patent. Romag also registered the mark "ROMAG" (the "ROMAG" mark) for magnetic snaps in the Principal Trademark Register as of September 9, 1997. Statement Mat. Facts Romag ¶ 1; '367

8

registration.   While Romag alleges trademark infringement by all
the defendants, it presses its '126 patent infringement
contentions only against Fossil and Macy's.   Defs.' Opening Cl.
Constr. Br. 6.

### 1.   Facts Pertaining to the Accounting of Defendants' Profits

Romag alleges that the defendants knowingly adopted and
used the ROMAG mark without its consent when selling Fossil
Handbags that contained "competing" magnetic snap fasteners
embossed with Romag's mark.   Compl. ¶¶ 20-21.   Romag further
contends that the defendants' actions likely resulted in
significant confusion, mistake, and deception among the relevant
purchasing public and the trade, id. ¶ 22, and seeks an
accounting of defendants' profits to remedy the infringement,
id. ¶ F.   The defendants allege, and Romag disputes, that
wholesale buyers and consumers alike do not base their
purchasing decisions on the ROMAG mark when buying a Fossil
Handbag.   See Statement Mat. Facts ¶¶ 12, 13-23, 24-27; Geiger
Decl., Ex. Q, Decl. of Barbara Zeller (Macy's)("Zeller Decl."),
ECF No. 156-9; Geiger Decl., Ex. R, Decl. of Brooke James
(Zappos) ("James Decl."), ECF No. 156-9;, Geiger Decl., Ex. S,
Decl. of Geri Olson (Nordstrom) ("Olson Decl."), ECF No. 156-9;,
Geiger Decl., Ex. T, Decl. of Christy Lax (Dillard's) ("Lax

9

Decl."), ECF No. 156-9;, Geiger Decl., Ex. U, Decl. of Pamela McElroy (Belk) ("McElroy Decl."), ECF No. 156-9; Geiger Decl. Ex. V, Decl. of Paula Lewandowski (Bon-Ton) ("Lewandowski Decl."), ECF No. 156-9; Geiger Decl., Ex. BB, Decl. of Bernie Gessner ("Gessner Decl."), ECF No. 156-9; Geiger Decl., Ex. CC, Decl. of Sara Bruckner ("Bruckner Decl."), ECF No. 156-9; Geiger Decl., Ex. DD, Decl. of Glenda Moyer ("Moyer Decl."), ECF No. 156-9; Geiger Decl., Ex. EE, Decl. of Cynthia Padin ("Padin Decl."), ECF No. 156-9; Statement Mat. Facts Romag ¶¶ 12, 13-23, 24-27.  The defendants further support this allegation in the form of a survey, Statement Mat. Facts ¶ 12; Geiger Decl., Ex. P, Women's Accessories Survey – Report E. Deborah Jay, Ph.D. ("Jay Survey"), ECF No. 156-8, which Romag labels as "flawed" and "entitled to no weight," Statement Mat. Facts Romag ¶ 12, and an expert report, Statement Mat. Facts ¶ 27; Geiger Decl., Ex. FF, Expert Report Carol Rosenblatt ("Rosenblatt Report"), ECF No. 156-9, which – according to Romag – raises a genuine issue of disputed fact, namely whether Fossil customers purchase Fossil Handbags because of ROMAG snap fasteners, see Statement Mat. Fact Romag ¶¶ 24, 27.

Romag contends that Fossil exercised control over the choice of its manufacturer's materials and components used in Fossil Handbags, Opp'n Damages 5, that Fossil specifically asked

10

for Romag fasteners to be used in its handbags, id. at 7-9, and

that Fossil turned a blind eye to its supplier's use of

counterfeit Romag snap fasteners due to price pressure exerted

by Fossil and despite a cease-and-desist letter by Romag, id. at

9-12.

### 2.   The '126 Patent and Facts Pertaining to the Alleged Patent Invalidity

Romag alleges infringement of all three independent claims

of the '126 patent.  See Pl.'s Claim Constr. Br. 1; Defs.'

Opening Cl. Constr. Br. 7.  The patent claims a "magnetic snap

fastener for releasably connecting a first surface and a second

surface . . . ," claim one, as well as a female and a male

section of a magnetic snap fastener, claims two and three

respectively.  '126 patent col. 6, ll. 43-44; col. 7, ll. 26-30;

col. 8, ll. 18-22.[2]  The three claims comprise attachment legs

that are mounted to a base washer and are "rotatable" with

respect to this base washer.  Id. col. 7, ll. 16-25 (claim 1);

col. 8, ll. 13-17 (claim 2); col. 8, ll. 38-42 (claim 3).  The

term "rotatable" was the subject of the parties' claim

construction dispute, Defs.' Opening Cl. Constr. Br. 7, and

continues to be at issue with respect to the alleged

indefiniteness claim, Patent Invalidity Mem. Supp. 1.  Below,

_____

[2] The line numbers as they appear in the patent do not correspond to actual line numbers.  For purposes of this memorandum, line numbers will refer to the counted line.

claim one illustrates how the term "rotatable" is used in
context of the claim language:

1. A magnetic snap fastener for releasably connecting
a first surface and a second surface comprising:
(a) a female section, having
a first base washer defining a first hole
    substantially in the center of the first base
    washer;
a magnetic ring defining a second hole substantially
    in the center of the magnetic ring;
a non-magnetic cover defining a third hole
    substantially in the center of the cover and
    having a continuous peripheral flange, the cover
    being mounted to the first base washer by the
    continuous peripheral flange whereby the magnetic
    ring is held captively between the first base
    washer and the cover by the first base washer and
    the cover and whereby the first, second, and
    third holes are substantially axially aligned;
a first tubular stem with a fourth hole therethrough
    and substantially in the center thereof, the
    first tubular stem extending through the first
    and second holes, whereby the first, second,
    third, and fourth holes are substantially axially
    aligned; and
first attachment means affixed to the first base
    washer by the first tubular stem and adapted for
    attachment to the first surface;
(b) a male section, having
a second base washer defining a fifth hole
    substantially in the center of the second base
    washer;
a second tubular stem with a sixth hole therethrough
    and substantially in the center thereof, the
    second tubular stem extending through the fifth
    hole, whereby the fifth and sixth holes are
    substantially axially aligned; and
second attachment means affixed to the second base
    washer by the second tubular stem and adapted for
    attachment to the second surface;
(c) whereby insertion of the second tubular stem into
    at least the second and third holes creates a
    magnetic force which releasably connects the
    female and male sections and hence the first and

12

second surfaces attached to the first and second attachment means;

(d) wherein the first attachment means comprises a first pair of legs and the second attachment means comprises a second pair of legs;

(e) wherein the first pair of legs is mounted to the first base washer by the first tubular stem and the second pair of legs is mounted to the second base washer by the second tubular stem; and

(f) wherein the first pair of legs is rotatable with respect to the first base washer and second pair of legs is <u>rotatable</u> with respect to the second base washer.

'126 patent, col. 6, ll. 43-65; col. 7, ll. 1-25 (emphasis added).

The specification of the '126 patent expands on the purpose of installing "rotatable" legs, namely to allow coating solutions to reach all surfaces for better corrosion protection. <u>Id.</u> col. 3, ll. 25-28.  The relevant part of the specification reads as follows (here regarding the female section of the snap fastener[3]):

The distal end of the narrow diameter section 9b is rolled over to affix attachment legs 11 adjacent to the second side 7b of base washer 7. Preferably, the legs 11 are <u>not rigidly secured</u> so as to <u>allow them to rotate with respect to base washer</u> 7. <u>This allows coating solutions to reach all surfaces thereby giving greater corrosion protection.</u>

---

[3] The specification contains essentially the same phrasing regarding the male section of the snap fastener:
        "The attachment legs 23 are preferably <u>not rigidly secured</u> so that they <u>may rotate with respect to the second base washer</u> 21. <u>This allows coating solutions to reach all surfaces thereby giving greater corrosion protection.</u>"  '126 Patent col. 3, ll. 52-56 (emphasis added).

Id. col. 3, ll. 23-28 (emphasis added).

