**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ROMAG FASTENERS, INC., | : | |
| | : | |
| | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:10CV1827(JBA) |
| | : | |
| v. | : | |
| | : | |
| FOSSIL, INC., ET AL., | : | |
| | : | |
| Defendants. | : | APRIL 7, 2014 |
| | : | |

**PLAINTIFF ROMAG FASTENERS, INC.'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to Fed. R. Civ. P. 52, Plaintiff Romag Fasteners, Inc. ("Romag") submits the following Proposed Findings of Fact and Conclusions of Law concerning the equitable phase of the trial in this action.

## I.    PROPOSED FINDINGS OF FACT

### A.    Background Facts

1.    Howard Reiter founded Plaintiff Romag Fasteners, Inc. in 1996, and he is the President of that company.  (Tr. 79-80.)

2.    Mr. Reiter is also involved in a company called Rome Fastener, Corp., which makes products other than ROMAG magnetic snap fasteners.  (Tr. 80-81.)

3.    Mr. Reiter invented the magnetic snap fastener covered by the claims in the '126 patent, which patent he assigned to Romag Fasteners, Inc.  (Tr. 94-95.)

4.    Romag had sold over 57 million magnetic snap fasteners from its inception through 2011.  (Tr. 118.)

5.     Wing Yip is a company started by Mr. Reiter and Timmy Cheung in 1997 to produce magnetic snap fasteners for Romag and other products for Romag.  Wing Yip's headquarters has always been in the same place in Hong Kong.  (Tr. 121-24.)

**B.     Irrelevant Kong Yip Strike**

6.     The first factory Wing Yip owned was named Kong Yip in mainland China.  Product was made at the Kong Yip factory from the founding of Wing Yip through February of 2008.  (Tr. 124-25.)

7.     A decision was made to close the Kong Yip factory in about 2004, when Mr. Reiter and Mr. Cheung decided to build a new, larger factory to handle the increased volume of production.  (Tr. 125.)

8.     The new factory, referred to as the Timake factory, which is located in Fogang, China, began manufacturing Romag products in December of 2007.  The Timake factory was the only factory making ROMAG magnetic snap fasteners thereafter.  (Tr. 104-05.)  ROMAG magnetic snap fasteners were made in the Timake factory beginning in December of 2007.  (Tr. 128-29.)

9.     Almost all the product made at both of Wing Yip's factories, Kong Yip and Timake, was made for Romag or Rome Fastener.  (Tr. 126.)

10.     Mr. Reiter visited the Timake factory in December of 2007 and again in January of 2008.  (Tr. 106.)

11.     Mr. Reiter took photos of the Timake factory in January of 2008, which photos depict stamping presses, the polishing process, the lacquering process, and the assembly process for magnetic snap fasteners.  (Tr. 105-11.)

12. In January of 2008, just after Mr. Reiter left China, there was a strike at Kong Yip that lasted about a week. The strike had nothing to do with the production of ROMAG magnetic snap fasteners, which had been moved to Timake before the strike, and there was no inventory of magnetic snap fasteners at the Kong Yip factory at the time of the strike. (Tr. 304-06.)

**C.** **Fossil's Relationship With Romag And Fossil's Use Of Counterfeit Romag Magnetic Snap Fasteners**

13. From at least 2002 and through at least 2010, Fossil had the handbags it designed in Dallas and sold under the FOSSIL brand name (the "Fossil Handbags") principally made in China because the cost of making such handbags was lowest in China.

14. The serious problem of counterfeiting in China was universally known, and was also specifically known to Fossil.

15. One of the factories in China used by Fossil to manufacture Fossil handbags was Superior Leather Limited (a/k/a Dong Guan Red Lion Leather Products, Ltd.) ("Superior").

16. During the relevant time period, Fossil exerted control, or had the ability to exert control, over every aspect of the manufacturing process at Superior.

17. In or about April 2002, Fossil, through its Divisional Merchandise Manager for Women's Leathers, Doug Dyment, contacted Romag to explore using ROMAG Magnetic Snap Fasteners for the FOSSIL handbags being made in China.

18. In response to that contact by Fossil's Mr. Dyment, Howard Reiter, Romag's President, told Fossil that ROMAG Magnetic Snap Fasteners were protected by Romag's '126 patent and the registered trademark ROMAG, and that use of ROMAG Magnetic Snap Fasteners did not require Fossil to pay licensing fees to others. Romag informed Fossil that

the only authorized seller of ROMAG Magnetic Snap Fasteners in Asia was Wing Yip Metal Accessory Manufacturing Ltd. ("Wing Yip").  (Ex. 37.)

19.     Fossil agreed to purchase ROMAG Magnetic Snap Fasteners if Romag entered into a contract to indemnify Fossil against any claims of patent infringement made by others. (Ex. 37.)

20.     In 2002, after speaking with Mr. Reiter and obtaining the required indemnity agreement, Doug Dyment of Fossil directed factories making Fossil handbags to use only ROMAG magnetic snap fasteners.  (Exs. 38 & 39.)  Under this direction, Fossil's factories purchased ROMAG magnetic snap fasteners directly from Wing Yip in Hong Kong, and those factories did not specify the company for whom the factory was making the products using the ROMAG magnetic snap fasteners.  (Tr. 144-47.)

21.     From at least 2002 until 2008, Superior purchased from Wing Yip millions of ROMAG Magnetic Snap Fasteners for use in making the Fossil Handbags in compliance with Fossil's specific requirements and instructions.

22.     Specifically, Superior had purchased ROMAG magnetic snap fasteners from Wing Yip since at least 2003 (Ex. 35), but did not make any purchases after August 21, 2008 with the exception of the purchase of 11,887 ROMAG magnetic snap fasteners in July of 2010.  (Exs. 227 & 228.)

