UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROMAG FASTENERS, INC., *Plaintiff,* *v.* FOSSIL, INC., *et al.,* *Defendants.* | Civil No. 3:10cv1827 (JBA) June 27, 2014 |

**MEMORANDUM OF DECISION**

On April 3, 2014, after a seven-day trial, a jury returned a verdict finding Defendants Fossil, Inc. and Fossil Stores I, Inc. ("Fossil") liable for trademark infringement, false designation of origin, state common law unfair competition, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). (*See* Jury Verdict [Doc. # 417].) The jury also found Fossil and Macy's, Inc. and Macy's Retail, Inc. ("Macy's") liable for patent infringement. (*Id.*) The jury returned a verdict of no liability for the remaining defendants, and found that neither Fossil nor Macy's had willfully infringed Plaintiff Romag Fasteners, Inc.'s ("Romag") patent or trademark. (*Id.*) The jury made an advisory award of $90,759.36 of Fossil's profits for trademark infringement under an unjust enrichment theory and $6,704,046.00 of Fossil's profits for trademark infringement under a deterrence theory and determined that one percent of Fossil's profits were attributable to its infringement of the ROMAG mark. (*Id.*) Finally, the jury awarded a reasonable royalty of $51,052.14 against Fossil and $15,320.61 against Macy's for patent infringement. (*Id.*)

The Court then held a two-day bench trial on April 8 and 9, 2014 to address "the equitable defenses of estoppel, acquiescence, unclean hands, and laches; the equitable adjustment of the amount of profits awarded by the jury; the calculation of punitive

damages; treble damages; attorneys' fees; and the amount of statutory damages to be awarded," (Ruling Granting Mot. to Bifurcate [Doc. # 360] ¶ 15), as well as Romag's claim for a permanent injunction.[1]  Defendants also asserted that Romag failed to mitigate its damages and sought sanctions as a result of Romag's conduct in procuring a temporary restraining order ("TRO") at the outset of this case.  (*See* Defs.' Prop. Findings of Fact and Conclusions of Law [Doc. # 419] at 42–45.)

For the following reasons, the Court concludes that Defendants have failed to establish that Romag is barred from relief by unclean hands or that Romag had a duty to mitigate its damages.  However, the Court concludes that Defendants have established their laches defense and that the Court should impose sanctions.  The Court further concludes as a matter of law that based on the jury's finding that the trademark infringement in this case was not willful, Romag is not entitled to recover an award of Fossil's profits associated with that infringement.  Finally, a permanent injunction will enter against Fossil.

## I.      Findings of Fact

Based on the evidence presented during the seven-day jury trial and the two-day bench trial, the Court makes the following findings of fact with respect to the affirmative defenses and the other equitable issues in this case.

---

[1] In their Proposed Findings of Fact and Conclusions of Law [Doc. # 419], Defendants address only the unclean hands and laches defenses, in addition to a newly asserted defense of failure to mitigate damages.  Thus, this ruling will not address the defenses of acquiescence or estoppel.  The issue of attorneys' fees, and any potential election of statutory damages by Romag will be addressed in separate rulings.  This ruling also will not address the calculation of punitive damages, because the jury did not find such damages warranted in this case, nor will it address treble damages, because the jury found that Fossil's trademark infringement was not willful, and because Romag did not brief the issue in its Proposed Findings of Fact and Conclusions of Law [Doc. # 421] or its Trial Memorandum in Support of Damages [Doc. # 448].

## A.    The Parties

Romag is a corporation organized under the laws of the State of Connecticut having a place of business in Milford, Connecticut.  (Trial. Tr. Vol. VI [Doc. # 438] at 1398.)  Howard Reiter founded Romag in 1996 and has served as its President ever since.  (Trial Tr. Vol. I [Doc. # 433] at 79–80.)  Romag manufactures magnetic snap fasteners that are protected by United States Patent No. 5,777,126 (the "'126 Patent") (*see* Pl.'s Ex. 1), which it owns by assignment (Trial Tr. Vol. VI at 1398–1401), and sells them under its registered trademark, "ROMAG," (*see* Pl.'s Ex. 2; Trial Tr. Vol. VI at 1398–1401).  These snaps are manufactured in factories in China by a company called Wing Yip Metal Manufactory Accessories Limited ("Wing Yip").  (Defs.' Ex. 548; Trial Tr. Vol. I at 82–85, 121–25.)  When Mr. Reiter decided to manufacture ROMAG snaps in Hong Kong, he was looking for "a very deep relationship," and so in 1997 he started Wing Yip with Timmy Cheung, whose family had previously worked with Mr. Reiter's family.  (Trial Tr. Vol. I at 122.)  Although the companies are distinct legal entities, Mr. Reiter considers Mr. Cheung to be his business partner.  (*Id.* at 122–23.)  Wing Yip employs inspectors in its Chinese factories to monitor its production, but Romag also has its own inspectors in China, who work directly for Romag and are Mr. Reiter's "eyes and ears on the ground in China."  (*Id.* at 111.)

All of the goods that Wing Yip manufacturers are made for Romag.  (*Id.* at 123.)  Pursuant to the License Agreement between these two companies, Wing Yip pays Romag a $0.05 royalty for every snap it sells.  (Defs.' Ex. 548.)  Wing Yip's first factory—Kong Yip—was located in mainland China.  (Trial Tr. Vol. I at 124.)  In 2004, Mr. Reiter and Mr. Cheung decided to open an additional factory, called Timake.  (*Id.* at 125.)  Mr. Reiter financed the construction of this factory, and purchased new equipment for

production there. (*Id.* at 126–27.) The machinery used to make ROMAG snaps at Kong Yip was also transferred to Timake, which began producing ROMAG snaps in December 2007. (*Id.* at 127–28.) In early 2008, the workers at Kong Yip went on strike, the factory was shut down, and some of the manufacturing equipment there was seized. (*Id.* at 222.) Several former Wing Yip employees left the company at that time, and started a new manufacturing company known as Hechuang Metal Manufactory ("Hechuang"), which was not an authorized manufacturer of ROMAG snaps. (Pl.'s Ex. 27.)

Fossil is a corporation organized under the laws of the State of Delaware, having a place of business in Richardson, Texas (Trial Tr. Vol. VI at 1398), which designs, markets, and distributes fashion accessories, including jewelry, handbags, and small leather goods, (Trial Tr. Vol. IV [Doc. # 436] at 899), and sells its products through its own retail stores and website, and through other retailers, including the Retailer Defendants: Macy's, Belk, Inc., The Bon-Ton Stores, Inc., The Bon-Ton Department Stores, Inc., Dillard's, Inc., Nordstrom, Inc., Zappos.com, Inc., and Zappos Retail, Inc., (Trial Tr. Vol. VI at 1400). Like Romag, Fossil does not manufacture its products itself, but rather, contracts with independent business entities to do so. (Pl.'s Ex. 47.) One of Fossil's independent authorized manufacturers is Superior Leather Limited a/k/a Dong Guan Red Lion Leather Products, Limited ("Superior"), which operates a factory in China. (*Id.*; Trial Tr. Vol. VI at 1401.) Superior manufactured the handbags at issue in this case on behalf of Fossil. (*Id.*) As Fossil's designated manufacturer, Superior, not Fossil, purchases the component parts for handbags, including the magnetic snaps used in the handbags at issue in this case. (Trial Tr. Vol. III [Doc. # 435] at 527–28.)

In 2002, Romag and Fossil entered into an agreement for the use of ROMAG magnetic snap fasteners in Fossil products. (Pl.'s Exs. 37–39; Trial Tr. Vol. I at 144–45.)

Pursuant to the agreement, Fossil instructed its factories, where necessary, to purchase ROMAG snaps from Wing Yip. (Pl.'s Ex. 38; Trial Tr. Vol. I at 144.) Via Wing Yip, Romag has sold magnetic snaps to Superior for use by multiple designers and retailers since 2001. (Trial Tr. Vol. I at 138, 168.) Although Mr. Reiter was forwarded an email in July 2002 identifying Superior as a Fossil manufacturer (*see* Pl.'s Ex. 42), the invoices between Wing Yip and Superior would not typically have identified the orders as being specifically for Fossil (Trial Tr. Vol. I at 146–47.) From 2002 through 2008, Superior purchased tens of thousands of ROMAG snaps from Wing Yip for use in Fossil products. (Pl.'s Ex. 35.) However, between August 2008 and the commencement of this action, Superior purchased only a few thousand ROMAG snaps from Wing Yip. (*Id.*; *see also* Pl.'s Ex. 54.) On December 2, 2010, in response to Fossil's inquiries after this action commenced, Superior informed Fossil that it had purchased ROMAG snaps from a manufacturer that was "not the authorized licensee of Romag." (Pl.'s Ex. 53A.)

