UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROMAG FASTENERS, INC.,<br>　　　*Plaintiff*,<br>　　　*v.*<br>FOSSIL, INC., *et al.*,<br>　　　*Defendants*. | Civil No. 3:10cv1827 (JBA)<br><br>August 8, 2014 |

**RULING ON POST-TRIAL MOTIONS**

On April 3, 2014, after a seven-day trial, a jury returned a verdict finding Defendants Fossil, Inc. and Fossil Stores I, Inc. ("Fossil") liable for trademark infringement, false designation of origin, state common law unfair competition, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA").  (*See* Jury Verdict [Doc. # 417].)  The jury also found Fossil and Macy's, Inc. and Macy's Retail, Inc. ("Macy's") liable for patent infringement.  (*Id.*)  The jury returned a verdict of no liability for the remaining defendants, and found that neither Fossil nor Macy's had willfully infringed Plaintiff Romag Fasteners, Inc.'s ("Romag") patent or trademark.  (*Id.*)  The jury made an advisory award of $90,759.36 of Fossil's profits for trademark infringement under an unjust enrichment theory and $6,704,046.00 of Fossil's profits for trademark infringement under a deterrence theory and determined that 99% of Fossil's profits were attributable to factors other than its infringement of the ROMAG mark.  (*Id.*)  Finally, the jury awarded a reasonable royalty of $51,052.14 against Fossil and $15,320.61 against Macy's for patent infringement.  (*Id.*)

The Court then held a two-day bench trial on April 8 and 9, 2014 to address "the equitable defenses of estoppel, acquiescence, unclean hands, and laches; the equitable adjustment of the amount of profits awarded by the jury; the calculation of punitive

damages; treble damages; attorneys' fees; and the amount of statutory damages to be awarded," (Ruling Granting Mot. to Bifurcate [Doc. # 360] ¶ 15), as well as Romag's claim for a permanent injunction.  Defendants also asserted that Romag failed to mitigate its damages and sought sanctions as a result of Romag's conduct in procuring a temporary restraining order ("TRO") at the outset of this case.  (*See* Defs.' Prop. Findings of Fact and Conclusions of Law [Doc. # 419] at 42–45.)   The Court ultimately concluded that Defendants had failed to establish their equitable defenses of unclean hands or breach of the duty to mitigate, but that they had sustained their burden with respect to the equitable defense of laches, and reduced the jury's award of a reasonable royalty by 18% to an award of $41,862.75 against Fossil and an award of $12,562.90 against Macy's.  (*See* Findings of Fact and Conclusions of Law [Doc. # 471] at 40–41.)  The Court also imposed sanctions on Plaintiff for its conduct in seeking a Temporary Restraining Order ("TRO") in this case, holding that Plaintiff may not recover its attorney's fees in connection with the TRO proceedings.  (*Id.* at 40.)  Finally, the Court held as a matter of law that because the jury found that Fossil's trademark infringement was not willful, Romag was not entitled to an award of Fossil's profits.  (*Id.* at 40–41.)

Plaintiff now moves [Doc. # 472] pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure for judgment as a matter of law and for a new trial.  Romag argues that it is entitled to judgment as a matter of law with respect to the issue of trademark infringement by the Retailer Defendants—Macy's, Belk, Inc., The Bon-Ton Stores, Inc., The Bon-Ton Department Stores, Inc., Dillard's, Inc., Nordstrom, Inc., Zappos.com, Inc., and Zappos Retail, Inc.  Romag further argues that it is entitled to a new trial on the issue of willful trademark infringement and the attribution of Fossil's profits.  Defendants have also filed a "conditional" motion [Doc. # 475] for judgment as a

2

matter of law and a new trial on the issue of an award of profits if this Court's ruling with respect to the willfulness requirement is overturned on appeal and this Court determines in its analysis of the equitable factors governing an award of profits that Plaintiff is entitled to such an award.[1] For the following reasons, Plaintiff's motion will be granted in part and denied in part, and Defendants' motion will be denied without prejudice to renewal.

## I.      Legal Standard

A court may enter judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The standard for judgment as a matter of law under Rule 50 "mirrors" the summary judgment standard "such that the inquiry under each is the same." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal citations and quotation marks omitted). However, where a jury has deliberated and returned a verdict, the Court "may set aside the verdict pursuant to Rule 50 only where there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against him [or her].'" *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 456 (2d Cir. 2009) (quoting *Cross v. New York City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005)).

---

[1] Also pending before the Court in this case are Plaintiff's Motions for Supplemental Relief [Doc. # 378], Attorney Fees and Costs [Doc. # 450], and to Compel Compliance with Plaintiff's Subpoenas [Doc. # 466], which will be addressed in a separate opinion.

"The court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence [her]self, and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998). "A new trial must be granted if the court determines that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Santa Maria v. Metro–North Commuter R.R.*, 81 F.3d 265, 273 (2d Cir. 1996). The grant of a new trial is also appropriate when, "in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." *DLC Mgmt. Corp.*, 163 F.3d at 133.

