UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROMAG FASTENERS, INC.,<br>　　　*Plaintiff*,<br>　　　*v.*<br>FOSSIL, INC., FOSSIL STORES I, INC., MACY'S,<br>INC., and MACY'S RETAIL HOLDINGS, INC.,<br>　　　*Defendants*. | Civil No. 3:10cv1827 (JBA)<br><br>September 30, 2015 |

**RULING ON PLAINTIFF'S MOTIONS FOR ATTORNEYS' FEES**

The Court has previously granted Plaintiff's Application for Attorneys' Fees in part, permitting Plaintiff to recover its reasonable fees and taxable costs under CUTPA[1] and the Patent Act[2] but not under the Lanham Act. (First Ruling on Mot. Att'ys' Fees [Doc. # 481] at 18.) The Court did not, at that time, determine the amount of fees and costs due to Plaintiff. It does so now. For the reasons that follow, Plaintiff's Motion [Doc. # 450] for Attorneys' Fees is granted with modification.

**I.  Legal Standard**

In determining a reasonable attorney's fee under CUTPA or the Patent Act, courts begin by assessing what hourly rate a reasonable client would be willing to pay, keeping in mind the factors enumerated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).[3] *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 493 F.3d

---

[1] CUTPA permits a court to award a plaintiff "costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery." Conn. Gen. Stat. § 42-110g(d).

[2] The Patent Act provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.

[3] The *Johnson* factors include (1) the time and labor required by an attorney; (2) the novelty and difficulty of the questions presented by the litigation; (3) the level of skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney

110, 118 (2d Cir. 2007) ("*Arbor Hill I*"), *amended on other grounds by* 522 F.3d 182, 184 (2d Cir. 2008) ("*Arbor Hill II*") (determining reasonable fees in the context of 42 U.S.C. § 1988); *see Emerald Investments, LLC v. Porter Bridge Loan Co.*, No. CIV.A. 3:05-CV-1598J, 2007 WL 1834507, at *5 (D. Conn. June 25, 2007) (applying the *Arbor Hill* approach in a CUTPA case to calculate the presumptively reasonable fee); *City of Burlington v. Dague*, 505 U.S. 557, 561–62 (1992) (holding that because many federal fee-shifting statutes use the language "reasonable attorney fees," "case law construing what is 'reasonable' applies uniformly to all of them"). Courts "then use that reasonable hourly rate to calculate . . . the 'presumptively reasonable fee.'" *Arbor Hill I*, 493 F.3d at 118. Once the court has determined the "presumptively reasonable fee," it "may still adjust that amount" upward or downward "based on relevant factors specific to the instant case," such as the level of success the plaintiff attained.[4] *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, No. 3:03-CV-599 (CFD), 2011 WL 721582, at *3 (D. Conn. Feb. 22, 2011).

## II. Discussion

Plaintiff, who was represented by three law firms in this case, seeks fees totaling $2,983,838 ($1,076,967.50 for Brenner, Saltzman & Wallman LLP ("BSW"), $1,811,789.50 for Cooper & Dunham LLP ("CD"), and $95,081.00 for Wiggin and Dana LLP ("WD")), expert fees

---

because of acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) whether the case is undesirable; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

[4] However, in accord with the specific statutory language in CUTPA, for purposes of determining fees under CUTPA, "the question whether plaintiff achieved a 'level of success' . . . cannot be answered . . . with reference to the dollar recovery as it is in other contexts." *Bristol Tech., Inc. v. Microsoft Corp.*, 127 F. Supp. 2d 64, 68 (D. Conn. 2000).

totaling $542,290.58, and costs totaling $245,083.25. (Mot. for Fees at 1–2.)  Defendants raise a number of objections which are detailed below.

### A.  Reasonableness of Hourly Rates

#### 1.  Attorney Zivin

Defendants do not contest the reasonableness of the hourly rates charged by BSW's attorneys or WD's attorneys. They do, however, object to the hourly rates charged by Attorney Norman H. Zivin of CD (*see* Opp'n Mot. for Att'ys' Fees [Doc. # 463] at 32–33), which ranged from $595 at the start of the trial to $625 at the time of trial, and averaged $610.60 (CD Summary Chart, Ex. B to Zivin Decl. [Doc. # 453]).

In determining a reasonable hourly rate in connection with an application for attorneys' fees, district courts attempt to "step[] into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case effectively." *Arbor Hill I*, 493 F.3d at 112. Thus, courts attempt to "ascertain whether 'the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" *Chambless v. Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053, 1058–59 (2d Cir. 1989) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)).

Where, as here, the prevailing party hires out-of-district counsel, courts generally assess the reasonableness of that counsel's hourly rate by reference to "the hourly rates employed in the district in which the reviewing court sits." *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (internal quotation marks omitted). "[I]n order to receive an attorney's fee award based on higher out-of-district rates, a litigant must . . . persuasively establish[] that a

3

reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Id.* at 172.

Defendants argue that Romag has neither established that Attorney Zivins's rate is reasonable in Connecticut nor "made a particularized showing that the participation of out-of-state counsel was likely necessary in order achieve a better result." (Opp'n at 33.) The Court disagrees.

Attorney Zivin graduated *cum laude* from Columbia University School of Law in 1968 and has practiced law with CD for 45 years. (Mem. Supp. Mot. for Att'ys' Fees [Doc. # 451] at 33; Mellitz Decl., Ex. 2 to Mem. Supp. ¶ 28.) In that time, he has worked on more than 100 intellectual property lawsuits, tried more than 30 such cases, and argued more than 20 appeals in intellectual property cases, including before the United States Supreme Court. (Mem. Supp. at 33; Mellitz Decl ¶ 28.) In addition, he possesses a degree in mining and metallurgical engineering and is a registered patent attorney. (Mem. Supp. at 33.)

Two well-regarded members of the Connecticut bar, Attorneys Jeremy A. Mellitz and Jonathan B. Tropp, testified that an hourly rate of $625 is consistent with the billing rates of Connecticut attorneys specializing in patent litigation with comparable training, skill and experience to Mr. Zivin. (*See* Mellitz Decl. ¶ 29; Tropp Decl., Ex. 3 to Mem. Supp. ¶ 5.) Attorney Tropp added, by way of example, that "an intellectual property litigation partner in [his] firm's Stamford[, Connecticut] office with training and experience comparable to Attorney Zivin's has a billing rate of $665 per hour." (*Id.*)

Plaintiff additionally notes that "[t]his is not a case where attorneys' fees are being requested in a contingent fee case. [Rather,] [t]his is a case in which the client has had the motivation to review the hourly rates and charges of counsel as the litigation proceeded" because it paid counsel's bills throughout the litigation. (Mem. Supp. at 32.) Plaintiff contends that "[t]his

4

is a strong indication that such charges for legal services were charges at market rates for those services, and are reasonable." (*Id.*; *see* Reply [Doc. # 501] at 11.)