During the prosecution history of the '126 patent before the U.S. Patent and Trademark Office ("PTO"), the PTO rejected the claims three times as unpatentable, inter alia due to obviousness over prior art (the "Morita '230 patent application publication"), as the Patent Examiner found the Morita washers would "inherently rotate" due to their circular shape.  Defs.' Opening Cl. Constr. Br. 9-10; see Defs.' Cl. Constr. Br., Attach A. Decl. Nicholas A. Geiger ("Geiger Decl. Cl. Constr."), ECF No. 98-1; Defs.' Cl. Constr. Br., Attach E, Reiter 1997 Amend., 98-5.  Eventually, the applicant overcame the Patent Examiner's grounds for rejection by arguing that the Morita '230 patent likely used "stationary legs rigidly secured" and the '126 patent was subsequently granted.  Defs.' Opening Cl. Constr. Br. 10.

As the parties disputed the meaning of the term "rotatable" the Court construed this term to mean: "capable of being rotated and not rigidly secured, i.e. the connection between the legs and the base washer allows for a change of position about the rotational axis."  Markman Hr'g Minute Entry, Apr. 9, 2013, ECF No. 231.

Fossil and Macy's now contend that the term "rotatable" is indefinite because the claim does not provide guidance on the

amount of force required to rotate the legs in respect to the base washer, Statement Mat. Facts ¶ 32, and there are multiple ways to test "rotatability" that lead to different results, id. ¶¶ 35-39. Fossil and Macy's contend that this alleged indefiniteness renders the entire '126 patent invalid. See Patent Invalidity Mem. Supp. 1.

While Romag does not reject the general proposition that the '126 patent discloses neither the amount of force necessary nor how to test "rotatability", it disputes that this proposition constitutes a material fact and argues that a person of ordinary skill in the art[4] does not require knowledge of the degree of force necessary to rotate the legs with respect to the base washer to understand the patent's claims. See Statement Mat. Facts Romag ¶ 32, 35-39.

### C.   Federal Jurisdiction

This Court has federal question jurisdiction pursuant to 28 U.S.C. sections 1331, 1338(a), as well as 15 U.S.C. section 1121(a), as the summary judgment motions arise under the patent and trademark statutes, 35 U.S.C. § 271; 15 U.S.C. §§ 1114(1), 1125(a).

## II.   ANALYSIS

---

[4] PHOSITA is a commonly used acronym for a "person having ordinary skill in the art to which the claimed invention arises," which derives directly from the U.S. Patent Act. See 35 U.S.C. § 103.

### A.   Legal Standard

Summary judgment is appropriate where there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a).  For a fact to be "material" it must affect the outcome of the case under the governing law in question.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on the evidence presented.  Id.  The initial burden of proof as to whether no genuine issue of material fact exists, rests on the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"[A]lthough the Court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury would not be required to believe."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000); see In re Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009) (emphasizing that "a jury is free to believe part and disbelieve part of any witness's testimony" (citations omitted)); Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) (same); cf. Haywood v. Koehler, 78 F.3d 101, 105 (2d Cir. 1996) (noting that "the jurors were not required to accept the entirety of either side's account, but were free to accept bits of testimony from several witnesses and to make reasonable inferences from whatever testimony they

16

credited."). The Court thus considers only the facts admitted
by the nonmoving party as to those issues upon which the moving
party bears the burden of proof, and views all disputed facts in
the light most favorable to the nonmoving party.[5]

_____

[5] This approach is in tension with Connecticut Local Rule
56(a)1. which, like many districts' local rules, provides:

> All material facts set forth in said [Rule 56(a)(1)]
> statement and supported by the evidence will be deemed
> admitted unless controverted by the statement required
> to be filed and served by the opposing party in
> accordance with Local Rule 56(a)2.

Conn. L.R. 56(a)1.  While sitting as a visiting judge in the
Western District of Tennessee and the Southern District of New
York, I have had occasion to analyze the discord between
districts' local rules and Supreme Court precedent.  Delano v.
Abbott Labs., 908 F.Supp.2d 888, 896 n.4 (W.D. Tenn. 2012);
Seitz v. DeQuarto, 777 F. Supp. 2d 492, 494 n.2 (S.D.N.Y. 2011).
That analysis applies here.

As a visiting judge, I am, of course bound by the
district's local rules.  Still, the approach set out in the text
above appears mandated by Supreme Court precedent.  Fortunately,
resolution of this tension is not outcome determinative in this
case.  Nevertheless, it is appropriate to observe that use of
this "point-counterpoint" system has a tendency, wherever the
moving party bears the burden of proof, to shift to the non-
moving party a burden of production inconsistent with the law's
allocation of the burden of proof.

Today, in the wake of Bell Atlantic Corp. v. Twombly, 550
U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009), I
am reminded of Judge Patricia M. Wald's prescient comments made
more than a dozen years ago:

> [I]t seems clear that summary judgment gives judges
> more opportunities and power to make law . . . . My
> review of the D.C. Circuit's summary judgment rulings
> over a six-month period suggests that judges will
> stretch to make summary judgment apply even in
> borderline cases which, a decade ago, might have been
> thought indisputably trial-worthy.  It also suggests
> that appellate courts will, by and large, uphold these
> dispositions, unless they think the trial judge got

the law wrong. The upshot is that only plaintiffs who can put together strong cases without conducting discovery have a clear shot at reaching trial. Their pleadings must (notwithstanding the permissive language of Rule 8) provide factual evidence sufficiently detailed to enable them to withstand motions to dismiss or for judgment on the pleadings or for summary judgment. Discovery, despite Rule 56(f), may be withheld, unless they can justify it in terms of the likelihood that it will yield crucial evidence. None of this sounds or feels like what the Federal Rules of Civil Procedure say . . . . Rough justice may well be taking place in the corner-cutting practice I have described — the system may be surviving by weeding out marginal cases that would exact from the courts as well as the litigants costly and useless resources if permitted to go to trial. But that judgment ought to be made more openly, by changes to Rule 56, rather than covertly.

And one must at least think about the implications of the new regime, in which law is mostly made on the basis of undisputed facts "pleaded," "stipulated," or "inferred" rather than on fuller trial records that may more accurately represent the complexity and ambiguity of life. Will our law be less sensitive to the multivalenced and perspectival qualities of human events? Will our jurisprudence craft rules and principles and hand them down fully formed from the netherworld of law school hypotheticals, instead of forging them in the heat of pitched battle and hammering them into shape on the anvil of trials, witnesses, cross-examinations, and live evidence evaluated by ordinary lay persons? Will our law come to be characterized more by clear directives than by the balancing formulas so deplored by academics, but arguably superior in their ability to effect justice in the individual case?

. . . .

Ironically, as more cases are resolved by summary judgment, more law is created, because fewer cases will exit the system by reason of the plaintiff's inability to show the facts necessary to entitle them to a legal remedy under existing law . . . . The disposal of cases without trial ends the cases quickly, but creates law which persists . . . [J]udges

18

need not even explain their reasons for granting
summary judgment (though most do), even though they
must provide findings of fact and conclusions of law
in bench trials. The more reflexively summary
judgment is used, the less the goal of discovering the
truth – or even the reality – of particular disputes
remains at the forefront of the civil litigation
process. The name of the game in the emerging no-
trial regime is quickly amassing enough evidence to
support a legal theory on summary judgment.
Another ironic implication of the spread of summary
judgment is that, even as our law enjoys a growth
spurt quantitatively, it is enfeebled from growing in
a more meaningful, qualitative sense. With summary
judgment ruling the roost, the prototypical mode of
lawmaking involves applying legal principles to
incomplete, often anemic, factual scenarios. The
complexity of real-life situations, which require
judges to recognize the ways in which existing legal
principles may not account for the multifarious
possibilities of life - and accordingly to adjust or
temper the law as necessary – risks going by the book.
If Oliver Wendell Holmes was right when he said that
"[t]he life of the law has not been logic: it has been
experience," then the decoupling of law from
experience could strike a mortal blow to its
integrity; our law would not disappear, but it could
become lifeless, like a whale washed up on the beach.