23.     In the Summer of 2008, Superior stopped purchasing, or stopped purchasing all but a *de minimis* quantity of, genuine ROMAG Magnetic Snap Fasteners from Wing Yip and started purchasing from a company known as "Hechuang" low-cost fasteners bearing the ROMAG trademark, and Romag's '126 patent number, for use in making the Fossil Handbags.

24. The magnetic snap fasteners with Romag's trademark thereon used in Fossil Handbags that were not purchased from Wing Yip are counterfeit goods ("Counterfeit Romag Magnetic Snap Fasteners").

25. Fossil took no actions to monitor or prevent use by Superior of Counterfeit Romag Magnetic Snap Fasteners.

26. As a result, nearly 700,000 Fossil Handbags bearing Counterfeit Romag Magnetic Snap Fasteners were made by Superior and imported and sold in the United States by Fossil from 2008 through 2010.

**D.** **Romag's Discovery Of Fossil's Use of Counterfeit Romag Magnetic Snap Fasteners**

27. In about April 2002, Fossil directed Superior to use ROMAG Magnetic Snap Fasteners in the Fossil Handbags. However, Romag was not aware of which factories were buying magnetic snap fasteners for use in Fossil bags. Romag's factory, Wing Yip, had previously sold magnetic snap fasteners to Superior for a variety of brands.

28. Although Superior makes Fossil Handbags under the direction and control of Fossil, Superior also makes products for other companies.

29. Mr. Reiter had direct contact with Superior through Rome Fastener when Superior bought unpatented rings made in Milford, Connecticut for handbags made for the Ruehl division of Abercrombie & Fitch and snap fasteners for wallets made for Coach. (Tr. 150-51.)

30. In the Summer of 2008, Rome Fastener Corp.'s, Stanley Reiter, received an unsolicited facsimile from Hechuang offering to sell unpatented rings, but Rome had no interest in the rings and did not respond.

31.     On or about May 12, 2010, Mr. Reiter received an unsolicited email from an unidentified person named "Joe" who claimed to be a former employee of Wing Yip, stating that he worked for another factory in China at that time and that such factory was producing 14-millimeter and 18-millimeter Romag magnetic snap fasteners without Romag's authorization.  Joe further claimed that about one million units of such products were sold to several large leather factories in China.  (Ex. 27.)

32.     Mr. Reiter replied to Joe and asked Joe to tell him the name of the factory Joe was referring to, whether that factory was the place where many former Wing Yip workers went to work, and what handbag maker and brands in the United States were getting the counterfeit Romag magnetic snap fasteners on their handbags.  Joe replied on May 20, 2010 that the name of the factory was Hechuang Metal Manufacturing and provided copies of two purchase orders from Superior to Hechuang dated March of 2009 and December of 2008. (Ex. 27.)

33.     Mr. Reiter did not know who Joe was, nor did he ever find out.  (Tr. 159-160.) Joe did not send Mr. Reiter any samples of the alleged counterfeit product nor did he tell Mr. Reiter the name of the U.S. brand that was using such counterfeits.  (Tr. 166.).

34.     Randy Hyne, General Counsel for Fossil, testified that Fossil is often contacted by companies purporting to offer information about counterfeiting of Fossil products. Attorney Hyne testified that he did not respond or follow up on such inquires because it was difficult to know if the inquiry was legitimate because many times the inquiries provide the bare minimum of detail and are designed to drum up Fossil's business.  (Tr. 853-54.)

35.     Mr. Reiter did not know the identity of *Superior's* customer for whom the alleged counterfeit Romag magnetic snap fasteners were used.  Based on the information he

had at the time, Mr. Reiter suspected that the U.S. brand purchasing counterfeit magnetic snap fasteners from Hechuang was Abercrombie & Fitch's handbag division, Ruehl, because Ruehl was manufacturing handbags with Superior and Mr. Reiter recalled that his only direct connection with Superior was concerning that brand at that time frame. Since the purchase orders attached to the "Joe" email were more than one year old and Ruehl, in the meanwhile, had gone out of business, Mr. Reiter did not believe that he could take any meaningful action. (Tr. 167-170.)

36.     Mr. Reiter did not know of anyone else that Superior was making handbags for in May of 2010. Mr. Reiter also did not contact Superior because Superior owed money to Rome Fastener. (Tr. 170.)

37.     In May of 2010, Mr. Reiter had no idea that the company for whom Superior was making handbags using counterfeit Romag magnetic snap fasteners made by Hechuang was Fossil. (Tr. 307-08.)

38.     Mr. Reiter's wife, Jody Ellant, purchased Fossil bags at Macy's in May of 2010. Ms. Ellant purchased those bags because her sister was shopping at Macy's in Boca Raton, Florida and noticed that there were Romag snap fasteners on Fossil handbags. Ms. Ellant's sister, Elissa Katz, called Ms. Ellant and told her that they had found Romag magnetic snaps on Fossil bags. Ms. Ellant thought that was strange because Ms. Ellant was not aware that Fossil was using Romag magnetic snap fasteners. Ms. Ellant asked her sister to buy some handbags and send them to her and Ms. Ellant also went shopping at Macy's that evening to buy Fossil bags with Romag magnetic snap fasteners. (Tr. 154-155.)

39.     When Ms. Ellant told Mr. Reiter about the Fossil handbags with Romag magnetic snap fasteners and expressed her concern that the magnetic snap fasteners on the

handbags might be counterfeits, Mr. Reiter told her that Fossil had been a customer since 2002, which was something that Ms. Ellant did not know. (Tr. 155-57.) Mr. Reiter put the handbags aside. (Tr. 157.)

40.     Mr. Reiter did not have any contact with Fossil between 2002 through 2010 about magnetic snap fasteners. Mr. Reiter contacted Mr. Dyment only to solicit a charitable donation on two occasions. (Tr. 156.)