### B. Prior Instances of Counterfeiting

Three years before the events at issue here, in November 2007, shortly before Thanksgiving, Mr. Reiter testified that he discovered that counterfeit ROMAG snaps were being used in handbags for sale at J.C. Penney. (Trial Tr. Vol. I at 231–32.) Mr. Reiter stated that he discovered these bags during a routine shopping trip to the J.C. Penney store near his office. (J.C. Penney Reiter Decl. [Doc. # 5] ¶¶ 8–9, *Romag Fasteners, Inc. v. J.C. Penney Co. ("Romag I")*, Civil No. 07cv1667 (JBA) (D. Conn. 2007).) On November 12, 2007, Romag's counsel in this action, Attorney Norman Zivin sent a cease and desist letter to J.C. Penney detailing the alleged counterfeiting. (Defs.' Ex. 557.) The next day, Romag filed suit against J.C. Penney, and on November 15, 2007, moved for a TRO and preliminary injunction enjoining J.C. Penney from selling the accused products. (*See*

5

Compl. [Doc. # 1], Mot. for TRO [Doc. # 3], and Mot. for Prelim. Inj. [Doc. # 6], *Romag I.*)  On November 28, 2007, after a hearing, this Court granted Romag's motion for a TRO and a Preliminary Injunction.  (TRO Order [Doc. # 22], *Romag I.*)  A few weeks later, the parties reached a settlement in the suit and the TRO was dissolved.  (Stip. Of Dismissal [Doc. # 30], *Romag I.*)

In November 2009, Romag again discovered the presence of counterfeit ROMAG snaps in the market, this time, on handbags being sold by DSW, Inc. ("DSW").  (*Id.* at 233).  One of Mr. Reiter's employees received a bag with purchase at DSW and discovered that the bag contained a snap with the ROMAG mark.  (*Id.*)  On November 17, 2009, almost two years to the day from the last counterfeiting incident, Attorney Zivin sent a cease and desist letter to DSW demanding that it immediately discontinue the sale of the accused products.  (Defs.' Ex. 560.)  The two companies were able to reach a settlement agreement regarding the handbags before a civil action was initiated.  (Defs.' Ex. 564.)  Romag never informed Fossil about either incident, nor warned Fossil about the presence of counterfeit ROMAG snaps in the United States market.  (Trial Tr. Vol. I at 232–34.)

**C.    Romag's Discovery of Counterfeiting by Fossil**

On May 12, 2010, Mr. Reiter received an email from an unidentified former employee of Wing Yip who went by the name "Joe."  (Pl.'s Ex. 27.)  In the email "Joe" stated that another factory in China had been producing magnetic snap fasteners bearing the ROMAG mark without authorization.  (*Id.*)  On May 19, 2010, Mr. Reiter replied to the email, inquiring as to the identity of the factory and asking whether it was "the factory that many former workers from [W]ing [Y]ip went to."  (*Id.*)  Mr. Reiter further stated that the identity of the handbag maker using the snaps was the most important information for him because "it is hard for the law to work in [C]hina . . . easier in [the]

USA." (*Id.*) On May 20, 2010, "Joe" responded to Mr. Reiter's queries, identifying Hechuang as the factory in question and attaching two Superior invoices to the email to indicate which manufacturer was purchasing the unauthorized snaps. (*Id.*) Mr. Reiter testified that the only brand that he knew to be associated with Superior at that time was the defunct Ruehl division of Abercrombie & Fitch, and that because Ruehl had ceased operations, he felt that contacting Abercrombie & Fitch about the email would be futile. (Trial Tr. Vol. I at 169–70.) Mr. Reiter testified that he did not search his email correspondence for any references to Superior when he received the email from "Joe" in May, but he did perform such a search in October or November, and found an email identifying Superior as a Fossil manufacturer. (Trial Tr. Vol. IX [Doc. # 442] at 1685–86.)

The next day, on May 21, 2010, Mr. Reiter contacted Attorney Zivin on four separate occasions. (Trial Tr. Vol. II [Doc. # 434] at 294–95; Defs.' Ex. 584.) Then, on May 24, 2010, Mr. Reiter's sister-in-law, Elissa Ellant Katz, contacted his wife—Jody Ellant, who is Romag's General Counsel, (Trial Tr. Vol. II at 295)—to report to Ms. Ellant that she had discovered ROMAG snaps on Fossil handbags at a Macy's store in Boca Raton, Florida, where she and her daughter had been shopping, (Trial Tr. Vol. I at 155; Trial Tr. Vol. IX at 1689). Ms. Ellant was concerned by this discovery because she did not believe that Fossil was a Romag customer, so she asked her sister to purchase several bags and send them to her in Connecticut. (Trial. Tr. Vol. I at 155, 157.) Ms. Ellant also went to the Macy's in Milford Connecticut and purchased additional Fossil bags containing ROMAG snaps. (*Id.* at 155; Trial Tr. Vol. IX at 1689–90.) Ms. Ellant told Mr. Reiter about her discovery and her suspicion that these were counterfeit snaps, but he assured her that Fossil was a customer. (Trial Tr. Vol. I at 155–57.) Mr. Reiter testified that he did not suspect that the snaps were counterfeit because he knew Fossil was a customer.

(*Id.* at 157–58.)  Mr. Reiter testified that he put the bags that Ms. Katz and Ms. Ellant had purchased aside for several months.  (Trial. Tr. Vol. II at 299.)

In July 2010, Mr. Reiter traveled to the Timake factory in China, but did not investigate the information he had received regarding counterfeit manufacturing at Hechuang at that time.  (Trial Tr. Vol. I at 171–72.)  Then, at the end of October, Mr. Reiter claims he suddenly had an epiphany that he should investigate the bags his wife and sister-in-law had purchased in connection with the alleged purchase of counterfeit snaps by Superior.  (*Id.* at 174; Trial Tr. Vol. II at 299–300.)  Mr. Reiter testified that he does not know what prompted him to make the connection between the alleged counterfeiting and the Fossil bags so suddenly at that time.  (Trial Tr. Vol. I at 174–75.)  He did not contact anyone at Fossil to report his initial suspicions.  (Trial. Tr. Vol. II at 298.)  Rather, Mr. Reiter contacted Wing Yip and asked for computer reports on Superior's purchases.  (Trial Tr. Vol. I at 175.)  Mr. Reiter had not investigated Wing Yip's sales records prior to this request, but gave no indication they were not previously available to him.  (*Id.* at 240.)  Mr. Reiter found that Superior's purchases of ROMAG snaps had dropped off precipitously in 2008 and decided to investigate further.  (*Id.* at 177.)  He personally inspected the snaps from the Fossil bags purchased by Ms. Katz and Ms. Ellant, and sent them to Wing Yip for testing.  (*Id.* at 177–78.)  After performing some testing on the snaps, Wing Yip reported that the snaps could not have been made with Wing Yip's tooling.  (*Id.* at 178; Pl.'s Ex. 149.)

On November 8, 2010, Mr. Reiter emailed Doug Dyment at Fossil and requested information about which of Fossil's factories manufactured the types of handbags his wife and sister-in-law had purchased in May.  (Pl.'s Ex. 28.)  The email made no mention of Mr. Reiter's suspicions of counterfeiting.  (*Id.*)  Mr. Dyment replied via email that the

information Mr. Reiter had requested was proprietary (*id.*), and in a subsequent phone conversation with Mr. Reiter that day, directed Mr. Reiter to the legal department if he had further questions. (Trial Tr. Vol. I at 183–84.) After this conversation, Mr. Reiter testified that he went to Macy's specifically to confirm his suspicions regarding counterfeiting by Fossil, and purchased several additional bags from Macy's and from a Fossil outlet store. (*Id.* at 202.) On November 17, 2010, exactly one year after he sent a cease and desist letter to DSW, Attorney Zivin sent a cease and desist letter to Fossil, demanding that Fossil suspend all sales of products containing the counterfeit snaps. (Ex. 32.) Fossil began an investigation of the allegations and confirmed that Superior had manufactured the bags in question. (Pl.'s Exs. 48–49, 665; Trial Tr. Vol. IX at 1697–1705.)

### D. The Commencement of this Action

On November 22, 2010, Romag commenced this action against Defendants Fossil and Macy's (Compl. [Doc. # 1]),[2] and the next day, moved [Doc. # 10] for a TRO and preliminary injunction. This motion was filed on the eve of "Black Friday,"[3] which is the highest volume shopping day in the United States and kicks off the holiday shopping season. (Trial. Tr. Vol. IV at 956; *see also* Reiter Decl. [Doc. # 12] ¶ 19 (noting that "it is, of course, a well-known fact that the holiday selling season is the busiest time of year for retailers.").) Mr. Reiter submitted a sworn declaration [Doc. # 12] in connection with that motion. Portions of this declaration bear a striking resemblance to the declaration Mr. Reiter filed in connection with the J.C. Penney TRO application. (*Compare* Reiter

---

[2] The other Retailer Defendants were later sued in a separate action, filed on June 9, 2011, that was combined with this case.

[3] "Black Friday"—the Friday after Thanksgiving—fell on November 26th in 2010, a mere three days after Plaintiff's TRO application was filed.