## II.    Romag's Motion for Judgment as a Matter of Law and for a New Trial

Romag moves for judgment as a matter of law with respect to the issue of the Retailer Defendant's trademark infringement, and for a new trial on the issues of willful trademark infringement and the attribution of Fossil's profits.

### A.    Trademark Infringement as to the Retailer Defendants

Romag moves this Court to enter judgment as a matter of law against the Retailer Defendants finding that they infringed the ROMAG mark, arguing that the jury's verdict with respect to Fossil's trademark infringement cannot be reconciled with the jury's finding of no liability with respect to the remaining defendants in the action. The gravamen of Plaintiff's argument is that because the jury found that the accused snaps were counterfeits and because every retailer in the chain of sale is strictly liable for

trademark infringement, *see El Greco Leather Products Co., Inc. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir. 1986) ("[The defendant's] sale of the shoes was sufficient 'use' for it to be liable for the results of such infringement and its claimed lack of knowledge of its supplier's infringement, even if true, provides no defense."), the Retailer Defendant's sale of Fossil bags containing those counterfeit snaps rendered them liable for trademark infringement as a matter of law. (*See* Pl.'s Mem. Supp. [Doc. # 473] at 5–6.)   Romag further argues that by finding against Fossil with respect to counterfeiting and trademark infringement, the jury necessarily rejected Fossil's defense to infringement—i.e., that the snaps were genuine—and thus the Retailer Defendants cannot rely on such a defense with respect to their own infringement.

"When confronted with a potentially inconsistent verdict, the court must adopt a view of the case, if there is one, that resolves any seeming inconsistency.'" *Turley v. Police Dep't of City of New York*, 167 F.3d 757, 760 (2d Cir. 1999) (internal citations and quotation marks omitted); *see also Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995) ("A court's role is to reconcile and preserve whenever possible a seemingly inconsistent jury verdict.").   Defendants contend that the jury's disparate verdicts with respect to trademark infringement can be reconciled because Romag's argument ignores its own burden to establish that the Retailer Defendants actually sold Fossil handbags containing the infringing snaps.   Thus, Defendants argue, rather than interpreting the jury's split verdict as a rejection of the strict liability standard on which it was instructed (*see* Jury Instructions [Doc. # 410] at 10–11), the Court can reconcile any discrepancy by concluding that the jury found that Plaintiff failed to prove by a preponderance of the evidence that any of the Fossil handbags sold by the Retailer Defendants actually contained the counterfeit snaps.

5

In its briefing, Plaintiff argues that "[i]t cannot be disputed that the very same counterfeit Romag magnetic snap fasteners used in Fossil handbags imported and sold by Fossil to the Retail Defendants necessarily were sold by the Retail Defendants to the public." (Pl.'s Mem. Supp. at 5.)  In support of this proposition, Plaintiff cites the Retailer Defendants' interrogatory responses and their sales records, indicating that they sold Fossil handbags.  (*See* Exs. 126–130, 131A, 263–269, 596.)  However, in their responses to Plaintiff's interrogatories, each defendant included a disclaimer that nothing in the responses should be construed as an admission that the accused handbags actually contained the infringing snaps.  (*See* Exs. 126–30, 264–69.)  Thus, in the interrogatories, Defendants did no more than provide the sales data for the requested SKU numbers, and did not admit that the accused handbags contained the infringing snaps.

The jury heard testimony from Doug Dyment that Superior was only one of the three largest manufacturers of women's handbags for Fossil and that it only manufactured approximately forty to fifty percent of Fossil's handbags.  (Trial Tr. Vol. II [Doc. # 434] at 363–64.)  There was no evidence presented at trial regarding the exact sales chain between Superior, Fossil, and the Retailer Defendants with respect to any specific handbags containing counterfeit snaps.  Based on this testimony, the jury could have reasonably concluded that the Fossil handbags to which the Retailer Defendants admitted selling were manufactured  by a different manufacturer, and that because there was no evidence presented at trial that Fossil's other manufacturers had used counterfeit snaps, it could have further concluded that those bags did not contain counterfeits.   The jury also heard testimony that Fossil sold handbags through department stores, specialty stores, and through its own stores and website (Trial Tr. Vol. II at 349–51), and thus the

jury could have reasonably concluded that the snaps it found to be infringing were sold through sales channels other than the Retailer Defendants.[2]

With respect to the actual handbags and snaps presented to the jury at trial, Howard Reiter testified that he had purchased handbags at Macy's, at a Fossil outlet store, and online at Zappos.com to confirm his suspicions of counterfeiting (Trial Tr. Vol. I [Doc. # 433] at 202), but he did not testify as to any purchases from any of the other Retailer Defendants.  Mr. Reiter did testify that a Fossil bag of the same style that he had determined contained counterfeit snaps was shown in online advertising for Zappos.com. (*Id.* at 204.)   However, Mr. Reiter never testified that he inspected any of the bags purchased from Zappos.com, and stated only that he "checked quite a few bags."  (*Id.* at 205.)  Thus, Mr. Reiter's testimony did not establish that any of the bags purchased from the Retailer Defendants were manufactured at Superior or were found to contain counterfeit snaps.   Based on a review of the evidence presented at trial, the Court concludes that the jury could have found that Plaintiff failed to carry its burden to prove that the Retailer Defendants other than Macy's sold Fossil handbags containing counterfeit ROMAG snaps, which would resolve any potential inconsistency in their verdict.