Plaintiff's position finds support in the decisions of several district courts in this Circuit which have held that "when a sophisticated client pays attorneys' fees that it does not know it will necessarily recover, the rate paid is presumptively reasonable." *Wells Fargo Bank, NA v. Konover*, 2014 WL 3908596, at *5 (D. Conn. Aug. 8, 2014); *see Diplomatic Man, Inc. v. Nike, Inc.*, No. 08 CIV. 139 (GEL), 2009 WL 935674, at *6 (S.D.N.Y. Apr. 7, 2009) ("[T]he fact that Nike, a highly sophisticated business client, has paid these bills, presumably after careful review by its general counsel or other senior business executives, is prima facie evidence of the reasonableness of the amount as a whole (beyond just the reasonableness of the hourly rates charged), since Nike could not have assumed that it would be reimbursed in full, or even in part."). The Second Circuit has been less clear about the legal effect of actual payment on the reasonableness inquiry. *See Arbor Hill II*, 522 F.3d at 190 ("The reasonable hourly rate is the rate a paying client would be willing to pay."); *Crescent Publ'g Grp., Inc. v. Playboy Enterprises, Inc.*, 246 F.3d 142, 144 (2d Cir. 2001) ("[I]f the District Court again chooses to award fees, any evidence of the actual billing arrangement between [the litigant] and its counsel should be considered a significant, though not necessarily controlling, factor in the determination of what fee is 'reasonable'. . . ."). "But regardless of the precise legal effect of this factor, it is surely of some significance that [Romag] has been willing to incur these fees. This is not a case in which [Romag] can have assumed that it was litigating on [Defendants'] ticket." *Telenor Mobile Commc'ns AS v. Storm LLC*, No. 07 CIV. 6929 (GEL), 2009 WL 585968, at *2 (S.D.N.Y. Mar. 9, 2009).

Together, the evidence Plaintiff has presented in the form of sworn statements by members of the Connecticut bar about Mr. Zivin's skills and experience and the Connecticut legal market for attorneys specializing in intellectual property litigation, as well as the fact that

Romag, a sophisticated client, has actually paid Mr. Zivin the fees he seeks here, persuade the Court that Mr. Zivin's hourly rate is reasonable.

### 2.   Division of Labor

Defendants additionally object to Plaintiff's practice of assigning "the vast majority" of its "legal work" to "partners/principals" "rather than junior attorneys." (Opp'n Att'y Fees [Doc. # 465] at 32–34.) According to Defendants, BSW "principals" Attorneys Schaefer, Fisher, and Daniels billed 91% of the hours billed by BSW, and CD partners Attorneys Zivin, Miller, and Sayour billed 76% of the hours billed by CD. (*Id.* at 34.) Because "partners/principals billed for work that should have been done by associates or even clerical staff," Defendants claim, Plaintiff's counsels' fees are excessive and should be reduced. (*Id.*)

The Court is unpersuaded. As an initial matter, the Court finds it probative, as discussed above, that Romag did in fact pay the fees counsel seeks here.  In addition, the Court notes that although he was a partner at BSW, Attorney Fisher (who billed about 24% of the total hours billed to Romag) billed at an average rate of $232.43 per hour, a rate comparable to associate rates.  (*See* Reply at 16; BSW Summary Bill, Ex. A to Schaefer Decl.) Further, by Defendants' own admission, 24% of CD's hours were billed by associates. (*See* Opp'n at 34.) Finally, the Court is not convinced that it is necessarily less efficient to assign relatively more work to more experienced attorneys. As Judge Lynch noted in *Hnot v. Willis Grp. Holdings Ltd.*, No. 01 CIV. 6558 (GEL), 2008 WL 1166309, at *8 (S.D.N.Y. Apr. 7, 2008), it is "equally plausible . . . that plaintiffs' relative reliance on more experienced partners allowed them to devote fewer hours to any given task." *See Skold v. Am. Int'l Grp., Inc.*, No. 96 CIV. 7137 (HB), 1999 WL 672546, at *1 (S.D.N.Y. Aug. 25, 1999) ("[A]n hour spent by experienced counsel may be more efficient and in the end save more time than when that hour is expended by less experienced staff with less

supervision and guidance."). The Court will not therefore reduce Plaintiff's counsel's billing rate on the basis of inefficient staffing.

### B. Reasonableness of Hours Requested

The Court now turns to Defendants' objections to the number of hours requested by Plaintiff. Defendants contest four categories of claimed fees: (1) for various unsuccessful claims and motions (Opp'n at 35); (2) for "an e-discovery frolic and detour relating to Romag's demand that Fossil search its email back-up tapes" (*id.*); (3) for work performed by partners that should have been performed by associates (Albert Decl. [Doc. # 464] ¶ 22); and (4) for activities unrelated to this matter or for frivolous tasks (*id.*). Each objection is addressed below.

#### 1. Unsuccessful Claims/Motions

Defendants contend that Plaintiff should not receive fees for several unsuccessful claims. The Supreme Court has explained that:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, . . . counsel's work on one claim will be unrelated to his work on another claim. . . . The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

*Hensley v. Eckerhart*, 461 U.S. 424, at 434–35 (1983). Nonetheless, "[w]here the district court determines that the successful and unsuccessful claims are inextricably intertwined and involve a common core of facts or are based on related legal theories, it is not an abuse of discretion for the court to award the entire fee." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1183 (2d Cir. 1996) (internal quotation marks and brackets omitted). Thus, in assessing Defendants' objections, the Court must assess whether or not the successful and unsuccessful claims are inextricably intertwined.