Patricia M. Wald, Summary Judgment at Sixty, 76 Tex. L. Rev.
1897, 1942-44 (1998) (eighth alteration in original) (emphases
added) (footnotes omitted) (quoting Oliver Wendell Holmes, Jr.,
The Common Law 1 (Little, Brown & Co. reprint) (Mark D. Howe
ed., Harvard Univ. Press 1963) (1st ed. 1881)).
     This dire state of affairs is exacerbated in cases in which
judicially crafted doctrines intersect with summary procedures
to eviscerate further the role of fact-finding in litigation and
adjudication. See Goutam U. Jois, Pearson, Iqbal, and
Procedural Judicial Activism, 37 Fla. St. U.L. Rev. 901, 901
(2010) ("Iqbal takes away the district court's ability to manage
litigation (by using procedures explicitly provided in the
Federal Rules and previously approved by the U.S. Supreme Court)
in order to shield public officials, relying instead on the
rather blunt instrument of dismissing the case entirely."); id.
at 943 ("Iqbal restricts courts' discretion to carefully manage

The Court is duty-bound to believe the evidence of the nonmovant and draw all reasonable inferences in its favor, without making credibility determinations or weighing the evidence.  Reeves, 530 U.S. at 150; Anderson, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

---

litigation, thus forcing them to dismiss claims outright when in the past some targeted or limited discovery might have preserved the claims."); see also Nancy Gertner, Losers' Rules, 122 Yale L.J. Online 109 (2012), http://yalelawjournal.org/the-yale-law-journal-pocket-part/procedure/losers%E2%80%99-rules (discussing summary judgment in the employment discrimination context).

Regrettably, those of us in the judiciary appear not to be getting the message – or we don't care.  See generally Arthur R. Miller, From Conley to Twombly to Iqbal: A Double Play on the Federal Rules of Civil Procedure, 60 Duke L.J. 1 (2010); Arthur R. Miller, The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?, 78 N.Y.U. L. Rev. 982 (2003); William G. Young, A Lament for What Once Was and Yet Can Be, 32 B.C. Int'l & Comp. L. Rev. 305, 312-18 (2009). Judges must remember that "[t]he affidavit is the Potemkin Village of today's litigation landscape.  Purported adjudication by affidavit is like walking down a street between two movie sets, all lawyer-painted façade and no interior architecture." United States v. Massachusetts, 781 F. Supp. 2d 1, 22 n.25 (D. Mass. 2011).

I've reached the conclusion that the eclipse of factfinding foreshadows the twilight of judicial independence. Nevertheless, I am sworn to soldier on and apply the law of the Supreme Court and the Second Circuit to the undisputed facts in this record.

Therefore, the Court ought grant summary judgment only if, after drawing all reasonable inferences in the nonmovant party's favor, it concludes that "a reasonable juror would have been compelled to accept the view of the moving party." Piesco v. Koch, 12 F.3d 332, 343 (2d Cir. 1993).

**B.    The Defendants Are Not Entitled to Summary Judgment on Trademark Damages**

**1.    There Exist Three Independent Rationales upon Which to Base a Defendant's Profits Award**

Section 35(a) of the Lanham Act sets forth the remedies available to a successful plaintiff in a trademark infringement suit and provides that "subject to the principles of equity," a plaintiff is entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Profits are awarded according to the principles of equity and the Court is granted "some degree of discretion in shaping [the] relief," in light of the circumstances of the individual case. George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1537 (2d Cir. 1992) (citing 15 U.S.C. § 1117(a)) (noting that "[n]evertheless, that discretion must operate within legally defined parameters."). In George Basch, 968 F.2d at 1537, the Second Circuit summed up the three independent rationales, well-settled through prior Second

Circuit holdings, upon which an accounting of a defendant's
profits has been based:

> (1) unjust enrichment of the defendant,
>
> (2) damages sustained by the plaintiff from the
> trademark infringement, and
>
> (3) the necessity to deter a willful infringer from
> future acts of infringement.

Id. ("These justifications are stated in the disjunctive. Any
one will do." (quoting Cuisinarts, Inc. v. Robot-Coupe Intern.
Corp., 580 F. Supp. 634, 637 (S.D.N.Y. 1984))); see W. E.
Bassett Co. v. Revlon, Inc., 435 F.2d 656, 664 (2d Cir. 1970)
("An accounting should be granted if the defendant is unjustly
enriched, if the plaintiff sustained damages from the
infringement, or if an accounting is necessary to deter a
willful infringer from doing so again." (emphasis added)).  The
defendants here are therefore entitled to summary judgment only
if they can demonstrate that sufficient evidence is before the
Court with respect to all of these three rationales that would
arguably render Romag's claim for an accounting of profits
unmeritorious.

    The defendants' attack on Romag's entitlement to such an
accounting is twofold.  First, while the defendants concede that
a plaintiff may be entitled to an accounting of a defendant's

profits on the basis of any of these three rationales, the
defendants contend that the measure of the accounting or the
amount of profits to which Romag may be entitled is zero in this
case because an accounting of such profits ought only be granted
to the extent that they are attributable to the infringing use
of the ROMAG mark.  Defs. Profits Mem. Supp. 9.  The defendants
allege that because "uncontroverted evidence, and common sense,
establishes that handbag buyers did not purchase a single FOSSIL
handbag based on [the ROMAG mark on the snap fastener]," they
were entitled to summary judgment as a matter of law.  Id.
Second, the defendants further argued that because Romag was not
a direct competitor of Fossil and did not sell handbags, "the
profits earned by Defendants on the sale of FOSSIL handbags
would not have been earned by [Romag] on the sale of ROMAG
snaps," id. (emphasis in original).

      The latter argument relies on the premise that only
competitors can be entitled to profits because only in a
competitive relationship will loss of profits of one party
equate to profits made by the other party.  Moreover, the
defendants' latter argument is really a consequence of the first
argument in that, if the amount of profits awarded solely
depended on whether the profits were attributable to the
infringed mark, then an accounting of profits would have to be

based on the plaintiff's lost profits or sales of the <u>infringed</u> product, Romag's snap fasteners, and not the <u>infringing</u> product, the Fossil Handbags.

> **2.   The Requirement that the Defendants' Profits Must
>        Be Attributable to the ROMAG Mark Does Not
>        Implicate the Deterrence Rationale and Has
>        Limited Applicability in the Indirect Competition
>        Context**

In arguing that a defendant's profits award must be linked to the infringed ROMAG mark, the defendants rely on a Supreme Court decision from 1942, <u>Mishawaka Rubber & Woolen Mfg. Co.</u> v. <u>S.S. Kresge Co.</u>, 316 U.S. 203 (1942) (Frankfurter, J.).  In <u>Mishawaka</u>, the Supreme Court remarked that "[t]he plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark," but placed on the infringing defendant the burden of proof on the question of whether any or how much of a defendant's profits were attributable to the mark infringed.  <u>Id.</u> at 206-207; <u>see also</u> <u>Venture Tape Corp.</u> v. <u>McGills Glass Warehouse</u>, 540 F.3d 56, 64 (1st Cir. 2008); <u>Clearline Techs. Ltd.</u> v. <u>Cooper B-Line, Inc.</u>, No. H-11-1420, 2013 WL 2422571, at *11 (June 3, 2013 S.D. Tex.) ("The <u>Mishawaka</u> burden of proof principle remains the law of the land.").  While at first blush this seems to solve in favor of the defendants the question at hand, namely whether Romag is entitled to the defendants' profits only if and insofar as those profits are

attributable to the ROMAG mark, a careful analysis of the law's development since Mishawaka, speaks against prematurely foreclosing Romag's chances of recovering the defendants' profits.

In Mishawaka, the parties were both in the business of selling rubber heels for use in shoes and thus were direct competitors, as was then traditionally required for the grant of a defendant's profits.  316 U.S. at 203-204; see George Basch, 968 F.2d at 1539 ("Historically, an award of defendant's profits has [] served as a rough proxy measure of plaintiff's damages.").  The question of whether an infringer who is not in direct competition with the trademark owner has to turn over his profits, was (consequently) not before the Supreme Court in Mishawaka.

The view that only direct competitors are entitled to defendant's profits, due to the fact that only direct competitors have been deprived of something that they should have and would have received had it not been for the defendant's wrongdoing or diversion of sales, has since changed in the Second Circuit and led to the acceptance of deterrence as an additional rationale upon which to award defendant's profits. See George Basch, 968 F.2d at 1537.

In its seminal decision Monsanto Chem. Co. v. Perfect Fit
Prods. Mfg. Co., 349 F.2d 389, 395-96 (2d Cir. 1965), the Second
Circuit answered in the affirmative the question of whether to
allow an accounting of profits in a non-competitor setting.  The
facts of Monsanto amounted to an egregious case of intentional
trademark infringement by a mattress pad manufacturer trading on
the goodwill of the plaintiff Monsanto's trademark protected
"Acrilan" fiber, an acrylic fiber which was used as filling of
coverlets.  See id. at 390-91.  The case is especially relevant
to the present case because it represents an action of a mark
holder of a component against the manufacturer of a product
containing that component, not unlike the Fossil Handbags that
contain counterfeit ROMAG snap fasteners.  Therefore, a closer
look at the Second Circuit's reasoning that led to its decision
to grant a defendant's profits on the basis of unjust enrichment
and deterrence is appropriate.