41.     At the time Mr. Reiter put the handbags aside, he did not believe that those handbags had counterfeit Romag magnetic snap fasteners because Fossil was a customer of Romag and Mr. Reiter had no reason to suspect they would use counterfeit magnetic snap fasteners. (Tr. 156-158.)

42.     From May of 2010 through mid-October of 2010, Mr. Reiter was absorbed in the thick of the highest production period for his companies. (Tr. 171.) He also traveled with his wife to India and had knee surgery.

43.     In mid-October 2010, Mr. Reiter looked into the allegations made in the May 2010 email from Joe. (Tr. 174-175.)

44.     At that time, Mr. Reiter asked Wing Yip for reports concerning Superior's purchases so Mr. Reiter could learn or confirm what Superior was buying and what the buying patterns might be. Mr. Reiter found out that Superior's purchases of magnetic snap fasteners stopped in the middle of 2008, none were purchased in 2009 and that Superior had purchased a small quantity of magnetic snap fasteners in 2010. (Tr. 175.)

45.     After being told by Wing Yip that there had been no sales to Superior between mid-2008 and July of 2010, Mr. Reiter took snaps off the Fossil handbags purchased in May of 2010 to examine them. (Tr. 177; 311.)

46.     Upon examining the snaps Mr. Reiter did not think that the snaps came from Romag's production.  Mr. Reiter sent the magnetic snaps he had taken off the Fossil handbags to Wing Yip so that the tooling engineers could take a look at the snaps and compare them to the stamping dies that produced those parts.  (Tr. 177-178.)

47.     Mr. Reiter and his staff also took measurements, viewed the magnetic snap fasteners under a microscope, and sent samples for testing.  In doing so, Mr. Reiter and his staff noted several physical attributes that caused Mr. Reiter to suspect that the magnetic snap fasteners from the Fossil handbags were not made by Romag or Wing Yip.  (Tr. 186-202.)

48.     Mr. Reiter received an email from Timmy Cheung at Wing Yip on November 8, 2010 informing Mr. Reiter that the magnetic snap fasteners removed from the Fossil handbags purchased in May of 2010 were not made by Wing Yip.  (Ex. 149.).

49.     On November 8, 2010, Mr. Reiter sent an email to Doug Dyment at Fossil asking Mr. Dyment what factory made the Fossil handbags that Mr. Reiter had examined and were purchased from Macy's in May of 2010.  Mr. Dyment responded on November 15, 2010 by telling Mr. Reiter that such information was considered confidential by Fossil and refusing to disclose the identity of the factory that made the Fossil handbags Mr. Reiter asked about. (Ex. 28.)

50.     Mr. Reiter sent Mr. Dyment an email asking the identity of the factory in order to confirm his suspicion that the Fossil handbags he examined were made by Superior.  Mr. Reiter was reluctant to accuse Fossil of using counterfeit ROMAG magnetic snap fasteners without asking Fossil to confirm which factory made those Fossil handbags.  (Tr. 180-81.)

51.     After receiving Mr. Dyment's response, Mr. Reiter called Mr. Dyment on November 15, 2010.  Mr. Reiter asked why the information he asked for was secret in light of

the fact that Romag was a nominated vendor of Fossil. Mr. Dyment replied that Mr. Reiter needed to contact Fossil's legal department. (Tr. 183-84.)

52. After speaking to Mr. Dyment on November 15, 2010, Mr. Reiter went to Macy's in Milford, Connecticut to look at the Fossil handbags because he wanted to find out if Fossil handbags with Romag magnetic snap fasteners were being sold at that time. Mr. Reiter was surprised to find an abundance of Fossil handbags that were using magnetic snap fasteners with the Romag trademark and '126 patent number printed on them. Mr. Reiter purchased a number of handbags that day and made other purchases of Fossil handbags at Macy's, Zappos.com, and Fossil's outlet store in Clinton, Connecticut shortly thereafter. (Tr. 202-03; Exs. 6E, 7L, 8M & 9B.)

53. After communicating with Fossil, and undertaking his own review of the magnetic snap fasteners removed from the Fossil handbags purchased in May of 2010, Mr. Reiter concluded that such magnetic snap fasteners were not made by Romag or Wing Yip and were therefore counterfeits. (Tr. 203-04.)

54. On November 17, 2010, Mr. Reiter directed Romag's counsel to send a letter to Fossil's counsel demanding that Fossil cease the use and sale of counterfeit Romag magnetic snap fasteners in Fossil products. (Ex. 32.) On November 19, 2010, Fossil's counsel responded to Romag's counsel's letter and confirmed that the factory that made the Fossil handbags Mr. Reiter inquired about was Superior. (Ex. 665.) This was the first time Mr. Reiter actually knew that Superior made the Fossil handbags he examined that were purchased in May of 2010. (Tr. 186.)

55. Romag filed this action on November 22, 2010, and Romag sought a temporary restraining order ("TRO") on November 23, 2010.

56.     The allegations contained in the Declaration of Howard Reiter dated November 23, 2010, in support of Romag's motion for a TRO were not false.

57.     There was simply no obvious relation between Superior's purchase of counterfeit Romag magnetic snap fasteners and Fossil handbags until Mr. Reiter made the connection in late October/November of 2010.  (Tr. 299-300.)  Romag acted promptly, without any ulterior motive or purpose, and presented unequivocally truthful testimony to this Court in support of its motion for a TRO.

58.     Romag's actions in response to the discovery of the Counterfeit Magnetic Snap Fasteners, i.e., bringing this lawsuit and seeking a TRO to remove the counterfeit articles from the marketplace, were reasonable under the circumstances of this case.

59.     After a telephone status conference on November 29, 2010 wherein Defendants objected to the issuance of a TRO, this Court entered a TRO on November 30, 2010.  On December 22, 2010, the Parties entered into a stipulation converting the TRO into a preliminary injunction.