Decl. ¶¶ 8–9 *with* J.C. Penney Reiter Decl. ¶¶ 8–9.) The declaration makes no mention of the May 19, 2010 email, Ms. Katz's and Ms. Ellant's May 2010 purchases of Fossil bags, or Mr. Reiter's investigation into the connection between the two in late October and early November. Rather, the declaration implies that the November shopping trip was the result of "habit and custom." (Reiter Decl. ¶ 8.) In it, Mr. Reiter stated that he "was somewhat surprised that so many of the handbags . . . had [ROMAG] magnetic snap fasteners," (*id.*), and that he was "shocked to find that the magnetic snap fasteners on the Fossil handbags were counterfeits," (*id.* ¶ 9). These statements are inconsistent with Mr. Reiter's testimony at trial that he went to Macy's in November 2010 with the specific purpose of confirming his suspicions that Fossil was using counterfeit ROMAG snaps. (*See* Trial Tr. Vol. I at 202 ("Well, after we contacted Fossil, I wanted to be sure before we went to the next step that they were still in the stores and verify the existence of these Fossil bags with counterfeits being on the floor of some stores. So I went to Macy's and I went to Fossil's outlet in Clinton, Connecticut, to check bags.").)

On November 30, 2010, Judge Droney,[4] granted Romag's motion for a temporary restraining order, and enjoined Fossil and Macy's from "selling or offering for sale Fossil Handbags bearing counterfeit [ROMAG] fasteners." (TRO Ruling [Doc. # 20] at 9.) Fossil worked with its employees and retailers to put a hold on all of the affected products and to prevent any items that had already been delivered to retailers from being sold to customers. (Trial Tr. Vol. IX at 1697–1705.) Because of the timing of the suit, this all had to be done during the busy holiday season, diverting workers from their other holiday

---

[4] This case was assigned to several judges, including Judge Christopher Droney, Judge Mark Kravitz, Judge Stefan Underhill, and Judge William Young, before it was transferred to the undersigned for trial.

sales tasks.  (*Id.*)  The inventory that Fossil ultimately had to remove from its sales channels was worth $4,148,093.39.  (*Id.* at 1712; Defs.' Ex. 736.)  If the TRO had been entered in May, when Mr. Reiter first received evidence of counterfeit sales to Superior, Fossil's tainted inventory would have been much smaller—Fossil estimates that its inventory in May would have been about half as valuable.  (Trial Tr. Vol. IX at 1712–14.) Fossil also believes that it could have replaced its holiday inventory with non-infringing products if it had been notified of the counterfeiting by September 2010.  (*Id.* at 1724–26.)

## II.    Conclusions of Law

Defendants have asserted the equitable defenses of unclean hands and laches as a bar to Plaintiff's recovery in this action, and argue that Plaintiff failed to mitigate its damages once it discovered the infringing conduct.  Defendants also ask the Court to impose sanctions as a result of Plaintiff's deceptive conduct in procuring a TRO in this case.    Finally, Defendants assert that the Court should vacate the jury's award of profits based on its finding that Fossil's trademark infringement was not willful, and argue that even if the Court concludes that Plaintiff may seek an accounting of profits absent a finding of willfulness, the equitable considerations in this case warrant a drastic reduction or elimination of the jury's award.    Plaintiff counters that it is legally entitled to an accounting of profits absent a finding of willfulness and that the Court should increase the jury's award of profits based on a consideration of the equitable factors.  Plaintiff further seeks a permanent injunction enjoining Fossil from further infringement and ordering it to destroy all counterfeit ROMAG snaps in its possession.

### A.     Unclean Hands

Defendants argue that Romag's unclean hands with respect to its delay in commencing suit and its submission of a false declaration to obtain a TRO "bars the equitable remedy of recovery of Defendants' Profits." (Defs.' Prop. Findings of Fact and Conclusions of Law at 37.)   Plaintiff counters that in the context of a trademark action, the unclean hands doctrine applies only to a plaintiff's acquisition or use of a trademark, and not to litigation conduct.   Plaintiff further denies that it acted inequitably with respect to the commencement of this action and the procurement of the TRO, and argues that even if its conduct could be the basis for an unclean hands argument, the balance of the equities weighs in favor of permitting recovery in this action.

"He who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945).   "The 'clean hands' doctrine is 'far more than a mere banality.   It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.'"   *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009) (quoting *Precision Instrument Mfg. Co.*, 324 U.S. at 814).   The Second Circuit has recognized that "the defense of unclean hands applies only with respect to the right in suit."   *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir. 1983).   "[T]he doctrine of unclean hands requires a balancing of the equities and the relative extent of each party's wrong upon the other and upon the public should be taken into account, and an equitable balance struck."   *Patsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 2d 427, 461 (S.D.N.Y. 2008) *aff'd*, 658 F.3d 254 (2d Cir. 2011) (internal citations and quotation marks omitted).   "Further, because trademark law also involves protecting the public's interest,

courts typically only bar recovery under a theory of unclean hands when a plaintiff's conduct was egregious or clear, unequivocal and convincing." *Id.* (internal citations and quotation marks omitted).

Defendants rely on a case from the Tenth Circuit for the proposition that litigation conduct in a trademark action may be the basis for an unclean hands defense. In *Worthington v. Anderson*, 386 F.3d 1314, 1321 (10th Cir. 2004), the Tenth Circuit recognized that historically, two types of inequitable conduct are covered by the unclean hands doctrine: (1) "inequitable conduct toward the public, such as deception in or misuse of the trademark itself, resulting in harm to the public such that it would be wrong for a court of equity to reward the plaintiff's conduct by granting relief," and (2) "when the plaintiff has acted inequitably toward the defendant in relation to the trademark." *Id.* In *Worthington*, the plaintiffs had failed to pay off a loan on which the defendants were guarantors, making it difficult for the defendants to fully comply with an arbitral award granting ownership of the trademark in suit to the plaintiffs. *Id.* at 1320. The Tenth Circuit held that the plaintiffs' interference with the defendants' ability to comply with their legal obligations was a proper ground for an unclean hands defense. *Id.* at 1321–22. In so holding, the Tenth Circuit cited with favor *Federal Folding Wall Corp. v. Nat'l Folding Wall Corp.*, 340 F. Supp. 141, 146 (S.D.N.Y. 1971), in which the court held that where the plaintiff induced the trademark owner to cancel its license agreement with the defendant and to award a license to the plaintiff instead, unclean hands would operate to bar the plaintiff's recovery. *Id.*

However, neither of the cases cited by Defendants specifically held that a plaintiff's conduct in the course of the trademark litigation itself could be a proper basis for an unclean hands defense in such a suit. Rather, the weight of the authority in this

Circuit holds that the inequitable conduct at issue must relate to the use or procurement of the trademark, rather than a position taken in the lawsuit. *See Jackson v. Odenat*, -- F. Supp. 2d ---, 2014 WL 1202745, at *17 (S.D.N.Y. Mar. 24, 2014) ("In the trademark context, the fraud or deceit must relate to plaintiff's 'acquisition or use' of the trademark." (quoting *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999)); *Coach, Inc. v. Kmart Corporations*, 756 F. Supp. 2d 421, 429 (S.D.N.Y. 2010) ("[I]t is well settled in trademark law that the defense of unclean hands applies only with respect to the right in suit. Filing a trademark or trade dress infringement lawsuit, therefore, cannot be a basis for an unclean hands defense to that lawsuit because any bad faith or inequitable conduct in filing the lawsuit is unrelated to the plaintiff's acquisition or use of the trademark or trade dress." (internal citations and quotation marks omitted)). Here, Defendants do not allege that Romag engaged in any fraudulent or misleading conduct with respect to its registration or use of the ROMAG mark, or that Romag in any way acted inequitably with respect to Defendants' use of that mark. The sole basis for Defendants' unclean hands defense is that Plaintiff delayed filing suit to obtain a tactical advantage and then filed a misleading declaration with the Court once the suit had commenced in order to obtain specifically-timed emergency injunctive relief. Because these allegations are unrelated to Romag's use or acquisition of the ROMAG mark, Defendants' unclean hands defense to bar Plaintiff's recovery of Defendants' profits on the trademark infringement claim must fail.

### B.    Laches

Defendants also assert the equitable defense of laches, arguing that Plaintiff's delay in filing suit after receiving the May 19, 2010 email resulted in economic prejudice to Defendants and that Plaintiff should therefore be barred from recovery with respect to its

trademark and patent claims. Romag counters that Defendants have failed to establish either unreasonable delay or economic prejudice, and that their claim for laches therefore fails.

### 1. Laches—Patent Claim

In the context of patent litigation the Federal Circuit has held that, "laches may be defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 128–29 (Fed. Cir. 1992) (en banc). "Laches bars relief on a patentee's claim only with respect to damages accrued prior to suit." *Id.* at 1041. "The application of the defense of laches is committed to the sound discretion of the district court." *Id.* at 1032. "With its origins in equity, a determination of laches is not made upon the application of 'mechanical rules.'" *Id.* "The defense, being personal to the particular party and equitable in nature, must have flexibility in its application. A court must look at all of the particular facts and circumstances of each case and weigh the equities of the parties." *Id.* (internal citations omitted).