However, with respect to Macy's, the jury did hear testimony that Fossil bags purchased from Macy's contained counterfeit snaps.  Mr. Reiter testified that it was the Fossil bags his wife and sister-in-law purchased at Macy's that initially raised his suspicion of counterfeiting.  (*Id.* at 174–180.)  Mr. Reiter also testified that he personally inspected the snaps taken from a Fossil bag purchased at Macy's, and had his factory in

---

[2] A review of Romag's exhibit list [Doc. # 415] indicates that some of the Fossil handbags entered into evidence were indeed purchased from non-party retailers, such as "SavyFashions."  (*Id.* at 3.)

China inspect those snaps, and that based on the analysis of those snaps he reached the conclusion that Fossil was selling handbags containing counterfeit snap fasteners. (*Id.* at 176–80.) Additionally, the jury's verdict against Macy's contains an inconsistency that is not present in its verdict against the other Retailer Defendants. The jury returned a verdict against Macy's with respect to patent infringement. The only way the Court could reconcile this verdict with its verdict finding for Macy's with respect to trademark infringement would be if the jury concluded that Fossil handbags containing Romag snaps manufactured by Superior were sold to Macy's, but that these snaps did not bear the ROMAG mark. There was no evidence at trial to support such a conclusion. Therefore, Plaintiff's motion for judgment as a matter of law with respect to trademark infringement is granted as to Macy's and denied as to the remaining Retailer Defendants.

### B.      Willful Trademark Infringement

Plaintiff moves for a new trial on the issue of willful trademark infringement, arguing that the Court's instructions on willful trademark infringement were erroneous and that the jury's verdict with respect to willful trademark infringement represents a miscarriage of justice that substantially prejudiced Romag. "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Cameron v. City of New York,* 598 F.3d 50, 68 (2d Cir. 2010). "A jury instruction is proper so long as the charge correctly and sufficiently covers the case to allow the jury intelligently to decide the questions presented to it." *Bruneau v. South Kortright Cent. Sch. Dist.,* 163 F.3d 749, 761 (2d Cir. 1998), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246 (2009). When determining whether jury instructions were erroneous, the Court must ask "whether considered as a whole, the instructions adequately communicated the essential ideas to the jury." *United*

*States v. Schultz,* 333 F.3d 393, 414 (2d Cir. 2003) (internal citations and quotation marks omitted).  If an instruction is erroneous, a new trial must be granted, unless the error was harmless.  *See United States v. Bah,* 574 F.3d 106, 114 (2d Cir. 2009).  "An error is harmless only if the court is convinced that the error did not influence the jury's verdict." *Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir. 2000).

The Court instructed the jury as follows with respect to willful trademark infringement:

> Plaintiff also alleges that Defendants willfully infringed its trademark.  If you find that Defendants infringed Romag's trademark, you must also determine if Defendants used the trademark willfully, as I now define that term for you.  This is a separate claim from Plaintiff's claim that Defendant's infringed Romag's trademark, which I described earlier.  To prove willfulness, Plaintiff must show (1) that Defendants were actually aware of the infringing activity, or (2) that Defendants' actions were the result of willful blindness.  Willful blindness means that Defendants knew they might be selling infringing goods but nevertheless intentionally shielded themselves from discovering the truth.

(Jury Instructions at 14.)  Romag argues that this instruction was erroneous because it did not inform the jury that it could find that Defendants' willfully infringed the ROMAG mark if they acted with reckless disregard.  In support of this proposition Romag cites *Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 F. App'x 26 (2d Cir. 2013), a non-precedential summary order, which held that:  "[t]o prove willfulness, a plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard or willful blindness."  *Id.* at 30 (internal quotation marks omitted) (quoting *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005)).

However, the Court notes that the portion of the *Island Software* opinion that the *Fendi* court quoted in defining trademark willfulness was actually a definition of

9

"willfulness" under the Copyright Act.  *See Island Software*, 413 F.3d at 263 ("To prove 'willfulness' under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights." (internal citations and quotation marks omitted)).  The *Fendi* court went on to define willful blindness as follows:  "In the context of a trademark infringement action, willful blindness means that a defendant knew it might be selling infringing goods but nevertheless 'intentionally shielded itself from discovering' the truth." *Fendi*, F. App'x at 31 (quoting *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 109–10 (2d Cir. 2010)).  The Court's instruction is nearly identical to this language and thus is not clearly erroneous.