#### a. Claims against Retailer Defendants

Defendants assert that "Romag should . . . be denied recovery of time spent on the unsuccessful Retailer Defendants claims." (Opp'n at 35.) According to Defendants, Romag's bills for that time total $98,633, including $13,515.00 billed by BSW and $85,118.00 billed by CD. (Albert Decl. ¶ 12; Ex. A to Albert Decl.) Plaintiff responds that "[d]iscovery of the underlying facts of all claims against all Defendants was consolidated and interrelated," and in any event, "[t]his Court has already effectively rejected Defendants' rationale for excluding such time when, following *Total Recycling Services*, it decided to exclude only time spent solely on Romag's claim for Defendants' profits." (Reply at 9, *id.* n.4.) This argument, however, misconstrues the Court's previous Ruling.  There, the Court held that it was impracticable to apportion "the vast majority of . . . costs and fees" between Plaintiff's CUTPA claim and its trademark claim. (First Ruling on Mot. Att'ys' Fees at 13.) The Court *did not* hold that it was impracticable to apportion costs and fees between Plaintiff's successful claims against Macy's and its unsuccessful claims against the Retailer Defendants. (*See id.*)

Quite the contrary, as evidenced by the chart compiled by Defendants in Exhibit A to the Albert Declaration, many of Plaintiff's counsel's entries relate exclusively to the Retailer Defendants and thus can easily be separated from work on successful claims. For example, time spent drafting the complaint against the Retailer Defendants (initially filed in a separate suit), serving them, preparing the 26f report with respect to the Retailer Defendants, preparing the motion to consolidate, and requesting and reviewing documents related specifically to the Retailer Defendants is unrelated to the claims on which Plaintiff succeeded. Exhibit A is, however, not limited to these clearly severable entries. Rather, the portion Defendants pulled from CD's invoices additionally includes numerous entries regarding Macy's, against whom Plaintiff succeeded on some claims and failed on others. It is not possible to distinguish work on the successful claims from work on the unsuccessful claims based solely on the entries listed in

8

Exhibit A. In addition, many of the entries in Exhibit A, with respect to both BSW and CD, are excerpts of entries that included work on several items, some of which were unrelated to the Retailer Defendants.

Recognizing these limitations, the Court will reduce BSW's fee by $6,757.50 (half of the amount requested by Defendants) and CD's fee by $21,279.50 (twenty-five percent of the amount requested by Defendants)[5], for a total reduction of **$28,037**.

### b. Motions to Amend

Next, Defendants argue that Plaintiff's fees should be reduced by $159,726.25 for work related to Plaintiff's "four attempts to add a claim under the False Marketing Statute, 35 U.S.C. Section 292." (Suppl. Albert Decl. [Doc. # 498] ¶ 6; *see* Suppl. Opp'n [Doc. # 497] at 14.) Plaintiff maintains that there should be no reduction made with respect to its false marketing claim, on the grounds that "the issues related to § 292 of the Patent Act were factually intertwined with all of the other claims throughout the litigation." (Reply at 21.) Indeed, Plaintiff notes, "Defendants first introduced § 292 of the Patent Act as a counterclaim in their answer to Romag's complaint" and "Romag then raised § 292 of the Patent Act." (*Id.* at 20–21.) Should the Court find that Plaintiff's work relating to § 292 is separable however, Plaintiff argues that the total amount that should be deducted from Plaintiff's fee is $72,599.00, not $159,726.25 as Defendants claim. (*Id.* at 22 n.9; *see* Ex. 2 to Schaefer Suppl. Decl. [Doc. # 502], Ex. B to Zivin Suppl. Decl. [Doc. # 503], Ex. 2 to Freiman Suppl. Decl. [Doc. # 504].)

While Plaintiff is certainly correct that some of the factual issues related to its counterfeit marking claim were intertwined with other claims, it does not follow from this that Plaintiff's work on its various attempts to add the counterfeit marking claim are inseparable from its work

---

[5] Fewer of the entries highlighted by Defendants with respect to CD appear to be specific to the claims against the Retailer Defendants than with respect to BSW.

on other claims. The majority of entries to which Defendants object are for work specifically on the motions to amend or for jury instructions on false marking. Because Plaintiff's repeated attempts to add a false marking claim were unsuccessful and much of the work related to that work is separable from other work, the Court finds that a reduction is appropriate.

Based on the Court's review of Defendants' and Plaintiff's marked-up versions of Plaintiff's billing records, it appears that the parties largely agree about which entries relate to the § 292 claim. Where the parties diverge is primarily on the question of how to handle block-billing. Plaintiff arrived at its figure of $72,599 by estimating the portion of block-billed entries that relate to § 292 work. Defendants appear to have included the entire amount of time for all work listed in one entry where only some of that work related to § 292. Defendants' method clearly overstates the amount of time Plaintiff spent on § 292 work, but having reviewed Plaintiff's estimates, the Court believes they slightly understate the amount of time spent on § 292 work.

The Court thus concludes it would be appropriate to deduct **$79,858.90** (comprising Plaintiff's estimated § 292 fees plus 10%) from Plaintiff's claimed fees ($19,111.40 from BSW, $48,194.30 from CD, and $12,553.20 from WD) to account for work related to Plaintiff's failed efforts to add a false marking claim.

### c.   TRO

In its previous Ruling on Plaintiff's motion for attorneys' fees, the Court held that "Plaintiff may not recover its costs and fees related to its pursuit of a TRO in this case." (First Ruling on Mot. Att'ys' Fees at 19.) The Court then directed the parties to identify which fees were "incurred in pursuing the TRO." (*Id.*) Defendants identified $176,032.50 of fees, covering "[v]irtually all of Romag's counsel's fees incurred in the time leading up to and through December 22, 2010" and Romag's defense of six witnesses deposed by Defendants "in an effort to

figure out the facts relating to what Romag knew and when it knew it regarding the counterfeit snaps." (Suppl. Opp'n at 5.) Plaintiff argues forcefully against this approach, asserting that "[t]here is no way this Court's order could possibly be construed to exclude any time other than that preparing the TRO papers, participating in court proceedings related thereto, and preparing the contempt papers," which "ended on the date Defendants agreed to a preliminary injunction." (Reply at 10–11.) Including only these activities, Plaintiff concludes that it incurred $28,751.25 of fees in pursuit of the TRO. (*Id.* at 11.)