Faced with the question of whether an accounting of the
defendant's profits ought be granted to someone other than a
direct competitor, the Second Circuit acknowledged that,
traditionally, "[a]n accounting has been thought proper only as
an indirect measure of the plaintiff's injury, that is, only if
some relationship between the infringer's profits and the
plaintiff's injury can be inferred."  Id. at 392.  This resulted

26

in limiting the accounting of profits to cases in which a
diversion of the plaintiff's sales took place.  Id.  It then
acknowledged that other circuits — the First Circuit explicitly
and the Third and Tenth Circuits by implication — followed the
view that a trademark was a type of property right and that the
infringer's use of the mark owner's property without the owner's
permission would entitle the mark owner to the infringer's
profits based on the principles of unjust enrichment.  Id.
(citing Baker v. Simmons Co., 325 F.2d 580, 582 (1st. Cir.
1963)).  The Second Circuit went on to examine two lines of
cases.  One line required that a plaintiff and an infringer
marketed at least similar products.  See Admiral Corp. v. Penco,
Inc., 203 F.2d 517, 521 (2d Cir. 1953); Triangle Publications,
Inc. v. Rohrlich, 167 F.2d 969, 974 (2d Cir. 1948).  The other
line allowed plaintiffs to recover a defendant's profits
although the infringed and infringing products were not marketed
in the same geographical area.  See Maternally Yours, Inc. v.
Your Maternity Shop, Inc., 234 F.2d 538, 545 (2d Cir. 1956);
Dad's Root Beer Co. v. Doc's Beverages Inc., 193 F.2d 77, 82-83
(2d Cir. 1951).  In particular, the Second Circuit pointed to
Dad's Root Beer, 193 F.2d at 82-83, for the proposition that,
while a defendant's profits "have been associated with the
working hypothesis that they are a valid measure of plaintiff's

27

lost sales," this affirmative holding would not of itself imply the negative, namely "that without direct competition in the same geographic area there can be no recovery of profits." Monsanto, 349 F.2d at 393-94 (quoting Dad's Root Beer, 193 F.2d at 83) (internal quotation marks omitted). Based on this observation, the Second Circuit in Dad's Root Beer held that a plaintiff ought be able to recover profits even if no direct competition on the same geographical market existed because it was "well settled that the court w[ould] endeavor to adapt its relief to the general equities of the particular situation, as nearly as it [wa]s possible to do so, in designing relief for unfair competition." Dad's Root Beer, 193 F.2d at 83 (quoting J.C. Penny Co. v. Lee Merchantile Co., 120 F.2d 949, 958 (8th Cir. 1941) (internal quotation marks omitted).

Rejecting the reasoning of the first line of cases that required direct product competition and instead applying the holding in Dad's Root Beer to the indirect product competition case at hand, the Second Circuit concluded in Monsanto that the principle of "refer[ring] to the traditional discretion of a court of equity in adapting its relief to the case before it," was "the proper one under [section] 35 of the Lanham Act." 349 F.2d at 395. The Second Circuit thus embraced a case-by-case inquiry into whether a plaintiff's lost sales constituted an

appropriate measure for the amount of a defendant's profits owed.

Besides commenting that this principle was in greater harmony with the language of section 35 of the Lanham Act, the Second Circuit emphasized that the principle was also "more suited to the general purposes of the Lanham Act," which the Second Circuit described as protecting the public's trust in a branded product and protecting the trademark owner's investment in his mark.  Id. (citing S. Rep. No. 1333, at 1-2 (1946)). Noting the blatant infringement practices of Perfect Fit with respect not only to Monsanto's synthetic fiber but also to three further products in that niche, the Second Circuit emphasized that "[t]here can be no doubt as to the need for deterrence in cases such as this," and held the narrow rule requiring diversion of sales "entirely inadequate to protect the interest of the public."  Id. at 396.  The Second Circuit thus introduced deterrence as a rationale for awarding a defendant's profits. Although the consumers who suffered from inferior quality components of a product they bought would likely not bring suit themselves to recover a marginal amount of damages, the Second Circuit reasoned that the consumers could be protected by deterring defendants from infringing in the future if infringement was made "unprofitable."  Id.

29

It follows that the Second Circuit departed from the "narrow rule," which allowed for an accounting only in cases where the plaintiff was damaged by a direct competitor's sales of his infringing product, in favor of a rule allowing indirect competitor plaintiffs to bring an action, and thereby developed the law for the factual situation not present in Mishawaka. This means in turn that the test the defendants here propose in reliance on Mishawaka – that Romag would be entitled only to such amounts of the defendants' profits as are attributable to the ROMAG trademark – is appropriate only when measuring the amount of profits allowable under the lost profits or unjust enrichment rationale in direct competition cases.

Applying this test to an indirect competition scenario would fly in the face of the Second Circuit's well-reasoned holding in Monsanto. Therefore, even if the defendants had here carried their burden of proof that none of their profits were attributable to the counterfeit ROMAG trademark, this finding could not foreclose the remedy altogether and thus, summary judgment is not warranted.

It is for this reason that the defendants' second argument must fail as well. This Court must follow the Second Circuit's law on point and may not foreclose recovery of the defendants' profits due to the fact that Romag is not in direct competition

30

with them.  See George Basch, 968 F.2d at 1540 (emphasizing that defendant's profits as measurement of the defendant's gain are not to be confused with plaintiff's lost profits, "which have been traditionally compensable as an element of plaintiff's damages [in law].").  Nor is the Court disposed to ignore facts calling for deterrence, including post-purchase confusion of the buying public, or the purpose of serving the public by strongly discouraging use of counterfeit products, especially as a small component of a well-known branded consumer item like the Fossil Handbags.  As Second Circuit Judge Moore so aptly noted in his concurrence to and dissent from Monsanto:

> Plaintiff undoubtedly has been adversely affected by defendant's unlawful infringement. Defendant, in turn, has made sales of mattress pads and at least to this extent has unjustly enriched itself. Equity requires that the barrier, if such it be, of the Rohrlich [, 167 F.2d 969 (2d Cir. 1948),] and Penco [, 203 F.2d 517 (2d Cir. 1953),] cases be surmounted. The law must keep pace with industrial and economic reality. Today products sold on a nationwide basis contain scores of component parts manufactured by others . . . . which are not sold to the purchasing public as such but are important and well-advertised ingredients of many household articles and articles of apparel.

349 F.2d at 398 (Moore, J. concurring and dissenting).  Such is the case here, where Romag's snap fasteners may well be considered desirable components and without doubt are important components of a handbag designed to close by use of a magnetic snap.

31

Thus, the Supreme Court's statement in Mishawaka upon which the defendants rely, must – in light of Second Circuit precedent – be read narrowly to apply to such cases where plaintiffs and defendants are direct competitors and the plaintiff suffered from a diversion of sales due to the infringement.

>   **3.    The Defendants Have Not Met Their Burden of Proving That None of the Profits Were Attributable to the ROMAG Mark and Principles of Equity May Warrant an Award of Defendants' Profits**
>
>       **a)    An Accounting May Be Warranted under the Unjust Enrichment Rationale**

The unjust enrichment theory for a defendant's profits recovery relates back to a Supreme Court decision from 1916 that likened the infringer to a trustee, who acquired the profits "by [the] wrongful use of the [trust] property." Hamilton-Brown Shoe Co. v. Wolf Brothers & Co., 240 U.S. 251, 259 (1916). The Supreme Court in Hamilton-Brown Shoe described this theory as applied to trademark infringement in the following way:

>   The infringer is required in equity to account for and yield up his gains to the true owner [of the trademark], upon a principle analogous to that which charges a trustee with the profits acquired by wrongful use of the property of the cestui que trust. Not that equity assumes jurisdiction upon the ground that a trust exists. . . . [T]he jurisdiction must be rested upon some other equitable ground, – in ordinary cases, as in the present, the right to an injunction – but the court of equity, having acquired jurisdiction upon such a ground, retains it for the purpose of administering complete relief, rather than send the injured party to a court of law for his damages. And

profits are then allowed as an equitable measure of compensation, on the theory of a trust ex maleficio.