60.     Mr. Reiter later received confirmation of his belief that such magnetic snap fasteners were counterfeit.   Shortly after this action was filed, and after several requests for information from Fossil's counsel from November 22, 2010 through December 1, 2010, Superior in the December 2, 2010 letter from its owner, Mr. Liu, admitted that the magnetic snap fasteners with Romag's trademark thereon it used in making Fossil Handbags for the years 2008 through 2010 had been obtained by Superior from a source not authorized by Romag.  (Ex. 53B, Tr. 206-07.)  Through this litigation, Mr. Reiter also received Superior's records of the purchase of over 700,000 counterfeit Romag magnetic snap fasteners from Hechuang during the period of August of 2008 through August of 2010, which counterfeit

Romag magnetic snap fasteners were used in Fossil handbags. (Exs. 64, 81, 238, 239, & 53B.)

61.     The Superior purchase orders to Hechuang, and Hechuang's invoices to Superior, for Counterfeit Romag Magnetic Snap Fasteners, which documentation was produced through Superior's counsel, evidenced that Superior first ordered Counterfeit Romag Magnetic Snap Fasteners on July 24, 2008 and placed its last order on August 17, 2010.

62.     Despite these indisputable admissions, Fossil continued to defend this lawsuit based on allegations that the Hechuang magnetic snap fasteners were not counterfeit.

63.     Fossil and its customers have admitted that they would not and could not sell handbags with counterfeit components and would have been required to remove them from sale with or without a TRO. Specifically, Mr. Dyment testified that upon receipt of the December 2, 2010 letter from the owner of Superior, Mr. Liu, Fossil would have had to remove from sale all Fossil handbags having the counterfeit Romag magnetic snap fasteners. (Tr. 484-486.) Ms. Stoke testified that consumers who purchased Fossil handbags with counterfeit Romag magnetic snap fasteners have been defrauded. (Tr. 968-69.) Similarly, each of the Retailer Defendants admitted that it would not sell handbags with counterfeit components. (Tr. 1097-1098 (Nordstrom); 1204 (Dillard's); 1222 (Zappos.com); 1232 (Belk); 1242-43 (Bon Ton); and 1253-1254 (Macy's).)

64.     Fossil also continued to defend this lawsuit based on allegations that Romag's '126 patent is invalid, unenforceable and not infringed. Fossil did not present those defenses at trial.

65. The magnetic snap fasteners Superior purchased from Hechuang and used on Fossil handbags were not made by or sold by Wing Yip. (Tr. 205-07; 327-28.)

66. Regardless of when and how Romag discovered Defendants' infringement, such infringement still violates federal law and Romag's valuable property rights, and this Court properly issued a TRO, which Fossil and Macy's, after vigorously protesting the entry of a TRO and continuing to sell Fossil handbags with counterfeit Romag magnetic snap fasteners until after the entry of such TRO, later conceded should remain in place as a preliminary injunction.

67. The jury has found Fossil liable for trademark infringement by counterfeiting, patent infringement, unfair competition under Connecticut common law, and a violation of the Connecticut Unfair Trade Practices Act. The jury also found Macy's liable for patent infringement.

## II.    PROPOSED CONCLUSIONS OF LAW

### A.    Defendants' Equitable Defenses[1]

1. The doctrine of unclean hands "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009). "As the Supreme Court

---

[1] To the extent any Defendant asserts an estoppel defense, such defense must be rejected pursuant to this Court's decision denying as futile, and therefore insufficient as a matter of law, Fossil's Motion for Leave to Amend attempting to assert an estoppel defense. (Dkt. # 360 ¶ 9.) As set forth in its Memorandum in Opposition to Motion for Leave to Amend (Dkt. # 339), the sole basis for Fossil's futile estoppel defense was a contract between Fossil and Romag, and no other Defendant was a party to such contract. Therefore, any attempt by a Defendant other than Fossil to assert an estoppel defense also necessarily fails as a matter of law.

has explained, '[t]he equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage.'" *Mashantucket Pequot Tribe v. Redican*, 403 F. Supp. 2d 184, 199 (D. Conn. 2005) (quoting *U.S. v. Milstein*, 401 F.3d 53, 64 (2d Cir.2005)).

2.      "The unclean hands doctrine applies only where the misconduct alleged as the basis for the defense 'has immediate and necessary relation to the equity that [plaintiff] seeks in respect of the matter in litigation.' The Second Circuit has repeatedly emphasized the narrowness of the doctrine's application." *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005) (quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933)).

3.      In the trademark and patent context, unclean hands "applies only with respect to the right in suit," i.e., Romag's trademark or patent itself. *Coach, Inc. v. Kmart Corporations,* 756 F. Supp. 2d 421, 429-30 (S.D.N.Y. 2010) (citing *Yurman Design, Inc. v. Golden Treasure Imports, Inc.,* 275 F. Supp. 2d 506, 518 (S.D.N.Y. 2003))("[f]iling a trademark or trade dress infringement lawsuit, therefore, cannot be a basis for an unclean hands defense to that lawsuit because any alleged bad faith or inequitable conduct in filing the lawsuit is unrelated to the plaintiff's acquisition or use of the trademark or trade dress rights."); *The Apollo Theater Found., Inc. v. W. Int'l Syndication*, 2005 WL 1041141, at *16 (S.D.N.Y. May 5, 2005) ("[T]he defense of unclean hands applies only with respect to the right in suit."); *see Sanofi-Synthelabo v. Apotex Inc.*, 2006 WL 3103321, at *2 (S.D.N.Y. Nov. 2, 2006) (stating that the acts allegedly constituting unclean hands are "unrelated to the procurement of the patent itself and will not be part of the January trial on the validity and enforceability of the patent").