To succeed on a laches defense a defendant bears the burden of establishing the following two factors by a preponderance of the evidence: "(1) the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and (2) the delay operated to the prejudice or injury of the defendant." *Id.* at 1032, 1045. "A court must also consider and weigh any justification offered by the plaintiff for its delay." *Id.* at 1033. "A patentee may also defeat a laches defense if the infringer has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor." *Id.*

(internal citations and quotation marks omitted). "Thus, for laches, the length of delay, the seriousness of prejudice, the reasonableness of excuses, and the defendant's conduct or culpability must be weighed to determine whether the patentee dealt unfairly with the alleged infringer by not promptly bringing suit. In sum, a district court must weigh all pertinent facts and equities in making a decision on the laches defense." *Id.* at 1034.

Plaintiff argues that Defendants have failed to establish unreasonable delay. Specifically, Plaintiff claims that because its alleged delay is shorter than the six-year statute of limitations, Defendants are categorically barred from asserting the laches defense. However, in the patent context, the Federal Circuit has held that laches may be applied within the limitations period. *Id.* at 1030 ("First, Aukerman is in error in its position that, where an express statute of limitations applies against a claim, laches cannot apply *within* the limitation period."). Rather, the statute of limitations functions to create a presumption of laches where the delay is alleged to have lasted longer than the six-year limitation period. *Id.* at 1035. Therefore, although the alleged delay in this case lasted only for a period of months, the length of the delay does not operate as a per se bar to Defendants' laches defense.

"The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances. The period of delay is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit." *Id.* at 1032. Despite Romag's assertion that it did not know of the alleged counterfeiting until late fall of 2010, the Court concludes that Romag knew or should have known of the use of counterfeit snaps in Fossil bags prior to that date. Mr. Reiter received an email communication from China informing him that Superior was selling counterfeit ROMAG snaps on May 21, 2010. (Pl.'s Ex. 27.) Although Mr. Reiter

claims he did not immediately make the connection between Fossil and Superior, a prompt search of his email archive would have identified Superior as a Fossil manufacturer. (Trial Tr. Vol. IX at 1685–86.) Although Mr. Reiter testified that he did not know the bona fides of "Joe," he also contacted his longtime intellectual property counsel, Attorney Zivin, several times the day after he received the email about the counterfeiting at Superior. (Trial Tr. Vol. II at 294–95; Defs.' Ex. 584.) In recognition of Romag's attorney-client privilege, the Court declines Defendants' invitation to draw inferences regarding the content of those communications from their timing. However, the contact between Mr. Reiter and his attorney does establish that Romag had access to intellectual property counsel at that time to help thoroughly investigate and develop its legal claims of counterfeiting. Furthermore, three days after receiving the email, Ms. Ellant and Ms. Katz purchased multiple Fossil bags containing ROMAG snaps and Romag's General Counsel, Ms. Ellant, brought this news and the handbags to Mr. Reiter, expressing her suspicion that the snaps used could be counterfeits. (Trial Tr. Vol. I at 155–57; Trial Tr. Vol. IX at 1689.)

Despite having notice of possible sales of counterfeit snaps by Hechuang to Superior, having access to information tying Fossil, through Superior, to that counterfeiting, having actual possession of the infringing products, as well as having access to specialized legal counsel, all within one week, Mr. Reiter testified, inexplicably, that he drew no connection between his wife's concerns regarding the Fossil bags and the email alleging that Superior was purchasing counterfeit snaps. He offered no explanation for why he did not contact Romag's inspectors in China to investigate Hechuang, the counterfeiting allegations, or his wife's suspicions, or for why he failed to investigate these matters himself when he was in China at the Timake factory two months later in July

2010, where sales records would have disabused him of his belief that Fossil remained a purchaser of ROMAG snaps through authorized channels. Rather, Mr. Reiter claims to have had an epiphany in late October, the trigger for which he could not recall,[5] that led him to finally make the connection between the Fossil bags and the Superior invoices. Mr. Reiter's testimony does not ring true, especially in light of his prior track record of issuing cease and desist letters and seeking emergency relief on the eve of Black Friday, a time that is an obvious pressure point for retailer defendants. Although Mr. Reiter claimed not to know what Black Friday was, he made note of the holiday selling season in his own declaration in support of the TRO in this case. (*See* Reiter Decl. ¶ 19.)

Even if the Court were to credit Mr. Reiter's testimony that he actually made no connection between Fossil and Superior until late October 2010, the record is clear that he had all the information he needed to make that connection by the end of May 2010: Superior invoices from Hechuang, an email in his archives linking Superior to Fossil, and several Fossil handbags with likely counterfeit snaps. With this information, by Mr. Reiter's estimation, it took him no more than three or four weeks to confirm his post-epiphany suspicions by requesting Superior invoices from Wing Yip, examining the snaps on the bags, requesting information about Fossil's factories, and purchasing additional handbags containing ROMAG snaps. Therefore, Romag knew or should have known by June 2010 of its good faith basis for believing that Fossil was infringing. The Court thus concludes that the period of delay with respect to Defendants' laches claim should be

---

[5] *The Meriam-Webster Dictionary* defines an epiphany as "an intuitive grasp of reality through something (as an event) usually simple and striking." (*Available at* http://www.merriam-webster.com/dictionary/epiphany.) However, Mr. Reiter was unable to identify any event in late October, as opposed to late May, that would have led him to the sudden understanding that the Fossil handbags were connected to Superior's counterfeit purchases.

measured from June 2010 to the commencement of this suit in November 2010—a period of five months. Although a delay of several months might not typically sound like unreasonable delay, based on the circumstances of this case, Romag's delay was unreasonable. The inescapable conclusion is that Plaintiff carefully timed this suit to take advantage of the imminent holiday shopping season to be able to exercise the most leverage over Defendants in an attempt to extract a quick and profitable settlement, as it had done twice before in the past three years. Furthermore, Plaintiff, in filing for emergency relief, relied on misleading representations that obfuscated the months of delay, where full disclosure would have undermined its claim of irreparable harm. The Court thus finds that Defendants have met their burden with respect to the first factor of their laches defense.

Plaintiff also argues that Defendants have not established that they suffered material economic prejudice as a result of the delay. "Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *A.C. Aukerman Co.*, 960 F.2d at 1020. "Such damages or monetary losses are not merely those attributable to a finding of liability for infringement. . . . The courts must look for a *change* in the economic position of the alleged infringer during the period of delay. On the other hand, this does not mean that a patentee may intentionally lie silently in wait watching damages escalate, particularly where an infringer, if he had had notice, could have switched to a noninfringing product." *Id.* (internal citations omitted) (emphasis in original).

Defendants presented testimony that the value of the accused inventory that Fossil had to remove from its sales channels was worth $4,148,093.39. (Trial Tr. Vol. IX at 1712;

Defs.' Ex. 736.) If the TRO had been sought and entered in May or June, when Romag first had a basis for asserting its infringement claims, Fossil's inventory would have been much smaller and half as valuable as its November inventory. (Trial Tr. Vol. IX at 1712–14.) Fossil's corporate representative also testified that Fossil could have replaced its holiday inventory with non-infringing products if it had been notified of the counterfeiting by September 2010. (*Id.* at 1724-26.) Plaintiff, citing mostly trademark cases, argues that this financial impact is insufficient to establish material prejudice because Defendants are "required to show that they had taken affirmative steps to increase their reliance on [the patent] during Plaintiff['s] alleged delay." *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 361 (S.D.N.Y. 1998). However, the nature of Defendants' claimed loss goes beyond just showing that they conducted business as usual during the period of delay. Defendants were ramping up production of their products in preparation for the holidays while Plaintiff sat on its rights. As a result of the American retail cycle, the timing of Plaintiff's suit meant that Defendants had nearly doubled their inventory by the time they were first told of their alleged counterfeiting. Furthermore, Fossil's representative testified that if the TRO had been filed prior to September 2010, Fossil could have switched the snaps on its handbags to generic snaps and still have been able to take its products to market for the profitable holiday selling season. Based on this evidence, Defendants have met their burden of establishing that they suffered material economic prejudice as a result of Plaintiff's unreasonable delay in bringing suit.

Plaintiff has not offered any excuse for its delay in this case, beyond Mr. Reiter's discredited claim that he had no idea of Fossil's infringement until October 2010. Plaintiff points to no egregious or outrageous conduct by Defendants that would counsel against the application of laches in this case, especially in light of the jury's finding that

Defendants' infringement was not willful. Thus, the Court concludes that based on the balance of the equities, laches should be applied in this case. Therefore, the Court will exclude the sales between June 2010 and November 2010 from the jury's award of a reasonable royalty, representing approximately eighteen percent of the twenty-eight-month period of infringement, and the jury's reasonable royalty awards will be reduced by eighteen percent to $41,862.75 and $12,562.90 respectively.