Furthermore, Romag did not object to this instruction, and actually requested the charge given by the Court.  The Court's original proposed instruction on willful trademark infringement included the phrase "reckless disregard" (*see* Court's Prop. Instructions, Ex. A to Geiger Decl. [Doc. # 478] at 15), but Romag itself requested that the Court strike this language from its final charge (*see* Romag's Response to Court's Prop. Instructions, Ex. B to Geiger Decl. at 14).  The charge the Court gave is *identical* to the charge Romag requested in response to the Court's proposed instructions.  (*Compare id. with* Jury Instructions at 14.)  "Where, as here, the party fails to object to the instruction before the jury begins deliberations, a subsequent challenge based on that charge should be entertained only if the alleged errors are fundamental.  An error is fundamental under this standard only if it is so serious and flagrant that it goes to the very integrity of the trial." *Shade v. Housing Authority of City of New Haven*, 251 F.3d 307, 312–13 (2d Cir. 2001).  The Second Circuit has previously noted that it "[cannot] see how holding [a party] to a jury verdict that faithfully followed an instruction . . . that [the party itself]

urged upon the court could give rise to a miscarriage of justice." *Id.* at 313. Thus, the Court's failure to include "reckless disregard" in its initial instruction does not warrant the granting of a new trial in this case.

After the Court gave its final instructions, the jury requested a definition of the term "intentionally shielded" as it appeared in the Court's instruction on willful trademark infringement. After colloquy with counsel, the Court instructed the jury that

> "Intentionally shielded'" is more than reckless or negligent conduct. It means when a defendant knew that there was a high probability that components which infringed Plaintiff's mark were used on its handbags, but took deliberate actions, such as purposefully looking the other way, to avoid learning of the infringement.

(Suppl. Jury Instructions [Doc. # 411] at 1.) Plaintiff initially objected to a proposal very similar to the language the Court ultimately used, but withdrew its objection when the Court agreed to omit the words "for the purpose of." (Trial. Tr. Vol. VIII [Doc. # 441] at 1594–95 ("Then that would be fine your honor.").) When the Court re-read the above-quoted language without the previously objected-to phrase, Plaintiff failed to object to the instruction in its final form. (*Id.* at 1596.)

Plaintiff now argues that the instruction was erroneous because it improperly incorporated language from *Global-Tech Appliances, Inc. v. SEB SA*, 131 S. Ct. 2060 (2011), a patent case, in contravention of the Second Circuit's trademark precedent on willful infringement as articulated in *Fendi*. However, in its proposed jury instructions, Plaintiff proposed an instruction on willfulness in the context of trademark infringement and unfair competition that included language similar to that used in the Court's clarifying instruction and that cited *Global-Tech* as the primary authority in support of the charge:

> In addition, you may determine that Defendants' conduct was willful if
> Defendants remained willfully blind to the infringement.   Defendants
> remained willfully blind to the infringement if they subjectively believed
> there was a high probability that they were infringing Romag's trademark,
> and took deliberate action to avoid confirming this infringement.

(Pl.'s Prop. Jury Instructions [Doc. # 303-13] at 48 (citing *Global-Tech*, 131 S. Ct. at 2070–

72).)   In light of this proposed instruction, Romag cannot now be heard to argue that

*Global-Tech* is not a proper authority for the Court's jury instructions.

In *Global-Tech*, the Supreme Court conducted a review of the precedents of the

Courts of Appeals with respect to "willful blindness," drawing on examples from the

criminal context, and synthesized that precedent to arrive at what it concluded was an

appropriate general definition of the term "willful blindness."   The Court noted that all of

the appellate courts appeared to agree on two basic requirements:   "(1) the defendant

must subjectively believe that there is a high probability that a fact exists and (2) the

defendant must take deliberate actions to avoid learning of that fact."   131 S. Ct. at 270.

The Court concluded that "these requirements give willful blindness an appropriately

limited scope that surpasses recklessness and negligence.   Under this formulation, a

willfully blind defendant is one who takes deliberate actions to avoid confirming a high

probability of wrongdoing and who can almost be said to have actually known the critical

facts."   *Id.* at 270–71.   The Second Circuit recognized a similar proposition in *Tiffany (NJ)*

*Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010):   "[W]illful blindness is equivalent to actual

knowledge for purposes of the Lanham Act."   *Id.* at 110 (internal citation and quotation

marks omitted).   This Court's supplemental instruction on "intentionally shielded"

closely tracked the Supreme Court's language defining the general concept of willful

blindness, which is not, as Plaintiff argues, in conflict with existing Second Circuit

precedent.   Therefore, this Court's instructions, adequately conveyed the concepts of

willfulness, were not erroneous and did not represent a fundamental error going to the very integrity of the trial.

Even if this Court's instructions with respect to willful trademark infringement had been erroneous, Plaintiff would not be entitled to a new trial because the evidence at trial at most could have supported a finding that Fossil[3] was negligent, not that it acted in reckless disregard, with willful blindness, or with actual knowledge of Superior's purchases of counterfeit snaps. Romag argues that the jury's verdict resulted in a miscarriage of justice, barring it from recovering any award of profits, because there was insufficient evidence based on which a jury could have concluded that Fossil's actions were not willful. Plaintiff cites evidence that Mr. Dyment knew of the only authorized sales channel for Romag snap fasteners, and that Fossil had had difficulties with Superior in the past, to argue that Romag's failure to inspect Superior's sales records or to visually inspect the snap fasteners on the bags produced by Superior[4] constituted willful infringement.