The Court is not persuaded by Defendants' arguments. With respect to the period between November and December 22, 2010, Plaintiff admits that some of the billing entries related to the TRO, but clearly not all of them did. (*See* Ex. 1 to to Schaefer Suppl. Decl. at 3–8; Ex. A, Pt. 1 to Zivin Suppl. Decl. at 3–9.) Plaintiff filed the lawsuit on November 22, 2010, the day before it moved for a TRO. Much of the work in the lead-up to November 22 appears related to preparing the complaint and preparing for litigation generally. (*See* Ex. 1 to to Schaefer Suppl. Decl. at 3–4; Ex. A, Pt. 1 to Zivin Suppl. Decl. at 3–4.) From November 22 to December 22, 2010, in addition to working on the TRO, the billing records reveal that Plaintiff's counsel was engaged in arranging service of process on Defendants, drafting the Rule 26(f) report, and reviewing Defendants' answer and counterclaim. (*See* Ex. 1 to to Schaefer Suppl. Decl. at 4–8; Ex. A, Pt. 1 to Zivin Suppl. Decl. at 4–9.) Nonetheless, a significant portion of the period from November to December 22, 2010 was dedicated to work on the TRO—more than Plaintiff admits. The vagueness of the some of the billing entries, particularly those of CD, however, makes the Court's task in parsing out relevant activities and irrelevant activities, difficult. For this reason, and because the Court believes Plaintiff has failed to account for all billing entries related to the TRO, the Court will increase Plaintiff's figure by 25%, for a total reduction of Plaintiff's fees by **$35,939.06** ($22,105.31 from BSW and $13,833.75 from CD).

11

The Court will not, however, include in this sum discovery-related costs, as Defendants urge. The six depositions to which Defendants point include that of Howard Reiter, whose deposition, by Defendants' own accounting, "encompassed numerous issues, including patent issues" (Albert Suppl. Decl. at 9), and was therefore not limited to issues relating to Defendants' efforts to expose Plaintiff's delay in seeking a TRO.  Furthermore, the Court is not persuaded that the other five witnesses identified by Defendants would not have been deposed even if Plaintiff had not sought a TRO because when and how the counterfeiting was discovered was relevant background to the suit regardless of the TRO.

### d.  Lanham Act Profits

Because the Court previously ruled that "Plaintiff is not entitled to recover any costs and fees that were incurred solely in pursuit of an accounting of Defendants' profits" (First Ruling on Mot. Att'ys' Fees at 14), both parties have highlighted billing entries which they argue should be excluded because they pertain to Romag's counsel's work on the issue of profits.

Defendants contend that Romag's counsel's fees should be reduced by $1,770,699.50, which comprises $728,045.50 in fees Defendants claim were for work pursuing Defendants' profits; two-thirds of the $760,259.75 billed by Romag's attorneys for trial preparation; two-thirds of the $230,489.50 billed by Romag's attorneys for trial; and two-thirds of the $573,154.50 billed for activities ambiguously described in the billing records. (Suppl. Opp'n at 9–11.) The $728,045.50 in fees for work Defendants coded as relating to profits includes work on the depositions of eleven witnesses and four experts, requests for production and interrogatories, and summary judgment. (*Id.* at 6–9.) With regard to the billing entries Defendants have coded "trial preparation," "trial," and "vague," Defendants explain that "[g]iven that the driver in this case was Romag's single-minded pursuit of Defendants' profits, and . . . that the patent damages Romag sought were only 1.5% of the total amount of profits award Romag sought, Romag should

be allocated a percentage of at most 33.33% of the non-specific fees" Defendants identified.  (*Id.* at 10.)

In so arguing, however, Defendants ignore the Court's prior holding that Plaintiff's "CUTPA claim was so intertwined with its other causes of action that the vast majority of its costs and fees cannot be apportioned between the claims at issue in this case." (First Ruling on Mot. Att'ys' Fees at 14.) As Plaintiff notes, its CUTPA claim relied on a showing of willfulness, and therefore a blanket exclusion of all fees associated with proving willfulness is not appropriate, notwithstanding Defendants' arguments to the contrary. Further, in light of the Court's instruction to the parties to highlight only fees incurred "*solely in relation to*" Romag's claim for profits (*id.* at 14 (emphasis added)), Defendants' acknowledgement that not all of the work it identified relating to discovery pertained *exclusively* to profits (*see* Suppl. Opp'n at 7) is dispositive.

Additionally, Defendants curiously contend that Plaintiff should be precluded from recovering fees for its counsel's work successfully defending against Defendants' motion for summary judgment on the issue of profits. (*Id.* at 8.) Since Plaintiff prevailed on that motion, the Court will award fees for Plaintiff's counsel's work on it.

Defendants additionally seek to exclude many of the billing entries that refer to "damages" or "sales," on the grounds that such entries relate to profits. However, the Court is persuaded that such work was necessary for Plaintiff's Patent Act claim (because damages are awarded based on the number of handbags sold) and did not therefore relate solely to profits under the Lanham Act. Next, Defendants assert that Romag should not be awarded fees for work related to demonstrating that Defendants' sales were attributable to its use of Romag's mark. However, as Plaintiff notes, such evidence was relevant to Romag's CUTPA claim and its efforts to show irreparable harm, in order to obtain a permanent injunction.

Finally, Defendants seek to exclude work related to the presentation of Dr. Beutel's testimony. Plaintiff opposes, arguing that not all of Dr. Beutel's testimony concerned the calculation of Defendants' profit. Plaintiff does admit, however, that some attorney time was spent working with Dr. Beutel to "wade[] through an enormous quantity of raw data from Fossil's sales system" to calculate Defendants' profits. (*Id.* at 10.) Plaintiff nonetheless contends that such time should not be excluded because the work was "necessary and appropriate in determining the number of handbags sold." (*Id.*) The Court is not persuaded that an expert was necessary to determine the number of handbags sold by Fossil. Rather, it appears that Dr. Beutel's primary contribution was in calculating Defendants' profit.

After reviewing the parties' submissions, the Court finds that Defendants have vastly overstated the amount of time spent *solely* on profit, and Plaintiff's estimate is much closer to the mark. Nonetheless, Plaintiff does omit some entries the Court finds excludable as relating solely to profit. Thus, the Court will add 10% to Plaintiff's proposed reduction, yielding a total reduction of **$75,588.43** ($31,178.13 from BSW, $27,095.20 from CD, and $17,315.10 from WD).