Id.

As historically required, the plaintiff and defendant in Hamilton-Brown Shoe were direct competitors in the shoe manufacturing business, see id. at 253, as were their rubber heel salesmen counterparts over twenty years later in Mishawaka, 316 U.S. at 203-04.  The first notable departures from the direct competition requirement as part of the unfair competition analysis appeared in Dad's Root Beer, 193 F.2d at 77, 82-83, there in the context of geographical non-competition,[6] and in the First Circuit case Baker, 325 F.2d at 582 ("A trade-mark infringer is liable as a trustee for profits accruing from its illegal acts, even though the owner of the mark was not doing business in the consuming market where the infringement occurred." (internal quotation marks omitted)(citing Blue Bell Co. v. Frontier Refining Co., 213 F.2d 354, 363 (10th Cir. 1954)).

As discussed above, the Second Circuit used the factual situation of non-competing products in Monsanto to depart from its previous holdings that direct competition is a prerequisite to awarding defendant's profits.  See 349 F.2d at 395. Regarding the equity view of the unjust enrichment theory, which

---

[6] See supra B. 1. b. for a discussion of this case.

the Second Circuit endorsed as "the proper one" at least in the indirect competition context, see id., the Second Circuit noted:

> the justification for an accounting is found in the principles of unjust enrichment traditionally applicable where property is used for profit without the owner's permission, and, if the view is carried to its logical conclusion, an accounting should be awarded automatically in most cases. In particular, since the accounting is not dependent upon presumed injury to the plaintiff, it is irrelevant that the plaintiff was not selling in the market exploited by the infringer.

Id. at 392. In contrast, the Court of Appeals pointed out that in the conventional, "more narrow view," a "monetary award, whether in the form of damages or an accounting, is justified only to the extent that injury is shown already to have been suffered." Id. Importantly, the Second Circuit recognized the shortcomings of this narrow view, namely that linking the defendant's profits award to plaintiff's injury resulted in limiting accountings to direct competition cases. See id. ("An accounting has been thought proper only as an indirect measure of the plaintiff's injury . . . . As a result accountings have been limited to cases in which the parties are competing for trade and the defendant's trade may thus be presumed to have been diverted from the plaintiff."). Post Monsanto Second Circuit law reveals that the Monsanto holding is still binding law for indirect competition cases, such as the one at hand.

34

The next case in which the Second Circuit reviewed the
appropriateness of a defendant's profits award was W. E.
Bassett, 435 F.2d 656.  The W. E. Bassett court concluded that a
defendant's profits award in that case could not be based on the
unjust enrichment rationale because the sales of the product
"were not attributable to the infringement" since the plaintiff
did not manufacture a competing product at the time.  Id. at
664.  While the Second Circuit thus seemingly rejected unjust
enrichment as the proper measurement in an indirect competition
case, a cursory look at the facts of that case reveals that
despite the lack of a directly competing product, the plaintiff
and defendant were direct competitors in the relevant product
field.  Id. at 659 ("In the manicuring-implements field
[plaintiff] and [defendant] are direct competitors.").  Thus,
the application of the "directly attributable" test to measure
defendant's profits was in keeping with the binding Supreme
Court law of Mishawaka and not in conflict with the
distinguishable indirect competition setting of Monsanto and the
case before this Court.

The issue of what was the appropriate standard for
measuring defendant's profits and allocation of the burden of
proof becomes more clouded in Burndy Corp. v. Teledyne Indus.,
748 F.2d 767 (2d Cir. 1984), a Second Circuit false

35

advertisement case.  The Burndy court affirmed the district
court's holding that a profits award on the basis of unjust
enrichment was unwarranted because the plaintiff failed to show
that defendant's profits on sale of the falsely advertised
product "were at [plaintiff's] expense," Id. at 773.  It
reasoned that "[u]njust enrichment warranting an accounting
exists when the defendant's sales were attributable to its
infringing use of plaintiff's trademark, and the burden of
proving this connection is on the plaintiff."  Id. at 772
(citations omitted) (internal quotation marks omitted).

    While Burndy is easily distinguishable from the case at bar
as a false advertisement dispute between direct competitors, its
holding appears at odds with the Supreme Court's clear
allocation of the burden of proving non-attributable profits to
the defendant, see supra B.1.b.; Mishawaka, 316 U.S. at 206-07.
The Burndy and Monsanto precedents set seemingly divergent and
conflicting standards for cases involving direct competitors and
cases involving indirect competitors.  For cases involving
direct competitors, the precedent limits the unjust enrichment
rationale to recovery of profits acquired through diversion of
sales and places the burden of proof of such sales diversion on
the plaintiff.  For cases involving indirect competitors, the
precedent makes the infringer liable for his illegal use of the

36

mark and lets an accounting follow automatically unless the defendant can show that an accounting of profits is not warranted.

In George Basch, the Second Circuit harmonized the seemingly conflicting standards.  The George Basch court held that a trademark infringing defendant can "be deemed to hold its profits in constructive trust for the injured plaintiff" only "when the defendant's sales 'were attributable to its infringing use' of the plaintiff's mark," or, put differently, when the plaintiff can prove a diversion of sales.  968 F.2d at 1538 (quoting Burndy, 748 F.2d at 772).  The Second Circuit continued its reasoning as follows:

> At bottom, this is simply another way of formulating the element of consumer confusion required to justify a damage award under the Lanham Act. As such, it follows that a profits award, premised upon a theory of unjust enrichment, requires a showing of actual consumer confusion or at least proof of deceptive intent so as to raise the rebuttable presumption of consumer confusion.

Id.

Thus, by holding that the diversion of a competitor's sales is really the manifestation of consumer confusion or intent to deceive, the George Basch court clarified that it is "actual consumer confusion . . . or at least . . . deceptive intent so as to raise the rebuttable presumption of consumer confusion,"

id., that the plaintiff has to prove.  As a result, the
plaintiff may prove the manifestation of consumer confusion
either measured as a diversion of sales in a direct competition
case or as a loss of goodwill or devaluation of the mark in
indirect competition cases.

Although plaintiffs usually bear the burden of proving
consumer confusion, in counterfeiting cases, the defendant has
the burden of disproving consumer confusion as the use of a
counterfeit is equated with the infringer's intent to confuse
the public.  See, e.g., id. at 1541; Mobil Oil Corp. v. Pegasus
Petrol. Corp., 818 F.2d 254, 258 (2d Cir. 1987) ("Intentional
copying gives rise to a presumption of a likelihood of
confusion."); Coach, Inc. v. Horizon Trading USA Inc., 908 F.
Supp. 2d 426, 433 (S.D.N.Y. 2012) ("However, where items are
counterfeit, the Court need not undertake a factor-by-factor
analysis . . . because counterfeits, by their very nature, cause
confusion." (quoting Gucci Am., Inc. v. Duty Free Apparel, Ltd.,
286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) (internal quotation
marks omitted)).  This rebuttable presumption of consumer
confusion may well be relevant in the case at hand, where Romag
alleges that certain of the defendants counterfeited the ROMAG
mark.  See Compl. ¶ 32.  It follows that if the fact-finder were
to determine that the snap fasteners used in Fossil Handbags

38

were counterfeit, consumer confusion and likewise Romag's injury
would be inferred, and it would fall to the defendants to
disprove that their use of ROMAG snap fasteners was not intended
to deceive the public.  As the trademark owner's injury arguably
lies in consumer confusion and resulting loss of goodwill, an
accounting of the defendant's profits may best compensate for
such injury. Diversion of sales is a possible indicator of a
defendant's unjust enrichment but it is not the gold standard
for proving injury in every conceivable case as defendants urge
the Court to interpret the law on this point.  See Vuitton Et
Fils, S.A. v. Crown Handbags, 492 F. Supp. 1071, 1077 (S.D.N.Y.
1979) ("In all claims, however, plaintiff must demonstrate the
basis for his recovery with specificity, thereby showing that
injury or profitable infringement actually occurred." (emphasis
added)).