4.      The defense of unclean hands is unavailable where the basis for the defense is a position taken "in the course of litigation," *Yurman Design, Inc. v. Golden Treasure Imports, Inc.,* 275 F. Supp.2d 506, 518 (S.D.N.Y. 2003;), and "[c]ourts and commentators alike have rejected the thesis . . . that alleged bad faith in bringing suit can itself be the basis for an unclean hands defense to a trademark infringement action," *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 13 F. Supp.2d 430, 445 (S.D.N.Y. 1998).   The focus of the inquiry is not on alleged litigation strategy.  *Sears, Roebuck & Co. v. Sears PLC*, 744 F. Supp. 1297, 1310 (D. Del. 1990).

5.      Because the basis for Defendants' unclean hands defense is Romag's pre-litigation and litigation conduct, and not Romag's trademark or patent itself, the defense of unclean hands is not available to the Defendants.

6.      Unclean hands, in its application, "requires a balancing of equities and the relative extent of each party's wrong upon the other and upon the public should be taken into account, and an equitable balance struck.  Where both parties have acted inequitably, relief should still be granted against a defendant because it is better to remedy one wrong than to leave two wrongs at large.  Further, because trademark law also involves protecting the public's interests, courts typically only bar recovery under a theory of unclean hands when a plaintiff's conduct was egregious, or clear, unequivocal and convincing," *Patsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 2d 427, 461 (E.D.N.Y. 2008) aff'd, 658 F.3d 254 (2d Cir. 2011) (internal quotation marks omitted).

7.      For an unclean hands defense to be made out based on alleged inaccuracies or misrepresentations before the Court, there must be a "clear picture of wrongdoing".  *Mag Instrument, Inc. v. JS Products, Inc.*, 595 F. Supp. 2d 1102, 1110 (C.D. Cal. 2008) (granting

motion for judgment on the pleadings dismissing unclean hands defense based on attachment of inaccurate pictures of Defendant's products to the patent infringement complaint). The misrepresentation must "be plainly made in bad faith." *Wilson Jones Co. v. Gilbert & Bennett Mfg. Co.*, 332 F.2d 216, 218 (2d Cir. 1964) (rejecting District Court's finding of unclean hands based on statement in the complaint regarding previous USPTO trademark proceedings, even though the statement was erroneous). "In order to be a [unclean hands] defense to a trademark action, misrepresentation must be intentional, gross, and serious." *Johnson Products Co. Inc. v. Brodt & Co. Inc.*, 1973 WL 19848, at *3 (E.D.N.Y. Mar. 27, 1973) (citing *Wilson Jones Co.*).

8.      Romag has not made any misrepresentations "plainly in bad faith," engaged in egregious misconduct, "acted fraudulently," or "by deceit or any unfair means . . . gained an advantage."

9.      Even if Romag's conduct at issue is weighed against Defendants' wrongful conduct, such balancing weighs heavily in favor of awarding relief to Romag.  Fossil imported, offered for sale, or sold over 700,000 Fossil handbags with counterfeit Romag magnetic snap fasteners during the period of 2008 through 2010, and the jury believed that such conduct was serious enough to require an award of $6.7 million in order to deter Fossil from engaging in such misconduct in the future.  As such, Defendants have not proven that Romag is not entitled to relief under the doctrine of unclean hands.

10.      Laches is a bar to equitable relief only.  *Ivani Contracting Corp. v. City of New York,* 103 F.3d 257, 260 (2d Cir. 1997) ("The prevailing rule, then, is that when a plaintiff brings a federal statutory claim seeking legal relief, laches cannot bar that claim, at least where the statute contains an express limitations period within which the action is timely.");

*Eastman Kodak Co. v. Ricoh Co., Ltd.*, 2013 WL 4044896, at *19 (S.D.N.Y. Aug. 9, 2013) ("The doctrine of laches is not, however, a defense to a claim for damages.").

11.     "Laches is an equitable defense which bars injunctive relief where a plaintiff unreasonably delays in commencing an action." *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994).

12.     The Second Circuit has repeatedly held that, if a plaintiff's claims were brought within the applicable limitations period, a defendant is necessarily barred from asserting a laches defense. *See Astra USA, Inc. v. Bildman*, 375 Fed. App'x. 129, 133 (2d Cir. 2010) ("Because we conclude that Astra's claims were brought within the applicable limitations period, defendants' laches defense necessarily fails."); *United States v. Milstein*, 401 F.3d 53, 63 (2d Cir. 2005) (holding that "[l]aches is not a defense to an action filed within the applicable statute of limitations"); *United States v. RePass*, 688 F.2d 154, 158 (2d Cir. 1982) ("Laches is not a defense to an action filed within the applicable statute of limitations.").

13.     The applicable limitations period for Romag's patent claims is six years, 35 U.S.C. § 286, and the applicable limitations period for Romag's other claims is three years, *Argus Research Grp., Inc. v. Argus Media, Inc.*, 562 F. Supp. 2d 260, 273 (D. Conn. 2008) ("Because the Lanham Act does not include a statute of limitations, courts apply the most analogous state statute of limitations, which in this case is Connecticut's three-year statute of limitations for fraud."); Conn. Gen. Stat. § 42-110g(f) (CUTPA statute of limitations is three years).

14.     Because Romag brought this action within all applicable limitations periods, the laches defense is not available to Defendants.

15. Even if bringing suit within the applicable limitations period does not categorically bar a laches defense, "laches will generally not be invoked to shorten the statutory period." *Ikelionwu*, 150 F.3d at 238 (internal quotation marks omitted); *Call Ctr. Technologies, Inc. v. Grand Adventures Tour & Travel Pub. Corp.*, 2014 WL 859344, at *23 (D. Conn. Mar. 5, 2014). "[I]f the applicable legal statute of limitations has not expired, there is rarely an occasion to invoke the doctrine of laches and the burden remains on the defendant to prove all the elements of the defense." *Ikelionwu*, 150 F.3d at 238.