### 2.    Laches—Trademark Claims

Defendants also claim that laches operates as a complete bar to Plaintiff's recovery of profits on its trademark infringement claims. In this context, Defendants must demonstrate that Romag had knowledge of their use of counterfeit snaps, that Romag inexcusably delayed in taking action, and that Defendants suffered prejudice as a result of Romag's delay. *Tri-Star Pictures, Inc. v. Leisure Time Productions, B.V.*, 17 F.3d 38, 44 (2d Cir. 1994). "The inquiry is a factual one. The determination of whether laches bars a plaintiff from equitable relief is entirely within the discretion of the trial court." *Id.* Plaintiff raises largely the same arguments against Defendants' trademark laches defense as it does against Defendants' patent laches defense.

First, relying primarily on precedent other than civil trademark cases, Plaintiff maintains that Defendants have no valid laches defense because Plaintiff's delay was not longer than Connecticut's analogous three-year statute of limitations for fraud. *See, e.g.*, *United States v. Milstein*, 401 F.3d 53, 63 (2d Cir. 2005) ("[A]s a general rule, laches is not a defense to an action filed within the applicable statute of limitations."). However, in *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187 (2d Cir. 1996), the Second Circuit upheld a district court's application of laches in a trademark suit where suit was brought within the analogous limitation period, explaining that "[a]lthough laches is an equitable

defense, employed instead of a statutory time-bar, analogous statutes of limitation remain an important determinant in the application of a laches defense. . . . [the analogous state] statute of limitation . . . determines which party possesses the burden of proving or rebutting the defense." *Id.* at 191. Thus, similar to the patent context, in a trademark action, if the plaintiff's delay is longer than the analogous state statute of limitations, a presumption of laches applies, whereas if suit is brought within the limitations period, there is no presumption, and a defendant assumes the burden of proving the defense. *Id.* Therefore, although there is no presumption of laches in this case, the fact that Plaintiff delayed less than three years is not dispositive of Defendants' laches defense.

Plaintiff again claims that it had no knowledge of Defendants' use of counterfeit snaps until shortly before filing suit in November 2010, but the Court has not credited Mr. Reiter's testimony purporting to justify his delay in investigating or asserting potential counterfeiting claims until his alleged "epiphany" in late October 2010. Ms. Ellant raised her suspicions that Fossil was selling handbags with counterfeit ROMAG snaps on May 24, 2010, a mere three days after Mr. Reiter received the May 21, 2010 email informing him that Superior had been purchasing ROMAG snaps from an unauthorized source. These two events are simply too close in time for Mr. Reiter not to have made some connection between counterfeiting by Superior and potential infringement by Fossil and to have investigated it further. Mr. Reiter's response to "Joe" was immediate and expressed a desire to uncover the identity of the American brands using the counterfeit snaps in order to use the United States' legal system to enforce Romag's rights. (Pl.'s Ex. 27 ("What is more important to us is what handbag maker and what brands in [the USA] are getting these on their handbags. It is hard for the law to work in [C]hina . . . easier in [the USA].").) Thus, it defies belief that once he knew the

identity of the Chinese manufacturer purchasing the snaps, i.e., Superior, and was presented with Ms. Ellant's suspicions that counterfeit snaps were being used on Fossil-branded bags that he would have stopped any further investigation, especially in light of Romag's prior record of aggressive enforcement of its intellectual property rights.

Because the Court does not credit Mr. Reiter's testimony that it was only his "epiphany" in October 2010 that motivated him to act on the evidence of counterfeiting, rather than the evidence he had in May 2010, his testimony that he did not check or think to check his email archive for references to Superior until his October 2010 "epiphany" is called into doubt. At best, his failure to search for references to Superior as soon as he received the May 21, 2010 email appears to have been the result of conscious avoidance. Similarly, his failure to raise the allegations regarding Hechuang and Fossil with Romag's inspectors in China, or to investigate these allegations himself when he visited his Chinese factories in July 2010, lacks a good faith explanation. Therefore, as discussed above, the Court concludes that Romag had sufficient knowledge of Fossil's counterfeiting by June 2010 to bring suit. Additionally, as detailed above, the Court concludes that Plaintiff's five-month delay before filing suit was inexcusable and is tainted by its prior track record of similarly seeking emergency relief on the eve of Black Friday to maximize the economic pressure on retailers.

Finally, Plaintiff argues that Defendants have not established that they suffered prejudice as a result in the delay in filing suit. In the context of a trademark infringement action, "[a] defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be inequitable in light of the delay in bringing that claim. Specifically, prejudice ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed." *Id.* at 192. In *Conopco*, the

Second Circuit found that the defendant had been prejudiced by the plaintiff's delay because it had forgone other marketing positions that had been assumed by other producers in the interval of the plaintiff's delay. *Id.* at 192–93. Plaintiff argues that Defendants did not change their position between May 2010 and November 2010. However, Fossil's representative testified that Fossil had increased its inventory during that time period to prepare for the holiday shopping season. She further testified that because of Plaintiff's delay, Fossil lost the opportunity to replace the counterfeit snaps with generic snaps in time for the higher holiday demand. Therefore, the Court finds that Defendants have established that they were prejudiced by their delay.

Although the Court concludes that Defendants have sustained their burden with respect to their trademark laches defense, the Court does not believe that Plaintiff's delay should operate as a total bar to its recovery of profits in this case. The delay at issue here, while significant in light of the unique timing circumstances of this case, does not cover the majority of Defendants' infringement. Therefore, the Court will consider Plaintiff's laches as a factor in reducing the jury's advisory award of profits when it performs the equitable adjustment of that award. *See George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir. 1992) (listing plaintiff's laches as a factor courts should consider in awarding an accounting of profits).

### C. Mitigation of Damages

Defendants assert that Romag failed to mitigate its damages by not filing suit when it first learned of Fossil's counterfeiting. Plaintiff counters that Defendants have waived this affirmative defense by failing to plead it in their Answer [Doc. # 31] and that Defendants have failed to show that the concept of mitigation of damages is applicable in trademark and patent actions. "Failure to mitigate damages is an affirmative defense and

therefore must be pleaded. The general rule in federal courts is that a failure to plead an affirmative defense results in waiver." *Travellers Internat'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1580 (2d Cir. 1994). Here Defendants did not plead a failure to mitigate defense in their Answer and did not raise the issue until the eve of trial. Therefore, Defendants have waived this defense. *Id.* at 1580–81.

Furthermore, even if the defense had not been waived, Defendants have failed to establish that the concept of mitigation of damages has relevance to this case. Defendants rely on one case, *IMX, Inc. v. E-Loan, Inc.*, 748 F. Supp. 2d 1354 (S.D. Fla. 2010) for the proposition that plaintiffs have a duty to mitigate in patent and trademark cases. In that case, which included no trademark claims, the court rejected the plaintiff's argument that because there was no authority recognizing a failure to mitigate defenses in the patent context, such a defense could never be relevant in a patent action. *Id.* at 1361. The court concluded that because the plaintiff was seeking compensatory damages for the alleged infringement "it is entirely appropriate for a defendant to assert a defense of failure to mitigate damages when considering what amount of compensation is appropriate for [the p]laintiff." *Id.* Thus, *IMX* is distinguishable from this case where Plaintiff seeks a reasonable royalty, rather than compensatory damages. *See* Robert A. Matthews, Jr., 4 *Annotated Patent Digest* § 30:6.100 (interpreting *IMX* to find that a mitigation defense would not apply to a reasonable royalty damage award because such an award "determines compensation to the patentee based on the infringer's use of the patented invention, not 'harm' suffered by the patentee"). By analogy, the same principle would apply to an award of a defendant's profits, rather than compensatory trademark damages, because such an award is based on the unjust enrichment or deterrence of a defendant, rather than on harm to the plaintiff.

Additionally, Defendants' argument that Romag failed to mitigate its damages by not giving notice of its claims earlier, either by contacting Fossil or by bringing suit immediately, is merely a re-tooling of their laches defense. In *Voda v. Medtronic, Inc.*, No. CIV-09-95-L, 2011 WL 6210760, at *3 (W.D. Okla. Dec. 14, 2011), another patent case, the court reasoned that "[a]lthough defendants present[ed] failure to mitigate as a separate defense . . . it is simply the opposite side of the laches defense. Both defenses have their genesis in plaintiff's delay in bringing this action." *Id.*; *see also* Robert A. Matthews, Jr., 4 *Annotated Patent Digest* § 30:6.100 ("Under some circumstances a 'failure to mitigate' defense may be nothing more than a laches defense if the lack of mitigation is based on an allegation that the patentee should have sued earlier."). The court went on to analyze both defenses under the doctrine of laches. Here, Defendants have already asserted and succeeded on a laches defense, and the only appreciable difference between the two defenses asserted by Defendants is their claim that Plaintiff had a duty to warn them about possible counterfeiting as early as 2007, when the J.C. Penney suit was filed. However, the Court is not persuaded that such a duty existed, and the claim that such a warning would have mitigated all damages in this case is speculative at best. Therefore, the Court concludes that Defendants' arguments with respect to Plaintiff's delay are properly addressed under the rubric of laches.