However, a defendant "has no affirmative duty to take precautions against the sale of counterfeits . . . [and is not required] to seek out and prevent violations." *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992). Thus,

---

[3] Plaintiff presented almost no evidence at trial with respect to the conduct of the Retailer Defendants, willful or otherwise, and cites no evidence in its briefing in support of a finding of willful infringement on the part of the Retailer Defendants.

[4] With respect to the evidence that Fossil failed to perform visual inspection of the snap fasteners on its handbags to determine whether or not they contained counterfeits, Mr. Reiter himself testified that when he first looked at the counterfeit snaps on the handbags his wife had purchased from Macy's he did not believe that they were counterfeits. (Trial Tr. Vol. II at 309.) If the inventor of the snaps himself cannot always distinguish a counterfeit snap from an authentic snap via visual inspection, it cannot be the case that a Fossil acted recklessly or with willful blindness by failing to visually inspect the snaps in its handbags.

unless Fossil had a specific reason to suspect that there was a risk that Superior was using counterfeit snaps, any lapses in its oversight of Superior would rise no higher than mere negligence.  The evidence that Fossil knew generally that counterfeiting was a serious problem in China, or that it had an issue with the use of counterfeit zippers by a different vendor does not establish that Fossil suspected Superior of using counterfeit snaps. Furthermore, when Fossil discovered the use of counterfeit YKK zippers in its products by a vendor, rather than turning a blind eye, it quickly set up a quality control program in an attempt to avoid future issues.  (Ex. 119.)

Plaintiff points to several instances where Fossil and Superior had a dispute regarding materials as evidence that Fossil suspected there was a risk that Superior was using counterfeit snaps.  However, Mr. Dyment testified that he believed Superior's use of PVC instead of genuine leather in some products was an honest mistake, made without any intent to mislead Fossil.  (Trial Tr. Vol. II at 461.)  He further testified that although Fossil suspected that Superior was charging Fossil for YKK zippers while using generic zippers (*see* Ex. 118), this led to the concern that Superior was inflating its prices, rather than to a concern that Superior was using counterfeits (*see* Trial Tr. Vol. II at 462–63). Neither of these instances would have alerted Fossil to the risk that Superior was using counterfeit snap fasteners.  Plaintiff cites only one instance in which Fossil had an issue with respect to the snap fasteners used by Superior.  There, Fossil raised questions as to the reimbursement amount requested by Superior and indicated that Superior should be using generic rather than branded snaps.  (Exs. 92–93.)  Ultimately, Fossil agreed to reimburse Superior for the branded price.  (Ex. 93.)  Romag argues that Fossil should have checked Superior's purchase orders when reviewing its request for reimbursement and that it would have discovered the counterfeiting if it had done so.  However, the

14

dispute over the reimbursement amount does not indicate that Fossil suspected Superior of using counterfeits. Rather, the fact that Fossil paid Superior the full amount requested indicates that Fossil believed the snaps were genuine. A company would be highly unlikely to pay full price for a counterfeit, and then to continue to ignore that counterfeiting, opening itself up to liability.

Thus, the evidence at trial established that Fossil paid full price for the snaps used by Superior, that it had never been informed of any specific instances of Superior using counterfeit snaps, and that it "[d]idn't believe that counterfeits were being used." (Trial Tr. Vol. III [Doc. # 435] at 579.) There was no other evidence to support a finding that Fossil knew or suspected there was a risk that Superior was using counterfeit snaps. If it had such suspicions, Fossil's failure to investigate those suspicions would have constituted willful infringement. However, absent evidence of such suspicions, Fossil's failure to investigate Superior more generally amounts to no more than negligence by Fossil. Therefore, the jury's verdict with respect to willful infringement did not constitute a miscarriage of justice because there was no evidence that Fossil acted recklessly, with willful blindness, or with actual knowledge of a risk of counterfeit snaps, and Romag is not entitled to a new trial on this issue.

### C.     Attribution of Profits

Romag argues that it is entitled to a full award of Fossil's profits under an unjust enrichment theory, without attribution, and that it is entitled to a new trial on the issue of attribution of Defendants' profits. Romag bases these arguments on perceived errors in the jury instructions and verdict form. Specifically, Romag believes that the jury improperly applied its attribution finding to its award of unjust enrichment profits, and that therefore the Court should multiply the jury's finding by 100 to correct this error.

Romag further asserts that the Court's instructions with respect to the jury's determination of the portion of Fossil's profits attributable to the use of the ROMAG mark were erroneous and that they are therefore entitled to a new trial on this issue.