## 2. Discovery of Email Backup Tapes (ESI)

In addition to seeking to exclude fees related to Plaintiff's unsuccessful claims, Defendants contend that $124,674.04 in fees should be excluded because they "relate to work involved in searching Fossil's back-up tapes," the cost of which Judges Kravitz and Young both ruled were to be borne by Romag. (Albert Decl. ¶¶ 13–15.) Plaintiff responds that "[n]either Judge Kravitz nor Judge Young in their discovery rulings decided who should ultimately bear the fees and costs associated with the discovery of emails stored on Fossil's backup tapes." (Reply at 8 n.3.) The Court agrees.

Judge Kravitz ruled [Doc. # 148] on July 17, 2012 that Romag would pay "all the costs associated" with the first phase of restoring and searching the Dallas and Hong Kong servers. On

April 1, 2013, Judge Young ordered [Doc. # 244] each party to pay its own costs for the second phase of restoring and searching the servers. Neither Judge, however, discussed attorneys' fees. Because Defendants' only argument that these fees should be excluded is that Judges Young and Kravitz so ordered and the Court does not interpret their orders to exclude fees, the Court declines Defendants' invitation to deduct $124,674.04 in fees associated with the production of the back-up tapes.

### 3.   Work Done by Partners that could have been done by Associates

Defendants next request that the Court deduct $100,538.50 of fees for work performed by partners that should have been done by associates, including "legal research," "booking travel," and "delivering papers to the Court." (Albert Decl. ¶ 22a.) With respect to legal research, this argument appears to simply rehash Defendants' already-rejected claim that Plaintiff's counsel's fees should be reduced because the majority of work was assigned to partners rather than associates. With respect to other categories of expenses, even if the work was not appropriate for a partner, it does not follow that the entirety of the claimed fees should be deducted, rather than merely reducing the rate at which that work is billed. Further, having reviewed the billing records, the Court has found only a few instances in which a BSW partner billed for work that should have been performed by an associate, and in each instance, the partner billed at a rate of $195 an hour, a rate comparable to a reasonable associate hourly rate. The Court does not find any billing entries in CD's invoices where associate-level work is billed at a partner rate.[6] Therefore, the Court will not deduct any fees from Plaintiff's claimed fees for work done by partners that should have been done by associates.

### 4.   Unrelated Work and Frivolous Tasks

---

[6] Defendants do not claim that WD billed for associate-level work at partner rates.

Defendants additionally seek deductions in Plaintiff's claimed fees for work unrelated to this matter and frivolous tasks such as "[s]earch[ing] for flights to Dallas, TX." (Albert Decl. ¶ 22b & c.) The Court has reviewed these records and is persuaded by most of Defendants' arguments. Therefore, $5,023.75 will be deducted from BSW's claimed fees and $4,069 will be deducted from CD's claimed fees, for a total deduction of **$9,092.75**.

### 5. Legal Research

In addition to hourly fees, Plaintiff claims $37,137 in legal research fees charged by Pacer, Westlaw, and Lexis. Because the Second Circuit has held that the "charges for . . . online research may properly be included in a fee award," *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 369 F.3d 91, 98 (2d Cir. 2004), the Court awards Plaintiff **$37,137** for its legal research fees ($25,418.99 to CD; $10,706.89 to BSW; and $1,011.12 to WD).[7]

### C. Adjustments

### 1. Excessive, Redundant, and Unnecessary Entries

Defendants seek a 10% across-the-board reduction "to account for inappropriate billing" (block billing, vague entries, and entries for duplicative, excessive, or unnecessary work).  (Opp'n at 38–39.)

Although counsel seeking fees are "not required to record in great detail how each minute of [their] time was expended," *Hensley*, 461 U.S. at 437 n.12, they are obliged "to keep and present records from which the court may determine the nature of the work done, [and] the need for and the amount of time reasonably required; where adequate contemporaneous records have

---

[7] The Court is cognizant that the Local Rules of Civil Procedure proscribe the award of legal research fees as costs, D. Conn. L. Civ. R. 54(c)(7), but the fees are awarded here as part of the award of attorney's fees, not as taxable costs.

not been kept, the court should not award the full amount requested," *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1265 (2d Cir. 1987). "[C]ounsel should at least identify the general subject matter of his [or her] time expenditures," and in the absence of such identification, a court may refuse to award fees based on those entries. *Electro–Methods, Inc. v. Adolf Meller Co.*, 473 F. Supp. 2d 281, 305–06 (D. Conn. 2007).

Courts in this district, including this Court, have reduced fee awards when time entries do not refer to the specific matter worked on.  While "preparation for hearing" is a permissible time entry not subject to reduction because it refers to a specific event and allows for a determination of the reasonableness of time spent, entries like "work on various items" and "work on documents" are too vague for a court to determine the reasonableness of time spent. *Electro–Methods*, 473 F. Supp. 2d at 305–06; *see also Rabin v. Wilson–Coker*, 425 F. Supp. 2d 269, 272–73 (D. Conn. 2006) (reducing the number of hours by five percent because the billing records contained entries such as "work on brief," even though most of the time entries were sufficiently detailed); *Mr. & Mrs. B. v. Weston Bd. of Educ.*, 34 F. Supp. 2d 777, 781 (D. Conn. 1999) ("Entries stating such vague references as 'review of file,' 'review of correspondence,' 'research,' 'conference with client,' and 'preparation of brief' do not provide an adequate basis upon which to evaluate the reasonableness of the services and hours expended on a given matter.").

Here, while the majority of Plaintiff's counsel's entries at least identify the general subject matter of the work performed, the Court notes that many, particularly in CD's invoices, are block-billed or impermissibly vague as to the tasks performed. The Court will therefore reduce CD's claimed fees by seven percent and BSW's by four percent; the Court does not believe a reduction in WD's claimed fees is warranted.

**2.  Degree of Success**

17

Although the Supreme Court has "rejected a *per se* proportionality rule, i.e., proportionally linking the prevailing party's attorneys' fees to the degree of monetary success achieved, *City of Riverside v. Rivera*, 477 U.S. 561, 578 (1986), it has also held that "the most critical factor" in determining the reasonableness of a fee award "is the degree of success obtained," *Farrar v. Hobby*, 506 U.S. 103, 114 (1992). Because "the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount" where the "plaintiff has achieved only partial or limited success," courts may need to adjust the presumptively reasonable rate downward. *Barfield v. N.Y. City Health and Hosps. Corp.*, 537 F.3d 132, 152 (2d Cir. 2008) (quoting *Hensley*, 461 U.S. at 436).