     This interpretation also accords with Mishawaka, especially
with placing the burden of disproving diversion of sales on the
defendant.  See Mishawaka, 316 U.S. at 206-07.  This is not to
say, however, that diversion of sales is the only form of injury
addressed by an accounting based on the unjust enrichment
rationale.  See Mobil Oil, 818 F.2d at 257-58 ("[D]irect
competition between the products is not a prerequisite to
relief. . . . Confusion, or the likelihood of confusion, not

competition, is the real test of trademark infringement."
(internal quotation marks omitted)); Emmpresa Cubana Del Tabaco
v. Culbro Corp., 123 F. Supp. 2d 203, 207 (S.D.N.Y. 2000), aff'd
in part, rev'd in part on other grounds, sub nom. Empresa Cubana
Del Tabaco v. Culbro Corp., 399 F.3d 462 (2d Cir. 2005) ("[T]he
Second Circuit has explicitly held that proof of 'lost sales' is
irrelevant in cases in which the parties do not directly
compete.") (citing Monsanto, 349 F.2d at 395-96).

     In conclusion, in both direct competition and indirect
competition cases, plaintiffs bear the initial burden of proving
consumer confusion.  In counterfeiting cases – wholly unrelated
to what form of competition exists between the parties – there
is an inference that consumer confusion exists, an inference
which the defendant will have to rebut.  Since diversion of
sales is a manifestation of consumer confusion, it becomes clear
why Mishawaka allocates the burden of proof as it does: where a
plaintiff is able to prove consumer confusion, the defendant has
to disprove that injury resulted from that confusion, otherwise
injury will be inferred and a profits analysis is warranted.
The appropriateness of a profits award based on unjust
enrichment is judged on a case-by-case basis and this decision
cannot hinge on the level of competition between the parties.
This avoids the unsatisfying result of a mechanical windfall to

the infringer whenever an indirect competitor cannot show injury because there was no diversion of sales.  See <u>Mishawaka</u>, 316 U.S. at 207 ("There may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer.").  Since the accounting is not based on a rough approximation of the plaintiff's injury or damages but is based on the premise that the defendant used something that did not belong to him to gain profit, it is irrelevant whether injury can be traced by looking at diversion of sales (in a competitor relationship) or not (between indirect competitors).  See <u>Monsanto</u>, 349 F.2d at 392 ("In particular since the accounting is not dependent upon presumed injury to the plaintiff, it is irrelevant that the plaintiff was not selling in the market exploited by the infringer.").

Thus, using an unjust enrichment rationale the fact-finder may determine that Romag is entitled to the defendants' gains that were made when using counterfeits of Romag's snap fasteners (assuming, as the defendants for purposes of their motion for summary judgment ask the Court to do,[7] that Romag is able to prove during trial both consumer confusion and counterfeiting).

---

[7] Defs. Profits Mem. Supp. at 9.

### b)  An  Award  of  Defendants'  Profits  May  Be Appropriate Under the Deterrence Rationale

In Monsanto, the Second Circuit held for the first time that the policy reasons behind trademark protection, namely protection of the trademark owner's investment in the mark, and protection of the public's trust in established marks, are not adequately served when an accounting of profits is granted only where the parties directly compete.  The Monsanto court introduced deterrence as a rationale for awarding defendants' profits.  349 F.2d at 397.

This view has since been affirmed.  See W. E. Bassett, 435 F.2d at 664 ("It is essential to deter companies from willfully infringing a competitor's mark, and the only way the courts can fashion a strong enough deterrent is to see to it that a company found guilty of willful infringement shall lose all its profits from its use of the infringing mark").

In International Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 71-72 (2d Cir. 1998), the Second Circuit stated that "an accounting for profits is available, even if a plaintiff cannot show actual injury or consumer confusion, if the accounting is necessary to deter a willful infringer from doing so again."  Id. at 72 (quoting George Basch, 968 F.3d at 1537) (internal quotation marks

omitted).  The Second Circuit continued its reasoning: "As with the decision to award profits at all, the decision whether to award a full or partial accounting must be based on what is necessary to deter future misconduct," adding that "a district court has discretion to fashion an alternative remedy, or to award only a partial accounting, if the aims of equity would be better served."  Id.  As the record in Hilfiger did not provide sufficient facts to determine the egregiousness of the infringer's behavior, the Second Circuit remanded the case to the district court for further findings on this point.  Id.  Thus, it is established that when awarding profits according to the deterrence rationale, the Court is not bound by the rule that defendants' profits must be attributable to the plaintiff's mark, but is free to fashion the award based on what is necessary and appropriate to deter the infringer from future willful acts of infringement and other potential infringers from infringing the ROMAG mark.

Similarly, in Stuart v. Collins, 489 F. Supp. 827 (S.D.N.Y. 1980) (Leval, J.), the New York district court awarded all such profits defendant earned in willful infringement of plaintiff's mark even though those profits were not attributable to the infringement.  Id. at 831.  Stuart involved a plaintiff who had registered a service mark in the name "Rubberband" for the

provision of musical performances, id. at 828, which a jury found to have been infringed by defendants, a major record label and its signed artist, id. at 830.  The district court concurred with the jury's advisory findings as to the amount of the defendants' profits to which the plaintiff was entitled, noting that "[w]here infringement is done knowingly and with callous disregard of the rights of a mark holder, all the profits of such activity are awardable although the use of the infringing name ["Bootsy's Rubber Band"] may not have contributed causally to the sales or profits."  Id. at 831 (citing W. E. Bassett, 435 F.2d at 664).

Here, Romag's allegations that Fossil exercised control over the choice of its manufacturer's components used in Fossil Handbags, that Fossil specifically asked for Romag fasteners to be used in its handbags, and that Fossil turned a blind eye on its supplier's use of counterfeit Romag snap fasteners due to price pressure exerted by Fossil and despite a cease-and-desist letter by Romag, see supra I.B.1., if proven during trial, fall squarely into the category of callous disregard of the known rights of a mark holder and may - at the appropriate time after trial - well be the basis of a profits award based on a deterrence rationale.

Therefore, the Court may decide to award the defendants' profits even when the profits were not acquired due to the use of Romag's mark in Fossil's Handbags, if the rationale of deterring defendants from further infringing Romag's rights as a trademark owner so warrants.

Needless to say, such a holding will be influenced by a finding of willfulness, whether willfulness is an absolute requirement for a profits award, see George Basch, 968 F.2d at 1537 (holding that "under any theory [damages, unjust enrichment, or deterrence], a finding of defendant's willful deceptiveness is a prerequisite for awarding profits."), or merely an important factor to consider, see, e.g., Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 174-75 (3d Cir. 2005) (holding that the 1999 amendment of section 35 of the Lanham Act superseded the rule that willfulness was an indispensable prerequisite of a profits award and suggesting that Congress chose to condition dilution but not trademark infringement on willfulness).[8]

> **c)     The Defendants Have Failed to Meet Their Burden of Proof That None of the Damages Can Here Be Awarded**

---

[8] Given the defendants' request that the Court assume willfulness for purposes of defendants' summary judgment motion, see Defs. Profits Mem. Supp. 9, the issue of whether willfulness is a prerequisite to a profits award is not before the Court at this time.

This Court has the power to grant summary judgment as to damages, as long as no genuine issue of material fact exists concerning this remedy, even where defendants still dispute liability.  See Motiva Enter. LLC v. W.F. Shuck Petrol., No. 3:10-cv-793 (JCH), 2012 WL 601245 at *16 (D. Conn. Feb. 22, 2012) (Hall, J.).

In determining whether there is sufficient evidence favoring the nonmovant to create a genuine issue of material fact to be tried, the Court "may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'"  Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (quoting Reeves, 530 U.S. at 150). As it is the Court's duty to disregard all evidence favorable to the moving party that the jury is not required to believe, summary judgment is "inappropriate when the admissible materials in the record make it arguable that the claim has merit."  Id. (internal quotation marks omitted).  Where the credibility of witnesses is determinative to the resolution of an issue as to a material fact, summary judgment is not appropriate.  Fed. R. Civ. P. 56(e) Advisory Committee Note (1963).  Likewise, where the evidence the moving party presented in support of its summary judgment motion "does not establish the absence of a

46

genuine issue, summary judgment must be denied <u>even if no</u> <u>opposing evidentiary matter is presented.</u>"  <u>Id.</u> (emphasis added).

The Supreme Court in <u>Mishawaka</u> placed the burden of disproving that its profits are not attributable to the infringement firmly on the infringing defendant.  <u>Mishawaka</u>, 316 U.S. at 206-07 ("The burden is the infringer's to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark.").