16. Defendants have not met their burden of proving that this is a rare case where laches should apply to shorten the applicable statutory limitations periods and bar Romag's claims. In order to prove laches, a defendant must show that (1) the plaintiff had knowledge of the defendant's misconduct, (2) that the plaintiff inexcusably delayed in taking action, and (3) that the defendant would be prejudiced if the plaintiff belatedly asserted its rights. *Tri-Star Pictures, Inc.*, 17 F.3d at 44; *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998) (same).

17. Romag had no knowledge of Defendants' use of counterfeit Romag magnetic snap fasteners until late October or November of 2010, and did not have such knowledge in May of 2010. Therefore, Defendants cannot meet the first element of their laches defense.

18. There was no period of unreasonable delay by Romag in seeking relief. *Omega S.A. v. Omega Engineering*, Inc., 228 F. Supp. 2d 112, 141 (D. Conn. 2002) (Arterton, J.) ("The Court does not hesitate in also concluding that plaintiff's ensuing delay of ten months before filing this action cannot be characterized as 'inexcusable.'"). Defendants therefore cannot meet the second element of their laches defense.

19.     Defendants cannot establish that they suffered prejudice even if Romag had waited an unreasonable period of time to commence this action because they did not change their position in reliance upon Romag's silence.  "In order to prevail on the affirmative defense of laches, a defendant must prove that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action. A defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be 'inequitable' in light of the delay in bringing that claim.  Specifically, prejudice ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed."  *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996) (internal quotation marks omitted).

20.     "In considering economic prejudice, courts must 'look for a *change* in the economic position of the alleged infringer during the period of delay.' Damages or monetary losses 'are not merely those attributable to a finding of liability for infringement.'"  *Enzo Biochem, Inc. v. Applera Corp.*, 2013 WL 3965305, at *26 (D. Conn. Aug. 1, 2013) (quoting *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992); emphasis in original).  "Obviously, the defense of laches requires more by way of showing prejudice than the simple fact that the business continued during the period of delay." *Cuban Cigar Brands N. V. v. Upmann Int'l, Inc.*, 457 F. Supp. 1090, 1098 (S.D.N.Y. 1978) *aff'd sub nom. Cuban Cigar Brands N.V. v. Upmann Int'l, Inc.*, 607 F.2d 995 (2d Cir. 1979).  What is required is affirmative conduct in reliance on the mark during the period of alleged delay.  *See Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 244 (S.D.N.Y. 2012) (internal quotation marks omitted) ("Prejudice does not inhere simply in the fact that the junior user conducted business using the mark. Instead, prejudice may be found where the junior user took affirmative steps to increase its use of the mark during and in reliance on the senior user's

period of delay, and that unwinding those actions would require it to reorganize its business or reeducate the public as to its product if restrained from using the mark."); *TBC Consoles, Inc. v. Forecast Consoles, Inc.*, 2009 WL 2337138, at *5 (S.D.N.Y. July 27, 2009) ("TBC is required to show it took affirmative steps to increase its reliance on the mark(s) during Forecast's delay. This it has not done."); *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 361 (S.D.N.Y. 1998) ("Defendants must show that they had taken affirmative steps to increase their reliance on the mark during Plaintiffs' alleged delay.").

21.     Defendants suffered no prejudice as a result of Romag's alleged unreasonable delay in bringing this action because they did not change their positions at all; rather, Defendants simply continued to sell Fossil handbags with counterfeit Romag magnetic snap fasteners without any appreciable change in their activities or business. Any consequence to Romag's alleged delay was therefore not the result of any reliance on Romag's silence and instead was merely a natural consequence of their infringement. As such, Defendants have not established the third element of their laches defense.

22.     Defendants failed to plead mitigation as a defense, and it is therefore waived. Fed. R. Civ. P. 8(c); *see also Presti v. Dellacamera,* No. 3:08cv427, 2010 WL 466006, at *3 (D. Conn. Feb. 4, 2010) ("All affirmative defenses must be asserted in the answer."). It is well-recognized that failure to plead an affirmative defense in the answer constitutes waiver of the defense. *Travelers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2nd Cir. 1994) ("The general rule in federal courts is that a failure to plead an affirmative defense results in a waiver."); *Satchess v. Dilworth,* 745 F.2d 781, 784 (2d Cir. 1984) ("Failure to plead an affirmative defense in the answer results in 'the waiver of that defense and its

exclusion from the case.'") (citations omitted); *Presti*, 2010 WL 466006, at *3 (holding that failure to plead an affirmative defense waived the right to that defense).

23.     To the extent the affirmative defense of mitigation has not been waived, Romag had no duty to mitigate any damage to Fossil, and mitigation is simply another term for laches.

24.     Defendants incorrectly apply the concept of mitigation of *damages* to a recovery for *profits*. There is no doctrine requiring a plaintiff to mitigate another's profits. Romag was awarded disgorgement of Fossil's profits – for the purpose of deterrence. It did not seek damages. Because there can be no mitigation of damages where no damages are sought, mitigation is irrelevant in an action for profits. Instead, the jury awarded disgorgement of Fossil's profits as a means of deterring future acts of trademark infringement.

25.     The question of whether a plaintiff has waited too long to bring a trademark or a patent suit is properly analyzed under the doctrine of laches. Laches is the long-established doctrine within which to determine whether the plaintiff waited too long to sue, and it would be unwise to transplant the doctrine of mitigation – a doctrine from unrelated areas of law – into the law of trademark and patent just to do what laches already does. Indeed, in *Voda v. Medtronic, Inc.*, 2010 WL 621076 (W.D. Okla. Dec. 14, 2011), where the delay was 8 ½ years, the Court considered a mitigation issue in a patent infringement case. The Court held that mitigation is "simply the opposite side of the laches defense."