Finally, during the jury portion of the trial, Defendants raised the argument that the failure to mitigate damages was relevant to the determination of whether Plaintiff suffered an ascertainable loss with respect to its CUTPA claim. In support of this argument, Defendants relied on *Landmark Inv. Group, LLC v. Calco Const. & Development Co.*, No. CV096002117, 2013 WL 5969076 (Conn. Super. Ct. Oct. 11, 2013), in which the court held that because the plaintiff failed to mitigate its damages, it could

not prove actual loss with respect to its tortious interference claim or an ascertainable loss with respect to its CUTPA claim. *Id.* at \*22–23. There, the plaintiff based its claims for actual and ascertainable loss on the loss of its anticipated profits in developing a piece of real estate. *Id.* However, the court concluded that the plaintiff had failed to purchase the property in question after it had been awarded a judgment of specific performance to do so. *Id.* Because the plaintiff failed to purchase the property when given a chance to do so, it could not claim that it lost profit from not being able to develop that same property. *Id.* Thus, the *Landmark* decision is distinguishable from this action, which lacks any similar condition precedent to the claimed loss. Although Romag improperly delayed filing this action, it cannot be claimed that Romag completely failed to exercise its rights pursuant to the ROMAG mark and the '126 patent. Furthermore, Fossil's counterfeiting began long before Mr. Reiter received the email from "Joe" warning him about Superior's purchase of counterfeit snaps. Therefore, the Court further concludes that Defendants' failure to mitigate defense is not relevant to Plaintiff's CUTPA claim.

Because the Court concludes that Defendants waived their failure to mitigate defense, and that the defense was not relevant to any of Plaintiff's claims, Plaintiff's recovery is unaffected by mitigation considerations.

### D.    Sanctions

Defendants ask this Court to impose sanctions pursuant to its inherent authority and under section 1927 of the Judicial Code based on the submission of the Reiter Declaration in support of the TRO in this case, which Defendants claim was false and misleading. "In order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, i.e., motivated by improper purposes such as harassment and

delay." *Enmon v. Prospect Capital Corp.*, 675 F.3d 128, 143 (2d Cir. 2012) (internal citations and quotation marks omitted). "Although both findings must be supported by a high degree of specificity in the factual findings, bad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Id.* (internal citations and quotation marks omitted). "The showing of bad faith required to support sanctions under 28 U.S.C. §1927 is similar to that necessary to invoke the court's inherent power. In practice, the only meaningful difference between an award made under § 1927 and one made pursuant to the court's inherent power is that awards under § 1927 are made only against attorneys or other persons authorized to practice before the courts while an award made under the court's inherent power may be made against an attorney, a party, or both." *Id.* at 143–44 (internal citations and quotation marks omitted).

As discussed above, the Court believes that the Reiter Declaration, which contains language that is nearly identical to the declaration filed in connection with the J.C. Penney case three years earlier, (*compare* Reiter Decl. ¶¶ 8–9 *with* J.C. Penney Reiter Decl. ¶¶ 8–9), was misleading in several respects. Its limited contents conveyed the impression that Mr. Reiter had just discovered the counterfeit ROMAG snaps and only by mere happenstance, (*see* Reiter Decl. ¶ 8 ("On November 15, 2010, I was shopping in a Macy's store in Milford, Connecticut, near my office. As is my habit and custom, I looked at some of the handbags in the handbag department.")), contrary to his sworn trial testimony that he went to Macy's that day with the express purpose of confirming his suspicions that Fossil was using counterfeit ROMAG snaps in their handbags, (*see* Trial Tr. Vol. I at 202 ("Well, after we contacted Fossil, I wanted to be sure before we went to the next step that they were still in the stores and verify the existence of these Fossil bags

with counterfeits being on the floor of some stores. So I went to Macy's and I went to Fossil's outlet in Clinton, Connecticut, to check bags.")). His testimony also belies his sworn statements in his declaration that he was "surprised" that the Fossil handbags contained ROMAG snaps and that he was "shocked" to discover that they were counterfeits. (*See* Reiter Decl. ¶¶ 8–9.)

More troubling, however, is the absence in the declaration of any reference to Mr. Reiter's knowledge about this counterfeiting prior to his November shopping trip, particularly because he acknowledged at trial that by late October he had strong suspicions that the counterfeit snaps purchased by Superior were being used in Fossil bags, and that once those suspicions were aroused, he requested Superior's invoices from Wing Yip, inspected the snaps from the bags purchased by Ms. Ellant and Ms. Katz, sent them to China for further inspection, and contacted Fossil both directly and through his attorney. (Trial Tr. Vol. I at 174–75, 177–78, 183–84; Trial Tr. Vol. II at 299–300; Pl.'s Exs. 28, 149.) Without mention of the May 19, 2010 email, Romag's General Counsel's May 24, 2010 shopping trip, or Mr. Reiter's investigation in late October and early November, the import of the declaration was that Mr. Reiter had no knowledge of counterfeiting before the November trip to Macy's and his chance discovery of the counterfeit snaps at that time.

The obvious significance of the omissions and contrived language in the Reiter Declaration was on Romag's claim of irreparable injury when it sought a TRO in this case. "In a trademark case, irreparable injury may be found where there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Media Group, Inc. v. Ontel Products Corp.*, No. CIVA300CV2034 (JCH), 2001 WL 169776, at *2 (D. Conn. Feb.

14, 2001) (quoting *Tough Traveler Ltd v. Outbound Products*, 60 F.3d 964, 968 (2d Cir. 1995) (internal quotation marks omitted).  Although Romag may have had a colorable claim for consumer confusion at the time it applied for the TRO, "any such presumption of irreparable harm does not operate, however, when the plaintiff has delayed bringing suit or in moving for preliminary injunctive relief."  *Id.*  In *Media Group*, the plaintiff had delayed approximately six months from its discovery of the allegedly infringing product until it sought a preliminary injunction, and based on this delay, the court denied preliminary injunctive relief, finding that the plaintiff could not show irreparable harm. *Id.* at *4.  Thus, Romag's sparse and misleading representations deprived Judge Droney of the ability to accurately apply the appropriate standard in considering Romag's request for emergency injunctive relief.

The Court further concludes that Romag acted in bad faith by delaying its TRO filing until the beginning of the holidays.  Romag explicitly relied on the fact that the holiday selling season was in full swing when it sought emergency injunctive relief, (*see* Reiter Decl. ¶ 19 ("It is, of course, a well-known fact that the holiday selling season is the busiest time of year for retailers.")), and Judge Droney relied on this timing in granting the TRO, (*see* TRO Ruling [Doc. # 20] at 4 ("Finally, given the high volume of shopping during the holiday season, Romag stands to suffer an even more significant injury to its reputation as it is likely that many Fossil handbags, which include the counterfeit snap fasteners, will be purchased in the coming weeks.")).  Given Romag's unmistakable pattern of relying on the pressure point of the holiday season when seeking to enforce its intellectual property rights, it is evident that Romag intentionally sat on its rights between late May 2010 and late November 2010 to orchestrate a strategic advantage and

improperly obtain emergency injunctive relief on a timetable of its choosing, not on the irreparability of its harm.

Based on these findings, the Court concludes that Defendants have shown through clear and convincing evidence that sanctions should be imposed on Romag pursuant to the Court's inherent powers. However, because there is no evidence implicating Plaintiff's counsel in this deception, the Court declines to impose sanctions pursuant to section 1927. Because the Court concludes that Romag's sanctionable conduct was limited to the TRO proceedings, and had no bearing on the underlying merits of this suit, the Court will not bar Romag's recovery or impose a large monetary fine, but instead will limit the sanction to preclude Romag from recovering its expenditures in relation to the prosecution of its TRO.

### E.      Award of Profits

In granting Plaintiff's motion to bifurcate the trial, the Court ruled that the jury would make an initial determination of the amount of Defendants' profits that Plaintiff was entitled to recover for Defendants' trademark infringement, and that a bench trial would be held to address the equitable factors affecting the final profits award to be imposed by the Court. The Court reserved judgment as to whether a finding of willfulness was necessary as a matter of law to entitle Plaintiff to an award of Defendants' profits in order to have the jury make an advisory determination on profits. At the bench trial, Fossil argued that Plaintiff was not entitled to any award of profits because the jury found that Fossil's trademark infringement was not willful, and asserted that even if the Court were to determine that willful infringement was not necessary for an award of profits, the jury's advisory award should be reduced to zero based on the equitable factors to be considered in granting an accounting of profits. Plaintiff urges that the 1999

amendments to the Lanham Act effectively abrogated Second Circuit precedent requiring willfulness for an award of profits for proven infringement, and maintains that the Court should award the full amount of Fossil's profits to compensate Plaintiff for Fossil's infringement of the ROMAG mark.