The Court instructed the jury with respect to an award of profits and attribution of profits as follows:

> Profits may only be awarded if you find a Defendant has been unjustly enriched by a use of Plaintiff's trademark or there is a need to deter an infringer from doing so again.  It is not necessary for you to make a finding of both unjust enrichment and deterrence in order for you to make an award of profits.  You may award Romag Defendants' profits if you make either a finding of unjust enrichment or deterrence, or both. . . .  Profit is determined by deducting all expenses from gross revenue.  Gross revenue is all of Defendants' receipts from using the infringing mark in the sale of its product.  Plaintiff has the burden of proving a Defendant's gross receipts by a preponderance of the evidence.  Expenses are all costs incurred in producing the gross revenue.  Defendant has the burden of proving expenses.  Defendant also bears the burden of proving that any portion of the profit is attributable to factors other than the infringement.  Defendant must prove each of these by a preponderance of the evidence.  Unless you find that a portion of the profit from the sale of the products using the trademark is attributable to factors other than use of the trademark, you should find that the total profit is attributable to the infringement.  If you determine that Plaintiff is entitled to an award of profits under the deterrence rationale, you may decide to award Defendants' profits even if the profits were not acquired due to the use of Romag's mark.

(Jury Instructions at 22–24.)  Romag objected to this instruction on the grounds that it invited improper speculation by the jury as to the attribution of the profits, in contravention of the Supreme Court's decision in *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203 (1942).

The Court's initial proposed verdict form simply asked the jury to calculate the amount of profits they found proved with respect to each Defendant, reserving the issue of what specific amount to award for the Court's consideration of the equitable factors

16

after trial.  At the charge conference, Plaintiff objected to this formulation, and requested that the jury be asked to indicate separately the amount of profits it found should be awarded under an unjust enrichment theory and under a deterrence theory.  (*See* Charge Conf. Tr. [Doc. # 439] at 5–8.)  The Court acceded to this request.  The verdict form given to the jury read as follows:

> B.1.    What amount of profits do you find that Romag proved by a preponderance of the evidence that each Defendant made on the sale of the accused handbags which should be awarded to Plaintiff to prevent unjust enrichment to Defendants? *Proceed to Question B.2.*
>
> B.2.    What amount of profits do you find that Romag proved by a preponderance of the evidence that each Defendant made on the sale of the accused handbags which should be awarded to deter future trademark infringement? *Proceed to Question B.3.*
>
> B.3.    Have Defendants proved by a preponderance of the evidence that any portion of the profits earned from the sale of the accused handbags was attributable to factors other than the use of the ROMAG mark?  If your answer to Question B.3. is "Yes," what percentage of Defendants' profits earned from the sale of the accused handbags was attributable to factors other than the use of the ROMAG mark?

(Jury Verdict at 4–5.)  Romag preserved an objection to the verdict form on the grounds that the order of Questions B.2 and B.3 should have been reversed, arguing that the order might confuse the jury as to whether attribution applied to deterrence profits in addition to unjust enrichment profits.  (Trial Tr. Vol. VII [Doc. # 440] at 1572.)

During deliberations, the jury asked the following question:  "How does the percentage in "B3" page 5 impact or relate in any way to the totals in "B2" page 4 in any way?" (Court Ex. 5.)   In response to this question, the Court suggested to the parties that the current verdict form be exchanged for the original verdict form, which asked only for total profits proved and the percentage of profits attributable to factors other than the use

of the mark.  (Trial Tr. Vol. VIII at 1598, 1600.)  The Court also specifically raised the issue of potential confusion between the unjust enrichment award and the attribution finding:

| | |
|---|---|
| The Court: | They haven't asked how attribution applies to unjust enrichment. |
| Mr. Schaeffer: | Right, but they've read the jury charge.  Okay? So they—I think they're just very closely following the jury charge . . . |
| The Court: | I'm accepting that your earlier view that it shouldn't be there is probably correct.  It has been proved to be correct.  But if the next question is, if the next question were to be, does it apply to B1, what's the answer? . . . If their award of unjust enrichment profits— |
| Mr. Schaeffer: | Right. |
| The Court: | —is less than 100 percent— |
| Mr. Schaeffer: | Right. |
| The Court: | —how then is the allocation applied? . . . All I want to know is we only have this jury once.  Do we want to know what the total amount of profits is as well as unjust enrichment and deterrence profits? . . . |
| Mr. Schaeffer: | Your Honor, our thinking hasn't changed.  We think it's— to start redoing their whole process would not be wise . . . |
| The Court: | Well, that's—does the answer to B3 apply to B1? |
| Mr. Schaeffer: | It would apply to B1, but we want to keep that separate because we may have questions on the charge on attribution and allocation, so we want those separate amounts. |
| The Court: | So it will be for the Court to apply that percentage to their unjust enrichment. |
| Mr. Schaeffer: | Correct. |

(*Id.* at 1603–06.)  Based on this colloquy, the Court instructed the jury that the percentage in Question B3 did not apply to the award in Question B2.  (*Id.* at 1607.) Ultimately, the jury awarded $90,759.36 of Fossil's profits under an unjust enrichment theory and $6,704,046.00 of Fossil's profits under a deterrence theory and determined that 1% of Fossil's profits were attributable to its infringement of the ROMAG mark.  (*See* Jury Verdict at 4–5.)