In this case, although Plaintiff prevailed on some of its claims, its monetary success was quite limited due to its failure to prove willfulness and thus lost profits. To account for this limited success, the Court will reduce Plaintiff's claimed fees by ten percent.

### D. Awardable Costs[8]

#### 1. Expert Fees

Defendants contend that Plaintiff is not entitled to any expert fees. (Suppl. Opp'n at 11.) Plaintiff argues, however, that the Court has inherent authority to award such fees here because Fossil acted in bad faith in pursuing "objectively baseless and frivolous defenses concerning the validity of Romag's patent, for the sole purpose of trying to punish Romag for bringing its counterfeiting claims." (Reply at 22.)

While it is true that "a district court may invoke its inherent power to impose sanctions in the form of reasonable expert fees in excess of what is provided for by statute," such sanctions are

---

[8] Defendants object to Romag's claim of costs for $1,250 of phone calls from the Four Seasons Resort in Costa Rica and "$27,166.67 for a researcher in forecasting in Australia who assisted J. Scott Armstrong, Kesten C. Green." (Albert Decl. ¶ 22d.) However, as Romag no longer appears to seek an award of these costs, Defendants' arguments are not addressed here.

only appropriate where the Court finds fraud, abuse of the judicial process, or bad faith. *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008); *see also Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71, 78–79 (2d Cir. 2000); *New York v. Solvent Chem. Co.*, 210 F.R.D. 462, 473–74 (W.D.N.Y. 2002).

Plaintiff claims that Defendants' conduct here warrants sanctions in the form of expert fees. In support of this argument, Plaintiff notes that it was forced to retain Dr. Schwarz to rebut the expert opinions—rejected outright by Judge Young on summary judgment—of Dr. Rice and Mr. Kucklick that Romag's patent was insufficiently definite. Indeed, Judge Young found Defendants' argument regarding indefiniteness so lacking in merit that he *sua sponte* granted Romag summary judgment on the issue of indefiniteness at the time he denied Defendants' own motion for summary judgment. (*See* Mem. & Order [Doc. # 260] at 56–58.) In light of Judge Young's ruling, this Court concludes that Defendants' indefiniteness defense was "entirely meritless" and was raised for "improper purposes," *Revson*, 221 F.3d at 79, and therefore Plaintiff is entitled to expert fees for Dr. Schwarz.

Plaintiff does not, however, offer compelling reasons for a finding of bad faith with respect to any other expert witness. That some defense witnesses who Plaintiff hired experts to rebut were not called at trial does not, without more, demonstrate bad faith on the part of Defendants. Plaintiff points to no further evidence of bad faith and the Court is aware of none. Thus, Plaintiff is awarded expert fees in the amount of **$54,877.54** for Dr. Schwarz's testimony.

### 2. Taxable & Non-Taxable Costs

The Court has previously ruled that Plaintiff is entitled to taxable costs under CUTPA, but not non-taxable costs. (First Ruling on Mot. Att'ys' Fees at 13–15.) Defendants contend, and Plaintiff appears to agree, that of the $245,083.25 in costs originally sought by Romag, $15,511.98 are taxable under CUTPA. (*See* Suppl. Opp'n at 13; Ex. 3 to Schaefer Suppl. Decl.) However,

Plaintiff additionally contends that it is entitled to recover costs under Federal Rule of Civil Procedure 54 and 28 U.S.C. § 1920.

Under Federal Rule of Civil Procedure 54(d)(1), "[u]nless a federal statute, these rules, or a court order provides otherwise, costs . . . should be allowed to the prevailing party." Allowable costs are defined by 28 U.S.C. § 1920 and include fees of the clerk and marshal, fees for printed or electronically recorded transcripts necessarily obtained for use in the case, fees and disbursements for printing and witnesses, fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case, docket fees, compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses and costs of special interpretation services.

The question here is whether Plaintiff may recover costs under both CUTPA and § 1920. Plaintiff offers no authority for the proposition that a federal court exercising supplementary jurisdiction over a state law claim may award costs under both state and federal law, and the Court concludes that it may not.[9] *See* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 10 *Federal Practice and Procedure* § 2669 (2014) ("The award of costs is governed by federal law."); *Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1167 (9th Cir. 1995) ("[I]t was error for the district court to use state procedure instead of federal procedure to determine the amount of costs."); *Conte v. Flota Mercante Del Estado*, 277 F.2d 664, 672 (2d Cir. 1960) ("[N]o authority is needed for the proposition that a court will tax ordinary court costs in accordance with its own practice rather than that of the state where the claim arose."); *Natale v. City of Hartford*, No. CIV. H-86-928 (AHN), 1989 WL 132542, at *7 n.10 (D. Conn. Sept. 12, 1989) ("The court notes that the additional fees sought under Connecticut statutory law, Conn. Gen. Stat. Section 52–257,

---

[9] To the extent this holding conflicts with the Court's holding in the First Ruling on Mot. Att'ys' Fees, that part of the prior ruling which conflicts is vacated.

shall be disallowed, as federal law (Section 1920) deals with the issue and therefore controls.");

*Baker v. Power Sec. Corp.*, 174 F.R.D. 292, 294 (W.D.N.Y. 1997) ("Except in rare circumstances in

which some important state interest is implicated . . . the awarding of costs in an action in federal

court is controlled by federal law, specifically Rule 54 and 28 U.S.C. §§ 1821 and 1920."); *United

States v. Bedford Assocs.*, 548 F. Supp. 748, 752 (S.D.N.Y. 1982) ("In the absence of such a specific

contractual provision, federal law is controlling on the amount of reasonable disbursements and

charges Bowery may recover."); *Vernon Lumber Corp. v. Harcen Const. Co.*, 61 F. Supp. 939, 941

(E.D.N.Y. 1945) (holding that federal law, not state law, controls award of costs); *Souto v. Int'l

Freighting Corp.*, 19 F. Supp. 856, 856 (S.D.N.Y. 1937) (same).

As this case was heard in federal court, federal procedural rules apply, and Plaintiff is

entitled to costs under § 1920, not under CUTPA. Turning then to the application of § 1920 here,

Romag's claimed costs consist of: (1) court fees; (2) trial and hearing transcripts; (3) process

server and marshal fees; (4) depositions and deposition transcription fees; (5) production; (6)

translations; (7) copies of documents; (8) trial presentation services; and (9) handbag purchases.

Each is discussed below.