In their attempt to satisfy this burden, the defendants provide the Court with declarations of Fossil's wholesale buyers employed by the retailer defendants, <u>see</u> Statement Mat. Facts ¶¶ 13-23; Zeller Decl. ¶ 4; James Decl. ¶ 5; Olson Decl. ¶ 4; Lax Decl. ¶¶ 4-5, McElroy Decl. ¶¶ 4-5, Lewandowski Decl. ¶ 3, and Fossil's customer care and sales staff members, <u>see</u> Statement Mat. Facts Romag ¶¶ 24-27; Gessner Decl. ¶ 4; Bruckner Decl. ¶ 3; Moyer Decl. ¶ 2; Padin Decl. ¶ 3, for the proposition that wholesale buyers and end-customers alike would not purchase handbags because of the ROMAG mark on the snap fasteners integrated in Fossil Handbags.  The defendants also retained expert Dr. E. Deborah Jay of Field Research Company, who conducted a survey of 839 participating handbag consumers to

47

determine whether the ROMAG mark played any role in their
handbag purchasing decisions in the five years preceding the
survey.  See Statement Mat. Facts ¶ 12; Jay Survey at 1-2.  None
of the participants identified ROMAG as a mark they wanted to
see on magnetic snaps.  Statement Mat. Facts ¶ 12.  Likewise, a
second expert for the defendants, Carol Rosenblatt, concludes
that the mark "ROMAG" on a magnetic snap fastener in a handbag
would have "had no role in a customer's decision to purchase a
Fossil brand handbag."  Statement Mat. Facts ¶ 27; Rosenblatt
Report ¶¶ 6, 15.

    Romag naturally claims that the ROMAG mark plays a role in
the purchasing decisions of wholesale buyers and consumers.  See
Statement Mat. Facts Romag ¶ 24.  Romag argues that a snap
fastener is a key component of a handbag and that consumers and
wholesale buyers purchasing quality branded handbags expect
hardware of good standard.  Id.  Romag then points out that
having branded components like a ROMAG snap fastener can be an
indicator of such high quality and spark confidence in the high
finish of the overall product even if the component brand is not
the sole motivator of the purchaser.  See id.  Romag claims that
Fossil itself instructed its manufacturer to use ROMAG products
exclusively for its snap fastener handbags, Opp'n Damages 7-9;
see Fisher Decl., Attach. E, Dep. of Doug Dyment (Dyment Dep.)

48

64:8–65:9, 68:8–19, 74:16–24, 199:6–15, ECF No. 187–1, a fact
that the defendants dispute, Statement Mat. Facts ¶ 10. Romag
thus concludes that the faith that Fossil apparently has in
branded components must be that of Fossil's customers who would
look to the source's reputation, especially if a problem with
the product occurs. Statement Mat. Facts Romag ¶ 24. Finally,
Romag disputes the reliability and credibility of the
defendants' survey, challenging the "assum[ption] that
purchasers of women's handbags at retail ("Consumers") are fully
aware of how they make decisions about handbags, that they can
remember this information for years, and that they will report
this information accurately in response to a survey." Id. ¶ 12.

Taking all reasonable inferences from the disputed facts in
Romag's, the non-movant's, favor, the Court determines that the
defendants cannot maintain the burden of proving that no sales
of its handbags can be traced back to the use of ROMAG branded
magnetic snap fasteners. The Court must necessarily disregard
the defendants' survey and the opinions of its experts because
the fact-finder is not required to credit either the survey or
the experts' opinions. See Reeves, 530 U.S. at 151. This is so
even though Romag advances no contrary survey.

While this rationale is enough to deny Fossil's motion for
summary judgment on the damages issue, Romag's argument that

49

branded components may play a subliminal role in the choice of a
high quality fashion accessory, resonates with the Court.  Romag
draws the analogy to a car purchase, where consumers would
certainly expect the tires of a high-quality car to be of no
lesser quality than the overall product.  Opp'n Damages 26.
Sturdy tires may be a motivating factor in the purchase even if
the particular tire manufacturer is completely unknown to the
purchaser.  Using branded components exudes confidence in the
overall quality of the product which may motivate the ultimate
purchase.

    **C.**    **The Patent at Issue Is Sufficiently Definite as Matter
of Law**

The question whether a patent is valid is one of law;
the factual questions raised during the patent prosecution
before the PTO, however, have a bearing on an invalidity defense
in an infringement action.  See Microsoft Corp. v. i4i Ltd.
P'ship, 131 S. Ct. 2238, 2242-43 (2011); Graham v. John Deere
Co. of Kan. City, 383 U.S. 1, 17 (1966) (addressing the "factual
inquiries" considered when evaluating obviousness).  A patent
that passes the examination process by the PTO is "presumed" to
be valid.  35 U.S.C. § 282.  As I have remarked elsewhere,
Amgen, Inc. v. Hoechst Marion Roussel, Inc., 126 F. Supp. 2d 69,
137 (D. Mass. 2001) aff'd in part, vacated in part, remanded,

50

314 F.3d 1313 (Fed. Cir. 2003), the presumption of validity is

not an evidentiary presumption at all.  Rather, it shifts the

burden of proof to those who would challenge the patent's

validity.  Id.  A party seeking to invalidate the patent must

"persuade the factfinder of its in-validity defense by clear and

convincing evidence."  Microsoft, 131 S. Ct. at 2243.

Therefore, a moving party seeking to invalidate a patent at the

summary judgment stage must demonstrate invalidity with such

clear and convincing evidence that no reasonable jury could find

in the alternative.  Eli Lilly & Co. v. Barr Labs., Inc., 251

F.3d 955, 962 (Fed. Cir. 2001).  As the Federal Circuit

concluded in Railroad Dynamics, Inc. v. A. Stucki Co., ,

> it is neither error nor dangerous to justice to submit
> legal issues to juries, the submission being
> accompanied by appropriate instructions on the law
> from the trial judge.  The rules relating to
> interrogatories, jury instructions, motions for
> directed verdict, JNOV, and new trial, and the rules
> governing appeals following jury trials, are fully
> adequate to provide for interposition of the judge as
> guardian of the law at the proper point and when
> necessary.

727 F.2d 1506, 1515 (Fed. Cir. 1984) (commenting on the jury's

role with respect to the issue of obviousness); Spectralytics,

Inc. v. Cordis Corp., 649 F.3d 1336, 1341-42 (Fed. Cir. 2011)

(quoting Railroad Dynamics and, in reference to the Reeves

standard, affirming the district court's holding that

"[c]onsidering the evidence in the light most favorable to [the non-movant], as the Court must, . . . [the movant] failed to carry its burden of showing by clear and convincing evidence that the . . . patent was obvious," Id. at 1345) (internal quotation marks and citation omitted).

Section 112 states in relevant part: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the [applicant] regards as the invention." 35 U.S.C. § 112(b). Fossil and Macy's base their invalidity defense on the allegation that the term "rotatable" as used in all three claims of the '126 patent is indefinite pursuant to 35 U.S.C. section 112, because neither the claims nor the specification convey what degree of force is needed to rotate the attachment legs in respect to the base washer or how to test rotation. Patent Invalidity Mem. Supp. 6.

Definiteness of a patent claim is, like obviousness, a matter of law. Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1376 (Fed. Cir. 2001). "If one skilled in the art would understand the bounds of the claim when read in light of the specification," the claim meets the standard of the aforementioned section 112 and "is sufficiently definite." Id. at 1375. Claims do not have to be "plain on their face" but must be "amenable to construction" and not so "insolubly ambiguous"

52

that no "narrowing construction can properly be adopted." Id.
("If the meaning of the claim is discernible, even though the
task may be formidable and the conclusion may be one over which
reasonable persons will disagree, we have held the claim
sufficiently clear to avoid invalidity on indefiniteness
grounds.").

The Supreme Court has afforded the validity presumption
great deference and holds claims definite despite imprecision or
imperfection of claim language, see id. at 1376, as well as
resolving "close questions of indefiniteness in litigation
involving issued patents . . . in favor of the patentee," id. at
1380.