26.     The doctrine of mitigation addresses a plaintiff's primary conduct, independent of litigation. For example, a landlord whose tenant breaks a lease must try to find a replacement tenant. Laches, by contrast, deals directly with the conduct of litigation. If

mitigation encompassed the duty to sue promptly then it would swallow the doctrine of laches.

27. Mitigation of damages is an affirmative defense, but defendants have not pleaded mitigation. *Travelers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580-81 (2d Cir. 1994). They did plead laches. The failure to plead mitigation is probative of the fact that mitigation is really just a repackaged laches defense.

28. Defendants' mitigation defense therefore fails for the same reasons as its laches defense fails.

29. The common law concept of mitigation of damages also has no place in the threshold determination of whether a plaintiff bringing a CUTPA claim has suffered an ascertainable loss. *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 287 Conn. 208, 217-18 (2008) ("The ascertainable loss requirement is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief."). A plaintiff need not measure or quantify its ascertainable loss, and ascertainable loss is not synonymous with damages. The Connecticut Appellate Court has recently cautioned against equating the statutory term "ascertainable loss" with damages, *E & M Custom Homes, LLC v. Negron*, 140 Conn. App. 92, 100 (2013) ("Contrary to the plaintiff's position, the determination of whether a party has suffered an ascertainable loss is not based on whether the party can recover damages for a loss, but rather on establishing whether a loss has occurred. Indeed, the term loss has a broader meaning than the term damages."), and cautioned against applying common law contract law to CUTPA claims, *id.* at 101 ("The present case, however, does not involve a contract or traditional contract damages law. Rather, this case concerns a foreclosure on a mechanic's lien and a counterclaim seeking damages for a statutory

violation."); *cf. Preston v. Keith*, 217 Conn. 12, 16 n.5 (1991) (holding that the concept of mitigation of damages serves as a "limitation on the amount of damages recoverable").

30.     The Connecticut Supreme Court has also recently rejected an attempt to engraft common law breach of contract limitations onto a CUTPA claim, and held that "this court repeatedly has recognized that CUTPA was intended to provide a remedy that is separate and distinct from the remedies provided by contract law when the defendant's contractual breach was accompanied by aggravating circumstances." *Ulbrich v. Groth*, 310 Conn. 375, 411 (2013) (rejecting application of the economic loss doctrine to CUTPA claims). Engrafting the concept of mitigation of damages onto the statutory term "ascertainable loss" thus runs afoul of controlling appellate authority precluding equating "ascertainable loss" with damages and rejecting the application of common law contract principles to CUTPA claims.

31.     Defendants cite no Connecticut appellate authority for the proposition that a plaintiff bringing a CUTPA claim, as opposed to a common law breach of contract or tort claim, must prove that it made reasonable efforts to mitigate the harm the plaintiff suffered in order to prove an ascertainable loss. Defendants rely upon one Connecticut Superior Court decision, which decision has been appealed. See *Landmark Inv. Grp., LLC v. Calco Const. & Dev. Co.*, 2013 WL 5969076 (Conn. Super. Ct. Oct. 11, 2013) ("Landmark"). In *Landmark*, the Court set aside a jury verdict for the plaintiff awarding compensatory damages resulting from the defendant's breach of a contract to sell real estate on the grounds that any harm suffered by the plaintiff was self-inflicted because the plaintiff never took action to enforce a judgment of specific performance against the defendant to convey the real estate in question. *Id.* at *21-*22. Although the Court in *Landmark* discussed a common law duty to mitigate damages with respect to common law tortious interference with contractual relations, citing

the same exact cases Defendants cite in their proposed jury instructions, and stated that the plaintiff's conduct was also relevant to whether the plaintiff could establish an ascertainable loss under CUTPA, the Court's actual holding was that "the evidence presented at trial was insufficient to establish that the defendants did anything improper. In addition, the plaintiff's failure to prove a causal relationship between the actions of the defendants and its alleged losses is fatal to the CUTPA allegation in that a necessary element of a CUTPA claim is proof of an ascertainable loss." *Id.* at *27 (emphasis added). The Court's actual holding, therefore, is consistent with the developed body of caselaw interpreting CUTPA, and was not based upon a duty to mitigate engrafted onto CUTPA's statutory scheme.

32.    Moreover, Romag did not seek compensatory damages under CUTPA, and so any requirement to mitigate compensatory damages under CUTPA would be irrelevant here.

33.    To the extent mitigation applies at all to this case, Defendants have not proven it.

**B.    Relief Available To Romag**

Relief Based on the Lanham Act

34.    The amount of Fossil's profits awarded by the jury is an amount the jury found to be necessary to deter Fossil from selling counterfeit Romag magnetic snap fasteners. The amount itself is appropriate, as it represents the amount of Fossil's profits from the sale of Fossil handbags with counterfeit Romag magnetic snap fasteners as calculated by Fossil's expert, Laura Stamm. Moreover, the amount awarded by the jury is a small percentage of Fossil's net profit of over $250 million a year in recent years and it is less than 2% of the almost one-half billion dollars of net profit earned by Fossil during the over two years during

which sale of counterfeit goods continued, and is therefore well in the range of an appropriate award.

35.    Willful infringement is not a prerequisite to an award of the Defendant's profits based on acts of infringement under Section 1114(1) or Section 1125(a) of the Lanham Act.  15 U.S.C. § 1117(a).  See Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 174 (3d Cir. 2005) ("We presume Congress was aware that most courts had consistently required a showing of willfulness prior to disgorgement of an infringer's profits in Lanham Act cases, despite the absence of the word 'willful' in the statutory text prior to 1999. By adding this word to the statute in 1999, but limiting it to § 43(c) violations, Congress effectively superseded the willfulness requirement as applied to § 43(a)."); Chanel, Inc. v. Veronique Idea Corp., 795 F. Supp. 2d 262, 268 (S.D.N.Y. 2011); Cartier v. Aaron Faber, Inc., 512 F. Supp. 2d 165, 172 (S.D.N.Y. 2007); Nike, Inc. v. Top Brand Co. Ltd., 2005 WL 1654859, at *9-*11 (S.D.N.Y. July 13, 2005).