The jury awarded $90,759.36 of Fossil's profits for trademark infringement under an unjust enrichment theory and $6,704,046.00 of Fossil's profits for trademark infringement under a deterrence theory, determining that one percent of Fossil's profits was attributable to its infringement of the ROMAG mark. Defendants argue that if the Court determines that Romag may recover an award of profits absent willful infringement, the jury's award should be reduced to zero based on a consideration of the equitable factors. Plaintiff contends that the award should be increased to $9,075,936, theorizing that because the jury awarded $90,759.36 in unjust enrichment profits, and found that only one percent of Fossil's total profits was attributable to the use of the ROMAG mark, the jury must have determined that the total amount of profits Fossil made on the sale of the accused handbags was in fact $9,075,936. While there are several equitable factors present in this case that would bear on an award of profits, the Court need not perform this equitable analysis because it concludes that Romag is not entitled to any award of profits as a result of Plaintiff's failure to prove that Fossil's trademark infringement was willful.

Under existing Second Circuit precedent, a plaintiff must establish willful infringement in order to recover an award of the defendant's profits in a trademark action. *Internat'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir. 1996) ("In order to recover an accounting of an infringer's profits, a plaintiff must prove that the infringer acted in bad faith."); *George Basch*, 968 F.2d at 1540

("[U]nder § 35(a) of the Lanham Act, a plaintiff must prove that an infringer acted with willful deception before the infringer's profits are recoverable by way of an accounting."). However, in 1999, after both of these cases were decided, section 1117(a), which provides for an accounting of profits under the Lanham Act, was amended to read:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a *willful* violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits . . . .

25 U.S.C. § 1117(a) (emphasis added). Plaintiff argues that this amendment, which added the language "or a willful violation under section 1125(c)," effectively abrogated prior Second Circuit law requiring a finding of willfulness before defendant's profits could be awarded for a violation of section 1125(a) because Congress failed to insert the word "willful" in the phrase "a violation under section 1125(a) or (d) of this title." The Second Circuit has expressly declined to decide this question thus far. *See Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 F. App'x 26, 31 (2d Cir. 2013).

The circuits that have considered the issue of whether willfulness is required for an award of profits after the 1999 amendments were passed are split. The Tenth Circuit is the only circuit to affirmatively maintain its prior willfulness requirement after the 1999 amendments. In *Western Diversified Servs., Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269 (10th Cir. 2005), the court held that in light of section 1117(a)'s direction that an award of profits is "subject to the principles of equity" and in light of the punitive nature of such an award and the increased risk of granting plaintiff a windfall, it was appropriate under the statute to require "a showing that Defendant's actions were willful to support an award of profits under 15 U.S.C. § 1117(a)." *Id.* at 1272–73. Additionally,

the First Circuit, while not speaking in terms of whether willfulness was a condition precedent to the recovery of the defendant's profits, has noted in a decision post-dating the 1999 amendments that a finding of willfulness is usually required for disgorgement of profits. *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 191 (1st Cir. 2012). [6]

Two other circuits have declined to address the issue of abrogation directly. The Ninth Circuit has expressed doubts that the 1999 amendments abrogated the willfulness requirement in that Circuit without affirmatively deciding the question. *M2 Software, Inc. v. Viacom, Inc.*, 223 F. App'x 653, 656–57 (9th Cir. 2007) (characterizing the argument that the 1999 amendments abrogated prior case law as a "shaky assumption"). The Eighth Circuit has similarly declined to address the question, but has assumed without deciding that willful infringement is a prerequisite for an award of profits. *See Masters v. UHS of Delaware, Inc.*, 631 F.3d 464, 472 n.2 (8th Cir. 2011) (noting circuit split).

Finally, three circuits have interpreted the 1999 amendments to permit an award of defendant's profits absent a finding of willful infringement. In *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168 (3d Cir. 2005), the Third Circuit concluded that the 1999 amendment did abrogate Third Circuit precedent requiring a finding of willfulness before an award of defendant's profits could be made. *Id.* at 176. It presumed that Congress was aware of the large body of case law requiring a finding of willfulness for an accounting of

---

[6] One leading commentator has dubbed as "inaccurate" a reading of the 1999 amendments as reflecting Congressional intent to abrogate the willfulness requirement typically imposed by courts. J. Thomas McCarthy, *5 McCarthy on Trademarks and Unfair Competition* § 30:62 (4th ed.) ("In fact, the 1999 amendment of Lanham Act § 35(a) was not intended to change the law by removing willfulness as a requirement for an award of profits in a classic infringement case, but rather was meant to correct a drafting error when Congress intended to limit the recovery of damages in dilution cases (and only dilution cases) to instances of 'willful violation.'").

profits under section 1125(a) and reasoned that in light of this awareness, Congress's failure to add the word willfulness to that section of the statute indicated a desire to supersede the judicially created doctrine requiring willfulness. *Id.* at 174. The Fifth Circuit reached a similar conclusion in *Quick Technologies, Inc. v. Sage Group PLC*, 313 F.3d 338 (5th Cir. 2002). Although *Quick Technologies* does not address the issue of abrogation because the Fifth Circuit had never adopted a bright-line rule, it noted that the decisions in other circuits adopting such a rule were of limited value because they predated the 1999 amendments, and held that the plain language of section 1117(a) indicated that such a bright-line rule requiring a finding of willfulness for an accounting of profits would be contrary to the statute. *Id.* at 350. Similarly, the Fourth Circuit, noting the 1999 amendments, has held that a finding of willfulness, although an important factor in the court's equitable analysis, is not a condition precedent to an accounting of profits. *Synergistic Internat'l, LLC v. Korman*, 470 F.3d 162, 175 & n.13 (4th Cir. 2006).

District courts within this Circuit are also split with respect to the effect of the 1999 amendments on the willfulness requirement, with the majority of courts and the more recent decisions favoring the interpretation that the requirement has not been abrogated. Two judges in the Southern District of New York have concluded that the plain meaning of section 1117(a) indicates that the willfulness requirement has been abrogated, while eight judges from the Southern and Eastern Districts of New York have held that the willfulness requirement remains good law. *Compare Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 268–69 (S.D.N.Y. 2011) (Marrero, *J.*) (holding that the 1999 amendments abrogated the willfulness requirement), *and Cartier v. Aaron Faber, Inc.*, 512 F. Supp. 2d 165, 172–73 (S.D.N.Y. 2007) (Marrero, *J.*) (same), *and Nike,*

*Inc. v. Top Brand Co. Ltd.*, No. 00 Civ. 8179 (KMW)(RLE), 2005 WL 1654859, at *9–11 (S.D.N.Y. July 13, 2005) (same), *with Beastie Boys v. Monster Energy Co.*, No. 12 Civ. 6065 (PAE), 2014 WL 1099809, at *9–11 (S.D.N.Y. Mar. 18, 2014) (holding that the 1999 amendments did not abrogate the willfulness requirement), *and Guthrie Healthcare v. Contextmedia, Inc.*, No. 12 Civ. 7992 (KBF), 2014 WL 185222, at *5–6 (S.D.N.Y. Jan. 16, 2014) (same), *and GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 469–71 (S.D.N.Y. 2011) (Castel, *J.*) (same), *and Mr. Water Heater Enterprises, Inc. v. 1-800-Hot Water Heater, LLC*, 648 F. Supp. 2d 576, 589–90 (S.D.N.Y. 2009) (Pauley, *J.*) (same), *and Pedinol Pharmacal, Inc. v. Rising Pharmaceuticals, Inc.*, 570 F. Supp. 2d 498, 502–503 (E.D.N.Y. 2008) (Wexler, *J.*) (same), *and Life Servs. Supplements, Inc. v. Natural Organics, Inc.*, No. 03 Civ. 6030 (SHS), 2007 WL 4437168, at *2–7 (S.D.N.Y. Dec. 17, 2007) (same), *and Luis Vuitton Malletier v. Dooney & Bourke, Inc.*, 500 F. Supp. 2d 276, 278–82 (S.D.N.Y. 2007) (Scheindlin, *J.*) (same), *and Mastercard Internat'l, Inc. v. First Nat'l Bank of Omaha, Inc.*, No. 02 Civ. 3691 (DLC), 2004 WL 326708, at *10–11 (S.D.N.Y. Feb. 23, 2004) (same).