18

Plaintiff now argues that the jury must have applied its finding in Question B.3 to Question B.1 based on the confusing verdict form and jury instructions and that therefore the court should multiply the unjust enrichment award by 100 and amend the judgment to reflect that the jury awarded $9,0759,360.00 of Fossil's profits under an unjust enrichment theory.  Plaintiff bases this argument on the fact that there was no evidence regarding an amount of $90,000 in profits, and on the fact that $9 million is an amount somewhere between Defendants' expert's calculation of profits as $6,704,046.00 and Plaintiff's expert's calculation of profits as either $16,192,555.00 or $13,540,338.00. However, Plaintiff's arguments are completely speculative.  Romag vehemently rejected the possibility of such confusion by the jury when this specific issue was raised by the Court and refused the Court's offer to provide clarifying instructions or a revised verdict form that could have resolved any doubt on the matter.   Furthermore, the jury adopted Defendants' expert's calculation of profits wholesale with respect to the deterrence rationale, which would undercut the argument that it believed that the total amount of profits was closer to $9 million.  If the jury had applied its attribution finding to its award of unjust enrichment profits it would have been more likely to award 1% of the $6,704,046.00 amount in its deterrence award.

The verdict form's wording permitted the jury to award less than the full amount of profits, before considering attribution, on both the unjust enrichment theory and the deterrence theory.  (*See* Verdict Form at 4 ("What amount of profits do you find . . . *should* be awarded . . . ).)  The Court has a duty to adopt a view of the verdict that would resolve any inconsistencies, *Turley*, 167 F.3d at 760, and it is possible that the jury concluded that Fossil was not unjustly enriched by the full amount of its profits. Additionally, the Supreme Court has recognized "the almost invariable assumption of the

19

law that jurors follow their instructions." *Shannon v. United States*, 512 U.S. 573, 585 (1994).   Here, the instructions on the verdict form clearly direct the jury to first determine the amount of profits that should be awarded under each rationale, and only then to determine the attribution of profits.   There is no instruction in either the jury charge or the verdict form to apply the attribution amount to the award of unjust enrichment profits.   Therefore, the Court may assume that the jury followed the directions in the verdict form to calculate their award of unjust enrichment profits before making any determination on the issue of attribution, and the Court declines to award a new trial or amend the judgment on this issue.

Romag also argues that Court should either amend the judgment to reflect an attribution of 0% or grant it a new trial because the jury's finding of 99% attribution was unsupported by the evidence at trial and based on erroneous jury instructions.   In *Mishawaka*, the Supreme Court set forth the standard for attribution of profits under the Lanham Act:

> If it can be shown that the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing mark because of the defendant's recommendation or his reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol, the burden of showing this is upon the poacher.  The plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark.  The burden is the infringer's to prove that his infringement had no cash value in sales made by him.  If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark.  There may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark.  But to hold otherwise would give the windfall to the wrongdoer.  In the absence of his proving the contrary, it promotes honesty and comports with experience to assume that the wrongdoer who makes profits from the sales of goods bearing a mark belonging to another was enabled to do so because he was drawing upon the good will generated by that mark.  And one who makes profits

20

> derived from the unlawful appropriation of a mark belonging to another
> cannot relieve himself of his obligation to restore the profits to their
> rightful owner merely by showing that the latter did not choose to use the
> mark in the particular manner employed by the wrongdoer.

316 U.S. at 206–07 (internal citation omitted); *see also Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 261–62 (1916) (holding that where attribution of profits is "inherently impossible" the plaintiff is entitled to the full amount of the defendant's profits).

Plaintiff asserts that these cases stand for the proposition that unless a defendant offers a "reasoned methodology" for the attribution of profits, the plaintiff must recover 100% of the profits proved.  Based on this proposition, Romag argues that the Court's instructions and verdict form were erroneous because they provided for an open-ended calculation of attribution, rather than instructing the jury that unless Fossil proved that *none* of its profits were derived from its use of the ROMAG mark, Romag was entitled to recover the full amount of profits proved.  However, *Mishawaka* and *Hamilton-Brown Shoe* do not speak in terms of a "reasoned methodology."  Rather, they instruct that where it is *impossible* to attribute profits the windfall should go to the plaintiff, rather than the infringer.  In *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390 (1940), a copyright case that relied on *Hamilton-Brown Shoe* and was cited with approval in *Mishawaka*, the Supreme Court explained that "mathematical exactness" was not required for the attribution of profits.  "What [i]s required [i]s only reasonable approximation which usually may be attained through the testimony of experts and persons informed by observation and experience. . . . The result to be accomplished is a rational separation of the net profits so that neither party may have what rightfully belongs to the other."  *Id.* at 404 (internal citations and quotation marks omitted).  The Court's instructions and

verdict form accurately reflected these concepts and thus were not erroneous and do not merit the granting of a new trial.