### a.   Court Fees and Trial/Hearing Transcripts

Plaintiff claims **$899** in court fees and **$8,741.25** in fees for trial/hearing transcripts,

which are clearly taxable under 28 U.S.C. § 1920(1) and (2), respectively, and will therefore be

awarded to Plaintiff.

### b.   Process Server and Marshal Fees

Plaintiff next claims **$355** for process servers and certified copies and **$1,345.48** in

marshal's fees. Both are covered by § 1920(1) and shall be awarded. *See U.S. for Use & Benefit of

Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 172 (2d Cir. 1996)

(holding that it is not an abuse of discretion for a district court to award fees for private process servers).

### c.   Depositions and Deposition Transcription Fees

Section 1920(2) permits the award of fees for "printed or electronically recorded transcripts necessarily obtained for use in the case." Plaintiff seeks $50,515.56 for deposition transcriptions. These fees are plainly covered by § 1920(2) and will be awarded with the exception of the fees for the transcription of Dr. Beutel's deposition for the reasons discussed above with respect to attorneys' fees. Plaintiff is therefore awarded **$50,226.56** for deposition transcriptions.

### d.   Production[10]

Among the costs claimed by Plaintiff is $858.51 for "production." The only bill Plaintiffs provide to substantiate this cost is for $848.79, and demonstrates that the sum was used to pay Xact Data Discovery for "B/W Blowbacks w/ slip sheets," i.e. for printing electronic documents, presumably for production to opposing counsel during discovery. "Printing copies (or blowbacks) . . . [is] the equivalent of photocopying," *Plantronics, Inc. v. Aliph, Inc.*, No. C 09-01714 (WHA) (LB), 2012 WL 6761576, at *12 (N.D. Cal. Oct. 23, 2012), and is taxable under § 1920(3) and (4). However, because Plaintiff has only produced an invoice for **$848.79**, that amount and not $858.51 will be awarded.

### e.   Translations

Plaintiff seeks an award of $1,064 for translations of certain documents, pursuant to § 1920(6). The award of translation costs are, however, foreclosed by the Supreme Court's 2012 decision in *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, in which the Court held that

---

[10] Defendants object to Plaintiff's claim of fees in connection with searching Fossil's back-up tapes (as discussed with regard to fees above). (Albert Decl. ¶ 13.) However, Plaintiff disclaims that it seeks such costs. (Reply at 8 n.3.)

"because the ordinary meaning of 'interpreter' is someone who translates orally from one language to another, we hold that the category 'compensation of interpreters' in § 1920(6) does not include costs for document translation." *Id.* at 2007. The Court thus declines to award Plaintiff fees for documents translations.

### f.   Copies

Romag requests $26,331.73 for copies and $3,573.84 for "client copies." Relying on CUTPA, which allows costs "for copies of records used in evidence, bonds, recognizances and subpoenas," Defendants contend that only copies made prior to January 2014 are taxable because "it is unlikely tha[t] copies made in 2010–2013 would constitute 'copies of records used in evidence.'" (Suppl. Albert Decl. ¶ 19c.)

Under § 1920, however, costs for "printing," 28 U.S.C. § 1920(3), and for "making copies of any materials where the copies are necessarily obtained for use in the case," *id.* § 1920(4), are taxable, regardless of whether the copies were of records used in evidence. *See Merritt Meridian Const. Corp.*, 95 F.3d at 173 ("Photocopying costs may be recovered even though the underlying document was not admitted at trial."). Local Rule of Civil Procedure 54 clarifies though that "[c]osts for the convenience of counsel or" more than "one copy of documents admitted into evidence" "are not taxable unless otherwise directed by the Court." D. Conn. L. Civ. R. 54(c)(3).

Both BSW and CD submitted bills for copying costs. BSW's bill includes the following categories of items:

| Description | Cost |
| --- | --- |
| Tyco [printing of documents from tif file; printing of documents from CD] | $1054.38 |
| Copies of documents in Dallas | $324.53 |
| Tyco [copying of documents] | $1390.59 |
| Tyco [copying of exhibits] | $7320.66 |
| Tyco [copying of documents in notebooks] | $486.82 |

Because printing costs are covered by § 1920(3) without a showing of necessity, Plaintiff shall be awarded the **$1,054.38** it claims for printing. Plaintiff will also be awarded the **$324.53** of copying costs it seeks in relation to the depositions in Dallas. With regard to the copies of exhibits, Plaintiff's invoices reveal that it expended $5,583.38 on obtaining seven copies of each exhibit and $670.56 on obtaining four copies of each exhibit. Because the Court generally requests a courtesy copy of each exhibit from counsel, the Court will permit the costs of three copies (one plus the original for the Court, one for counsel, and one for opposing counsel), but Plaintiff has offered no explanation for why four or seven copies were necessary. Therefore, the Court will award **$2,895.80** for copies of exhibits (3/7 of $5,583.38 + 3/4 of $670.56).

The Court declines to award the remaining costs requested by BSW for copying, however, because BSW did not "itemize those costs or explain why all those copies were necessary." *Merritt Meridian Const. Corp.*, 95 F.3d at 173. Neither Romag's charts nor its invoices identify which documents were copied and for what purpose. "Although the prevailing party is not required to submit a bill of costs so detailed as to make it impossible economically to recover photocopying costs, where a court is unable to determine whether the copies in question were reasonably necessary for use in the case, the claim for costs should be denied." *Moriarty v. Glueckert Funeral Home, Ltd.*, No. 95 C 2848, 1999 WL 162792, at *3 (N.D. Ill. Mar. 11, 1999) (internal quotation marks and citations omitted); *see Goodwall Const. Co. v. Beers Const. Co.*, 824 F. Supp. 1044, 1065 (N.D. Ga. 1992) *aff'd and remanded*, 991 F.2d 751 (Fed. Cir. 1993) ("The party seeking to recover photocopy costs must come forward with evidence showing the nature of the documents copied including how they were used or intended to be used in the case."). BSW additionally seeks $3,573.84 for "client copies," but it neither identifies what this means nor provides any authority for the proposition that client copies are taxable under § 1920. As such, these expenses will not be awarded. *See Barrington v. Lockheed Martin Corp.*, No. 6:05 CV 1601

24

(ORL) (KRS), 2007 WL 1303032, at *5 (M.D. Fla. May 3, 2007) ("Many of the copies were for the client. Such copies are not taxable.").