Fossil and Macy's rely heavily on Honeywell Int'l, Inc. v.
ITC, 341 F.3d 1332 (Fed. Cir. 2003) to argue that a degree of
force necessary to rotate and a test to determine "rotatability"
had to be specified in the claims.  Patent Invalidity Mem. Supp.
11.  Honeywell, however, is readily distinguishable from the
case at hand.  In Honeywell, a measurement was required by the
claim in question and the different methods of measurement
yielded different results.  See Honeywell, 341 F.3d at 1335-36.
Unlike Honeywell, here the definition of "rotatable" does not
focus on a measurement of force but rather describes a kind of
movement as is apparent from the claim construction ("rotatable"

53

means "capable of being rotated and not rigidly secured, i.e. the connection between the legs and the base washer allows for a change of position about the rotational axis." Clerk's Notes Apr. 9, 2013, ECF No. 231; see Marley Mouldings Ltd. v. Mikron Industries, Inc., 417 F.3d 1356, 1360-61 (Fed. Cir. 2005) (distinguishing Honeywell on the ground that it applies only where persons in the relevant field considered the choice of test to be important and reversing the district court's indefiniteness ruling). Since a test is not required for the disputed term's interpretation, a narrowing of the claim term or determination of a test for "rotatability" is inappropriate. What now? The Court denied Fossil and Macy's motion for summary judgment that the patent was invalid as indefinite ore tenus. Minute Entry, ECF No. 243. Should it go further and hold as matter of law that the patent is sufficiently definite?

Declaring that "the court may [1] grant summary judgment for a nonmovant," Rule 56 (f)(1) of the Federal Rules of Civil Procedure as amended in 2010 now makes explicit what has long been the law in the Second Circuit: a party that moves for summary judgment runs the risk that if it makes a woefully inadequate showing, not only might its own motion for summary judgment be denied, the court may grant summary judgment sua

sponte against the movant.[9] Coach Leatherware Co. v. Ann Taylor,
Inc., 933 F.2d 162, 167-68 (2d Cir. 1991) (recognizing that
there is no need for notice when entering summary judgment
against the moving party because the movants have "significant
incentive to put forward any compelling evidence in support of
their summary judgment motion since the law prevent[s] the
district court from drawing favorable inferences on their
behalf"); see also Garanti Finansal Kiralama A.S. v. Aqua Marine
& Trading Inc., 697 F.3d 59, 64 (2d Cir. 2012) ("District courts
have the discretion to grant summary judgment sua sponte, even
without notice in certain circumstances.") (quoting Schwan-
Stabilo Cosmetic GmbH & Co. v. Pacificlink Int'l Co., 401 F.3d
28, 33 (2d Cir. 2005)); First Fin. Ins. Co. v. Allstate Interior
Demolition Corp., 193 F.3d 109, 115 (2d Cir. 1999) ("as long as
some party has made a motion for summary judgment, a court may
grant summary judgment to a non-moving party, provided that
party has had a full and fair opportunity to meet the

---

[9] Federal Rule of Civil Procedure 56(f) states that the
court "may grant summary judgment for a nonmovant" only "[a]fter
giving notice." Fed. R. Civ. P. 56(f)(1). Even after this
amendment went into effect, however, courts within the Second
Circuit have continued to grant sua sponte summary judgment
without notice by applying the standard set forth in Coach
Leatherware Co. v. Ann Taylor, Inc., 933 F.2d 162, 167-168 (2d
Cir. 1991). See, e.g., Williams v. Secure Res. Commc'n Corp.,
No. 11 Civ. 03986 (PAC) (JCF), 2013 WL 4828578, at *4 (S.D.N.Y.
Sept. 10, 2013); Bank of N.Y. Mellon Trust, Nat'l Ass'n v.
Morgan Stanley Mortgage Capital, Inc., No. 11 Civ. 0505 (CM)
(CWG), 2013 WL 3146824, at *16 (S.D.N.Y. June 19, 2013).

proposition that there is no genuine issue of material fact to be tried."). The First Circuit holds likewise. <u>Sanchez</u> v. <u>Triple-S Mgmt. Corp.</u>, 492 F.3d 1, 7-9 (1st Cir. 2007); <u>Berkovitz</u> v. <u>Home Box Office, Inc.</u>, 89 F.3d 24, 29-30 (1st Cir. 1996); <u>see</u> <u>Rothschild</u> v. <u>Cree, Inc.</u>, 711 F. Supp. 2d 173, 195 (D. Mass 2010). In a recent opinion, I discussed the patent bar's common practice of overloading courts with summary judgment motions. <u>See</u> <u>Ambit</u> v. <u>Delta</u>, 707 F. Supp. 2d 74, 77-79 (D. Mass. 2010). In that opinion, I warned the patent bar to ensure that in making a motion for summary judgment upon an issue as to which they bear the burden of proof, they "lay every bit of evidence before the court - once." <u>Id.</u> at 78.

This body of precedent constitutes more than adequate notice that the Court may enter summary judgment against the moving party.[10] Such action is proper here. Fossil and Macy's

_____

[10] This Court concedes that the Second Circuit discourages the <u>sua sponte</u> summary judgment grants without express notice. <u>See</u> <u>Bridgeway Corp.</u> v. <u>Citibank</u>, 201 F.3d 134, 139 (2d Cir. 2000). However, such actions are permitted so long as they would not procedurally prejudice the party against whom summary judgment is granted. <u>Id.</u> "A party is procedurally prejudiced if it is surprised by the district court's action and that surprise results in the party's failure to present evidence in support of its position." <u>Id.</u> However, "[t]he threat of procedural prejudice is generally diminished if the court's <u>sua</u> <u>sponte</u> determination is based on issues identical to those raised by the moving party . . . [or] if the moving party speaks to those issues in the course of the district court proceedings." <u>Id.</u> at 140 (quoting <u>Leatherware</u>, 933 F.2d at 167) (internal quotation marks omitted). Summary judgment is

proffer Frederick Kucklick ("Kucklick") as their expert on

indefiniteness.  Other than mixed fact-law opinions on

anticipation and file wrapper estoppel, Kucklick opines only

that

> the '126 patent does not provide an acceptable way to
> quantify the degree of force necessary to consistently
> define the term 'rotatable' for invalidity and
> infringement purposes.  The '126 patent is silent
> regarding the degree of force necessary to qualify the
> attachment legs as 'rotatable' relative to the base
> washer.

Geiger Decl. Ex. GG, Expert Report Frederick C. Kucklick,¶ 86,

ECF No. 156-9.  That's it.  While these statements are true,

this Court's construction of "rotatable" renders them

immaterial.  What is more, these opinions are nothing more than

an _ipse dixit_, and the Federal Circuit has concluded that such

general and conclusory testimony "does not suffice as

substantial evidence of invalidity" sufficient to carry the

defendants' burden of proof.  Koito Mfg. Co., Ltd. v. Turn-Key-

---

similarly appropriate if there is no indication that the party
"would have brought forth additional evidence" had express
notice been provided.  Id.; see also Coach Leatherware, 933 F.2d
at 167 (holding that "[a]bsent some indication that the moving
party might otherwise bring forward evidence that would affect
the court's summary judgment determination," failure to provide
notice need not prevent summary judgment.)
     Here, both criteria are met.  The same indefiniteness issue
had been briefed and was already before the court.  Moreover,
the summary judgment record had already been developed; there
was no indication that any additional evidence was forthcoming,
nor, given the fact that definiteness is a question of law, any
suggestion that additional evidence would dictate a different
outcome.

Tech, LLC, 381 F.3d 1142, 1152 (Fed. Cir. 2004) (Gajarsa, J.);

NewRiver, Inc. v. Newkirk Products, Inc., 674 F. Supp. 2d 320,

325 (D. Mass. 2009).   In the absence of sufficient evidence of

indefiniteness, Fossil and Macy's claim must fail and the Court

declares that the '126 patent withstands the indefiniteness

challenge and that defense is no longer in this case.

**III. CONCLUSION**

> For the foregoing reasons, the Court

> (1)   DENIES defendants' motion for partial summary
>       judgment, ECF No. 153,

> (2)   DENIES defendants Fossil's and Macy's' motion for
>       partial summary judgment, ECF No. 154, and instead

> (3)   Sua sponte GRANTS summary judgment to Romag declaring
>       that the '126 patent is not invalid on the ground of
>       indefiniteness.

> **SO ORDERED.**


                        WILLIAM G. YOUNG[11]
                        DISTRICT JUDGE

---

[11] Of the District of Massachusetts, sitting by designation.
Order Transfer, Jan. 15, 2013, ECF No. 222.