36.    Where a Defendant has used a counterfeit mark, the Plaintiff may elect, at any time before final judgment is rendered by the Court, to recover, instead of actual damages and profits, an award of statutory damages not less than $1,000 or more than $200,000 per counterfeit mark per type of goods sold, offered for sale, or distributed, as the Court considers just.  15 U.S.C. § 1117(c)(1).

37.    Based on the defendants' conduct, including Defendants' use of Counterfeit Romag Magnetic Snap Fasteners, and the Defendants pursuing litigation in defense of Romag's counterfeit claim despite undisputed evidence of the counterfeit nature of those goods, Romag is entitled to an award of attorneys' fees and expenses under Section 1117(a) as an "exceptional case."  *See Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366,

1383 (2d Cir. 1993) (holding that an "exceptional cases" exists where there is "evidence of fraud or bad faith"); *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 463 (S.D.N.Y. 2012) (awarding fees based, in part, upon the defendant's conduct of litigation).

38.     Based on the defendants' conduct, including Defendants' use of Counterfeit Romag Magnetic Snap Fasteners, and the Defendants pursuing litigation in defense of Romag's counterfeit claim despite undisputed evidence of the counterfeit nature of those goods, Romag is entitled to injunctive relief under the Lanham Act.

39.     Since the jury has found counterfeiting, Romag is entitled to a permanent injunction against Fossil's acts of trademark infringement.  An injunction is necessary to prevent irreparable injury and to protect the public interest.

40.     An injunction against Fossil should enter as follows:

        a.      Prohibiting Fossil from importing, selling or offering for sale Fossil handbags bearing counterfeit Romag magnetic snap fasteners; and

        b.      Directing Fossil to destroy all counterfeit magnetic snaps in its possession, custody or control, including those in all handbags containing same, within 60 days and to provide a certification to the Court that it has done so, *see* 15 U.S.C. § 1118.

Relief Based on Connecticut Law

41.     Based on Defendants' conduct, including Defendants' use of Counterfeit Romag Magnetic Snap Fasteners, and the Defendants' pursuing litigation in defense of Romag's counterfeit claim despite undisputed evidence of the counterfeit nature of those goods, Romag is entitled to injunctive relief pursuant to the Connecticut Unfair Trade Practices Act.

42.     An injunction against Fossil should enter as follows:

a.    Prohibiting Fossil from importing, selling or offering for sale Fossil handbags bearing counterfeit Romag magnetic snap fasteners; and

b.    Directing Fossil to destroy all counterfeit magnetic snaps in its possession, custody or control, including those in all handbags containing same, within 60 days and to provide a certification to the Court that it has done so.

43.    The jury found that Fossil violated the Connecticut Unfair Trade Practices Act.

44.    Pursuant to the Act (Conn. Gen. Stat. § 42-110g(d)), Romag is entitled to recover from Fossil Romag's reasonable attorney's fees and expenses.

45.    This Court should direct Romag to submit its request for attorneys' fees and expenses by a date certain to be followed by a briefing schedule and a hearing on Romag's request for attorneys' fees and expenses, if necessary.

Relief Based on the Patent Law

46.    The court may award reasonable attorney's fees to a prevailing party in an action under the Patent Act where the court determines that the case is "exceptional." 35 U.S.C. § 285.  The purpose of the statute has been described by the Federal Circuit as "to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit." *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983).

47.    Misconduct in connection with patent litigation which evidences bad faith on the part of the losing party may be sufficient to render a patent case "exceptional." *See Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1314 (Fed. Cir. 2013) (finding that objective baselessness alone can create a sufficient inference of bad faith to establish exceptionality required for an award of attorney fees under 35 U.S.C. § 285, unless the circumstances as a whole show a lack of recklessness).

48.     The advancement of certain patent invalidity and non-infringement arguments by Defendants during the pendency of this litigation, and withdrawal during trial of these claims, makes this case exceptional within the meaning of 35 U.S.C. § 285, where such actions were objectively baseless and greatly prolonged both discovery and Romag's trial preparation.  Specifically, discovery was prolonged because of the advancement of theories with respect to invalidity, which theories were unfounded, as Defendants later withdrew them with prejudice, causing great expense to Romag.  Trial was similarly prolonged because of Defendants' advancement of theories relating to the Romag magnetic snap fasteners being sold out the "back door." Defendants' "back door" theory was without merit and was disproved based on the jury's findings.

Other Relief

49.     Romag, as the prevailing party, is entitled to an award of costs pursuant to Rule 54 of the Federal Rules of Civil Procedure and Rule 54 of the Local Rules of Civil Procedure for the District of Connecticut.

ROMAG FASTENERS, INC.

By: /s/ *David R. Schaefer*
    David R. Schaefer (ct 04334)
    Sean M. Fisher (ct 23087)
    BRENNER, SALTZMAN & WALLMAN LLP
    271 Whitney Avenue
    New Haven, Connecticut  06511
    203-772-2600  Telephone
    203-562-2098  Facsimile
    dschaefer@bswlaw.com
    sfisher@bswlaw.com

       and

    Norman H. Zivin (ct 08103)
    Tonia A. Sayour (admitted pro hac vice)
    COOPER & DUNHAM LLP
    30 Rockefeller Plaza
    New York, New York  10112
    212-278-0400  Telephone
    212-391-0525  Facsimile
    nzivin@cooperdunham.com
    tsayour@cooperdunham.com

    Attorneys for Plaintiff Romag Fasteners, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2014, a copy of foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.


_____/s/ David R. Schaefer_____
David R. Schaefer

m:\docs\00189\010\cd4224.doc