After reviewing this precedent and the parties' respective arguments, this Court is persuaded by those authorities that have concluded that a finding of willfulness remains a requirement for an award of defendants' profits in this Circuit. Contrary to Romag's arguments, the plain language of § 1117(a) does not indicate that Congress intended to abrogate the common-law willfulness requirement by adding the word "willful" to modify the trademark dilution section of the statute. Congress made no change with respect to the language governing section 1125(a) violations. The post-amendment language with respect to section 1125(a) is the same language that the Second Circuit interpreted, based on the principles of equity, to require a finding of willfulness before disgorgement of

profits could be awarded. *Pedinol Pharmacal, Inc.*, 570 F. Supp. 2d at 502–03 ("First and most importantly, when Section 1117 was amended to provide for recovery of a defendant's profits for a willful violation under Section 1125(c), no changes were made regarding the recovery provisions of Section 1125(a) or (d). . . . The court holds therefore, that the Second Circuit's interpretation of 1117(a) in *Basch*, which construed the same statutory language that existed prior to the 1999 amendment of the statute, remains good law."); *Life Servs. Supplements*, 2007 WL 4437168, at *6 ("On its face, then, the amended statute restricts monetary awards in dilution cases to willful violations, but leaves the appropriate remedy for other Lanham Act remedies subject to the principles of equity, just as it was prior to 1999 amendments."); *Louis Vuitton Malletier*, 500 F. Supp. 2d at 281 ("[T]he addition of 'willful violation under section 1125(c)' does not indicate that it was Congress's intention to simultaneously *sub silentio* overturn the weight of authority with respect to 1125(a).").

Plaintiff's argument that this interpretation renders the provisions for treble damages in cases of willful counterfeiting in section 1117(b) superfluous is unavailing. Plaintiff claims that Congress has already provided for increased damages in cases of willful infringement by including this provision for treble damages, and that to require willful damages for a simple award of profits would upset this scheme. However, this argument ignores the fact that section 1117(b) applies only to the use of a counterfeit mark, whereas section 1117(a) applies to all cases of trademark infringement. 15 U.S.C. § 1117(b). Other courts in this Circuit have reasoned that the addition of the "willful" modifier to section 1125(c) violations was not superfluous, because the Second Circuit draws a distinction between the requirements for a recovery of damages and a recovery of profits. *Mastercard Internat'l, Inc.*, 2004 WL 326708, at * 11 ("Since the Second Circuit

permits the recovery of damages when a plaintiff is able to prove actual confusion but not intentional deception, . . . the inclusion of the "willful" modifier before "section 1125(c)" in the 1999 Amendment provides a more stringent standard for recovery than is available for a violation under Section 1125(a).  The language of the 1999 Amendment is not rendered superfluous by the incorporation of the standards in this Circuit governing recovery under Section 35(a) of the Lanham Act.").  Thus, under the interpretation that willfulness is required for an award of profits, section 1117 sets forth a three-tiered system of recovery:  compensatory damages for non-willful infringement, an award of profits for willful infringement, and treble damages or profits for willful counterfeiting.

As Judge Sidney Stein outlined in his opinion on this issue, the legislative history of the 1999 amendments supports the view that they addressed only recovery in dilution actions, as the history is silent as to any other intended consequence of the amendments. *See Life Servs. Supplements, Inc.*, 2007 WL 4437168, at *6.  The section of the Trademark Amendments Act of 1999 containing the relevant amendment is entitled "Remedies in Cases of *Dilution* of Famous Trademarks."  Pub. L. No. 106-43, 113 Stat. 218 (emphasis added).  Furthermore, the Congressional Record contains comments by Congressman Elijah E. Cummings indicating that the purpose of the bill was to harmonize section 1117(a) with the recent Federal Trademark Dilution Act of 1995:

> This legislation is a necessary follow-up to the Federal Trademark Dilution Act of 1995, which was enacted last Congress and which gave a Federal cause of action to holders of famous trademarks for dilution.  *The bill before us today is necessary to clear up certain issues in the interpretation of the dilution act which the Federal courts have grappled with since its enactment.*

145 Cong. Rec. H6363 (emphasis added).  Thus, the legislative history gives no support to the argument that the 1999 amendments were intended to abrogate the common-law

willfulness requirement enacted by this Circuit because they are silent with respect to their intended consequences for awards made pursuant to section 1125(a).

Therefore, in light of the absence of evidence in the language of the statute or the legislative history of the 1999 amendments of a clear congressional intent to abrogate the existing Second Circuit precedent requiring a finding of willfulness before an award of profits can be made, the Court concludes that the holdings of *Internat'l Star Class Yacht Racing Ass'n* and *George Basch* remain good law. *Life Servs. Supplements, Inc.*, 2007 WL 4437168, at *7 ("Finally, jurisprudential considerations counsel in favor of this Court recognizing the continued validity of the willfulness standard. The law of this circuit is that profits cannot be awarded under the Lanham Act absent a showing of willfulness. While it is true that the Second Circuit has not revisited that question since the enactment of the 1999 amendments, the 1999 amendments do not directly contradict that precedent; at the most, they do so only by implication. Therefore, to the extent that the impact of the 1999 amendments is ambiguous, this Court should follow Second Circuit precedent." (internal citation omitted)). Thus, based on the jury's finding that Fossil's trademark infringement had not been proved willful, the Court concludes that Romag is not entitled to an award of Fossil's profits.

### G.     Permanent Injunction

In its Proposed Findings of Fact and Conclusions of Law [Doc. # 421], Romag claims entitlement to a permanent injunction under the Lanham Act and Connecticut law barring Fossil from importing, selling, or offering for sale Fossil handbags bearing counterfeit ROMAG snaps and directing Fossil to destroy all counterfeit ROMAG snaps in its possession, custody, or control. *See* 15 U.S.C. §§ 1116, 1118. Defendants did not specifically object to the issuance of a permanent injunction in their Proposed Findings of

Fact and Conclusions of Law. "A permanent injunction is appropriate where the party seeking the injunction has succeeded on the merits and shows the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011) (internal citations and quotation marks omitted). "A district court has a 'wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct.'" *Id.* at 273. "However, the injunctive relief should be narrowly tailored to fit specific legal violations." Thus, in fashioning the injunction, the Court should balance the equities to reach an appropriate result protective of the interests of both parties." *Id.* "In trademark cases, irreparable harm is presumed once infringement or dilution has been shown, based on the ensuing loss of goodwill and ability to control one's reputation." *Gucci America, Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 243 (S.D.N.Y. 2012). "Courts in this circuit have long held that a permanent injunction should issue in trademark cases where a defendant asserts that its pre-lawsuit use was lawful." *Id.* at 256.

Here, the jury found that the snaps on the accused handbags were counterfeits, and that Fossil was liable for trademark infringement and false designation of origin. In light of these findings, Romag is entitled to a presumption of irreparable injury based on loss of goodwill and the inability to control its reputation. The Court concludes that a monetary award would be inadequate to protect Plaintiff from the ongoing threat posed by such counterfeiting. Although the Court has found merit in Fossil's laches defense, the Court does not conclude that Plaintiff's laches should bar all recovery and injunctive relief in this suit, especially because Fossil had been selling handbags with counterfeit ROMAG snaps long before May 2010. The balance of the equities weighs in favor of granting a permanent injunction enjoining Fossil from selling bags with counterfeit

ROMAG snaps given Fossil's position at trial that the snaps were genuine, Fossil's own testimony that the counterfeit snaps can easily be replaced with non-infringing generics, and the public's interest in avoiding the sale of counterfeit goods.

Romag also requests that Fossil be ordered to destroy all counterfeit snaps in its possession. However, "it has been held that where an injunction is issued under the Lanham Act enjoining an infringer from further infringement, the rights of the plaintiff are adequately protected and an order requiring destruction of infringing articles, though permitted, may be unnecessary." *Breaking the Chain Foundation, Inc. v. Capitol Educational Support, Inc.*, 589 F. Supp. 2d 25, 33 (D.D.C. 2008) (citing *Kelley Blue Book v. Car-Smarts, Inc.*, 802 F. Supp. 278, 293 (C.D. Cal. 1992)); *Neva, Inc. v. Christian Duplications Int'l, Inc.*, 743 F. Supp. 1533, 1549 (M.D. Fla. 1990); *see also Bonanza Int'l, Inc. v. Double "B"*, 331 F. Supp. 694, 697 (D. Minn. 1971). The court concludes that an injunction barring Fossil from further infringement is adequate to protect Plaintiff's rights in this case. Therefore Fossil is hereby permanently enjoined from importing, selling, or offering for sale Fossil products bearing counterfeit Romag magnetic snap fasteners.

### III.    Conclusion

For the reasons set forth in this Memorandum of Decision, the Court concludes that Defendants have failed to establish their equitable defense of unclean hands or that Plaintiff had a duty to mitigate its patent or trademark damages. The Court further finds that Defendants have established their equitable defense of laches and the jury's award of a reasonably royalty shall be reduced accordingly. The Court also finds that sanctions are merited in this case. Plaintiff shall not be entitled to recover its attorney's fees in connection with the TRO proceedings. Finally, the Court concludes that Plaintiff is not

entitled to an award of Fossil's profits because there was no willful infringement in this case.  A permanent injunction shall issue as set forth above.  The jury's verdict is altered only with respect to its award of a reasonable royalty, which is reduced $41,862.75 for Fossil and $12,562.90 for Macy's, and that the award of Fossil's profits is eliminated in its entirety.


IT IS SO ORDERED.

    /s/
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 27th day of June, 2014.