Furthermore, contrary to Plaintiff's arguments, the evidence at trial did not mandate an all-or-nothing attribution calculation.  Although Fossil's expert Dr. Jay testified that the ROMAG mark played "no role in the purchase of handbags with magnetic snaps," (Trial Tr. Vol. VI [Doc. # 438] at 1269), the jury was "free to accept or reject the expert's opinions in whole or in part and to draw its own conclusions from it," *In re MTBE Products Liability Litigation*, 739 F. Supp. 2d 576, 604 (S.D.N.Y. 2010).  Dr. Jay's survey results indicated that 6% of respondents stated that whether there was a brand name printed on the magnetic snap was a reason for purchasing one particular handbag instead of another, and that 2% of respondents stated that the appearance of the brand name on the magnetic snap was the only reason for purchasing one particular handbag instead of another.  (Ex. 648 at 8–9.)   The jury also saw evidence that Fossil purchased its snaps for approximately $0.24, which represents approximately 1% of the total landed cost of $30.00 for its handbags.  (*See* Ex. 93, 234).  Based on this evidence, the jury could have reasonably concluded that the use of the ROMAG mark accounted for approximately 1% of Fossil's profits on the accused handbags.  The jury's verdict on attribution was not contrary to the evidence at trial so as to constitute a miscarriage of justice and is not in contravention of the governing legal standards.  Therefore, Romag is not entitled to a new trial on this issue or to an amendment of the judgment to reflect an attribution of 0%.

## III.   **Defendants' Motion for Judgment as a Matter of Law and for a New Trial**

Defendants have filed what they refer to as a "conditional" motion for judgment as a matter of law and for a new trial.  They argue that, in the event the Court's ruling

with respect to the willfulness requirement is overturned on appeal, and the Court determines after conducting an analysis of the equitable factors that Plaintiff is entitled to an award of profits, the Court should find as a matter of law that their conduct was not "willfully deceptive" or "unjust" such that Plaintiff cannot recover an award of profits, and that the Court's failure to include these terms in its instructions with respect to an award of profits entitles them to a new trial on this issue.  As Plaintiff correctly argues, Defendants essentially seek an advisory opinion with respect to the issue of an award of profits, and as such, Defendants' motion is unripe.  In order for the Court to reach the issues raised in Defendants' motion, its prior ruling must first be overturned on appeal, and it must find after an analysis of the equitable factors governing an award of profits that Plaintiff is entitled to such an award.  There are thus two different opinions that need to be decided in Plaintiff's favor before Defendants' arguments become ripe.  Furthermore, in their motion, Defendants rely on the standard set forth in *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532 (2d Cir. 1992), which would likely have to be abrogated in order for an appellate court to overturn the Court's prior ruling on the issue of the willfulness requirement for an award of profits.  Therefore, the Court is unable at this time to determine what standard to apply to Defendants' prospective, conditional arguments.  In light of these considerations, Defendants' "conditional" motion for judgment as a matter of law and for a new trial is denied without prejudice to renewal in the event that the conditions precedent for such a renewed motion are met.

## III.    Conclusion

For the foregoing reasons, Plaintiff's Motion [Doc. # 472] for Judgment as a Matter of Law and for a New Trial is GRANTED, in that judgment will be entered against Defendants Macy's, Inc. and Macy's Retail, Inc. with respect to trademark infringement,

and DENIED in all other respects.  Defendants' "Conditional" Motion [Doc. # 475] for Judgment as a Matter of Law and for a New Trial is DENIED without prejudice to renewal if the Court's ruling with respect to the willfulness requirement is overturned on appeal and the Court subsequently determines based on the equitable factors that Plaintiff is entitled to an award of Fossil's profits for trademark infringement.  The Clerk is directed to enter judgment[5] as follows:  (1) judgment shall enter against Fossil, Inc. and Fossil Stores I, Inc. with respect to trademark infringement, false designation of origin, state common law unfair competition, violation of CUTPA, and patent infringement in the amount of $41,862.75;[6] (2) judgment shall enter against Macy's, Inc. and Macy's Retail, Inc. with respect to trademark infringement and patent infringement in the amount of $12,562.90;[7] and (3) judgment shall enter for Defendants with respect to Plaintiff's remaining claims.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 8th day of August, 2014.

---

[5] The Court will delay the entry of this final judgment until five days after this opinion is issued in order to give Romag the opportunity to elect statutory damages against Fossil and Macy's for trademark infringement.

[6] This figure reflects the jury's award of a reasonably royalty for patent infringement, as reduced by the Court in light of its finding with respect to Plaintiff's laches.  The jury's award of Fossil's profits for trademark infringement is vacated by the Court's ruling with respect to the willfulness requirement. The jury awarded no damages on Plaintiff's state-law claims because Plaintiff sought only punitive damages with respect to those claims, and the jury found that Plaintiff was not entitled to such damages.

[7] This figure reflects the jury's award of a reasonably royalty for patent infringement, as reduced by the Court in light of its finding with respect to Plaintiff's laches.