Romag additionally requests costs in the amount of $15,754.75 for photocopies made by CD. However, CD offers no description whatsoever of the documents that were copied nor any explanation for why such copies were reasonably necessary for use in the case. Nor does CD submit any actual invoices or receipts to support its claim for $15,754.75. Nonetheless, Defendants have conceded that at least **$5,632.00** was likely reasonably necessary for copies, and the Court will therefore award CD copying costs in this amount.

### g. Trial Presentation Services

Plaintiff requests an award of $31,500.86 for "trial presentation services." These services include: the fees of IT specialists who helped to develop and present visual exhibits at trial, the rental cost of audiovisual equipment, the fees of a photographer, and the fees of a consultant for visual services. Under § 1920(4), "fees for exemplification" are taxable if "necessarily obtained for use in the case."

Although "[c]ourts in other circuits disagree about whether the reference in 28 U.S.C. § 1920(4) to 'exemplification' includes demonstrative aids," *In re Omeprazole Patent Litig.*, No. 00 CIV. 4541 (BSJ), 2012 WL 5427791, at *7 (S.D.N.Y. Nov. 7, 2012) (comparing *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 427 (7th Cir. 2000) *with Arcadian Fertilizer, L .P. v. MPW Indus. Servs., Inc.*, 249 F.3d 1293, 1297 (11th Cir. 2001)), several courts in this Circuit have found that it does, *see id.*; *Farberware Licensing Co. LLC v. Meyer Mktg. Co.*, No. 09 CIV. 2570 (HB), 2009 WL 5173787, at *8 (S.D.N.Y. Dec. 30, 2009) *aff'd*, 428 F. App'x 97 (2d Cir. 2011); *DiBella v. Hopkins*, 407 F. Supp. 2d 537, 540 (S.D.N.Y. 2005).

As then-district court Judge Chin explained in *DiBella*,

the use of technology to improve the presentation of information to the jury and/or to the bench should be supported. Computers, computer graphics,

> digitized documents, and other technological advancements have become important tools of the modern-day trial lawyer. As long as the cost is reasonable and the devices aid in the efficient and effective presentation of evidence, a prevailing party should be allowed to recover their expense.

407 F. Supp. 2d at 540 (internal quotation marks and citation omitted); *see also Farberware*, 2009 WL 5173787, at *8 (same).

Because Romag's visual presentation of exhibits was necessary to its presentation of its case, the Court will allow the costs of the equipment rental, the photographer, and the visual services consultant. The Court will additionally award the majority of the IT specialists' fees, but it will not award that portion of the fees that covered travel and incidental expenses, totaling $2,468.22. Thus, Romag shall be awarded trial presentation services costs in the amount of **$29,032.64**.

### h.  Handbag Purchases

Romag's final claim of costs is for $10,203.74 in handbags, of which four were put into evidence at trial.[11] Romag contends that this expense is taxable as an exemplification. The Court is not persuaded that it was "reasonably necessary" for Romag to purchase over $10,000 of handbags in order to present its case, particularly in light of the fact that only four of the bags were put into evidence. The Court will award **$400** for the cost of the handbags that were presented as exhibits at trial.

---

[11] Defendants incorrectly assert that Plaintiff seeks $16,838.20 for handbags. (*See* Opp'n at 39).

### E.  Summary

#### 1.  Fees

At the hourly rates determined by the Court, BSW's claimed fee is $1,076,967.50, CD's claimed fee is $1,811,789.50, and WD's claimed fee is $95,081.00. Adding their legal research costs, BSW's claimed fee is $1,087,674.39; CD's is $1,837,208.49; and WD's is $96,092.12.

To reflect the Court's findings above, these sums are reduced by these amounts:

|  | BSW | CD | WD |
|---|---|---|---|
| **Unsuccessful Claims** | $79,152.34 | $110,402.75 | $29,868.30 |
|    **a.  Claims against Retailers** | $6,757.50 | $21,279.50 | 0 |
|    **b.  Motions to Amend** | $19,111.40 | $48,194.30 | $12,553.20 |
|    **c.  TRO** | $22,105.31 | $13,833.75 | 0 |
|    **d.  Lanham Act Profits** | $31,178.13 | $27,095.20 | $17,315.10 |
| **Discovery of Email Backup Tapes** | 0 | 0 | 0 |
| **Work Done by Partners that Could have been Done by Associates** | 0 | 0 | 0 |
| **Unrelated and Frivolous Work** | $5023.75 | $4069 | 0 |
|  |  |  |  |
| **Total** | $84,176.09 | $114,471.75 | $29,868.30 |

Deducting the amounts listed in "Total" above from each firm's claimed fee yields the following presumptively reasonable fees:

BSW: $1,003,498.30 ($1,087,674.39– $84,176.09)

CD: $1,722,736.74 ($1,837,208.49– $114,471.75)

WD: $66,223.82 ($96,092.12– $29,868.30)

BSW's fee is further reduced by 4% and CD's by 7% to account for inappropriate billing, yielding the following fees: BSW: $963,358.37; CD: $1,602,145.17; WD: $66,223.82. Each of these fees is

further reduced by 10% to account for Plaintiff's limited success. Accordingly, Plaintiff is awarded the following fees: BSW: $867,022.53; CD: $1,441,870.65; and WD: $59,601.44, for a total of **$2,368,494.62.**

### 2. Costs

The Court's award of costs, discussed above, is summarized here:

| Description | Cost |
|---|---|
| Expert Fees | $54,877.54 |
| Marshal's Fees & Process-Server Fees | $1,700.48 |
| Court Fees | $899.00 |
| Trial/Hearing Transcripts | $8,741.25 |
| Production | $848.79 |
| Printing | $1,054.38 |
| Copies | $8,852.33 |
| Trial Presentation Services | $29,032.64 |
| Handbags | $400.00 |
| | |
| **Total** | **$156,632.97** |

### III. Conclusion

For the foregoing reasons, Plaintiff's Motion [Doc. # 450] for Attorneys' Fees is GRANTED with modifications.  The Court awards $2,525,127.59 in attorneys' fees and costs. To the extent the Court's holding that Plaintiff may not recover costs under CUTPA conflicts with

the First Ruling on Motion for Attorney's Fees [Doc. # 481], that part of the prior ruling which conflicts is VACATED.

IT IS SO ORDERED.

/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 30th day of September, 2015.