**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ROMAG FASTENERS, INC., | |
| Plaintiff, | Civil Action No. 3:10-cv-1827-JBA (Consolidated) |
| v. | |
| FOSSIL, INC., FOSSIL STORES I, INC., MACY'S, INC., and MACY'S RETAIL HOLDINGS, INC., | December 16, 2020 |
| Defendants. | |

**FOSSIL'S MEMORANDUM OPPOSING ROMAG'S ATTEMPT TO MEET ITS BURDEN TO ESTABLISH THAT EQUITABLE PRINCIPLES JUSTIFY AN AWARD OF SOME OF FOSSIL'S HANDBAG PROFITS**

# TABLE OF CONTENTS

**Page**

Table of Contents ................................................................................................... i

Table of Authorities ............................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

SUMMARY OF THE JURY'S VERDICT AND ADVISORY
CALCULATIONS AND THIS COURT'S RELEVANT FINDINGS AND CONCLUSION ...... 4

ARGUMENT ......................................................................................................... 6

I.  LEGAL PRINCIPLES UNDERLYING THIS COURT'S EQUITABLE BALANCING ........ 6

    A.  As a First Step, This Court Must Decide Whether Romag Is Entitled to Any Profits ......... 6

    B.  This Court Must Conduct Its Equitable Balancing Using Existing
       Findings and Conclusions, Supplemented Only to Fill Gaps, If Any ................................. 7

         1.  This Court Thoroughly and Contemporaneously Reviewed the
            Trial Record and Made All the Findings and Conclusions
            Needed to Conduct the Equitable Balancing ................................................. 7

         2.  Romag Cannot Wrongfully Erase, Rewrite and Supplant the Findings It Does Not
            Even Acknowledge, and Replace Them With New Findings to Its Liking ................. 8

    C.  The Jury's Advisory Profit Calculation is Not Binding, And this Court Must
       Rely On Its Own Independent Findings and Conclusions, Which it Has Already
       Made, as Supplemented by Any Additional Such Findings that May Be Needed,
       to Support Its Determination ..................................................................... 10

    D.  The Relevant Equitable Factors ........................................................................ 11

II.  APPLYING THIS COURT'S FINDINGS AND CONCLUSIONS TO THE
    EQUITABLE FACTORS CONCERNING FOSSIL, THE BALANCE OF THE
    EQUITIES STRONGLY SUPPORTS DENIAL OF THE MASSIVE PUNITIVE
    DISGORGEMENT ROMAG DEMANDS ............................................................ 12

    A.  Fossil's Lack of Intent Either to Benefit from the Romag Mark or Deceive Consumers
       Is a Highly Important Consideration Weighing Against Disgorgement ......................... 12

         1.  What this Court Found to Be Fossil's Unintentional and
            Non-culpable Conduct Weighs Against Disgorgement ................................. 12

2. Romag Rehashes Losing Arguments in a Desperate Futile Effort to Erase, Rewrite and Supplant This Court's Long-Standing Findings and Conclusions That Fossil Was, At Most, Negligent, and Not Reckless......................15

    a) This Court's Findings That Fossil's Use Was, at Most, Accidental, and That There Was No Evidence Fossil Acted Recklessly or In Reckless Disregard, Obviates Romag's Claim That Fossil Acted in Callous Disregard......15

    b) The Jury Was Not Asked To, And Did Not and Could Not, Conduct an Equitable Balancing or Assessment of Whether Fossil Needs to Be Deterred From Infringing Again ...........................................................20

    c) Fossil's Diligent and Prompt Post-Suit Conduct Cuts In Favor of Denying Any Profits Disgorgement ...........................................23

    d) As This Court and the Federal Circuit Ruled, Fossil Asserted Objectively Reasonable Defenses and, Unlike Romag, Litigated this Case In Good Faith......24

B. Fossil Played No Role in Effectuating the Infringement, A Factor Strongly Weighing Against Disgorging Its Profits.............................................27

C. The Findings Establish Conclusively that Fossil Did Not Benefit, Or Benefitted at Most Only a Scant 1%, From Romag's Trademark ...............................27

D. Romag Has Been Awarded Many Powerful Substantial Remedies, and an Award of Fossil's Profits Would be an Inequitable Windfall and Penalty.......................30

E. Romag's "Troubling," Bad Faith, Sanctioned Conduct In Previously Obtaining Equitable Relief "Weighs Heavily" Against Disgorging Fossil's Profits ........................35

F. Romag's Laches Caused Economic Loss In the Millions and Strongly Cuts Against Romag in the Equitable Balancing.................................41

III. ANY PROFIT AWARD IS CAPPED, AT MOST, AT 1% OF FOSSIL'S HANDBAG PROFITS BASED ON THE ATTRIBUTION FINDING...............42

CONCLUSION.................................................................................................46

# TABLE OF AUTHORITIES

*Cases*                                                                    **Page(s)**

*4 Pillar Dynasty LLC v. New York & Co.*,
    933 F.3d 202 (2d Cir. 2019)......................................................................11, 22, 27, 31

*Applera Corp. v. MJ Research Inc.*,
    297 F. Supp. 2d 453 (D. Conn. 2004)..........................................................9 n.3

*Bein v. Heath*,
    47 U.S. 228 (1848)..................................................................................................35

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
    807 F.3d 1283 (Fed. Cir. 2015).............................................................................26

*Champion Spark Plug Co. v. Sanders*,
    331 U.S. 125 (1947)...........................................................................................7, 31

*DeFelice v. Am. Int'l Life Assurance Co.*,
    112 F.3d 61 (2d Cir. 1997)..................................................................................11

*George Basch Co., Inc. v. Blue Coral, Inc.*,
    968 F.2d 1532 (2d Cir. 1992)...........................................................11, 22, 23, 33, 43

*Getty Petr. Corp. v. Bartco Petr. Corp.*,
    858 F.2d 103 (2d Cir. 1988)...........................................................................33, 45

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
    146 F.3d 66 (2d Cir. 1998)...........................................................22, 27, 42, 44

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
    205 F.3d 1323 (2d Cir. 2000)..............................................................................14

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
    No. 94 Civ. 2663 (RPP), 1999 WL108739 (S.D.N.Y. March 3, 1999) .......... 13-14, 29, 43

*De Johnson v. Holder*,
    564 F.3d 95 (2d Cir. 2009)..................................................................................9

*Liu v. SEC*,
    591 U.S.—, 140 S. Ct. 1936 (2020)...........................................................33, 34, 45

*Mallory v. Citizens Utils. Co.*,
    342 F.2d 796 (2d Cir. 1965)..................................................................................11

*Marshall v. Vicksburg,*
  14 Wall. 146 (1873) ........................................................................33

*Minnesota Pet-Breeders, Inc. v. Schell & Kampeter, Inc.,*
  843 F. Supp. 506, *aff'd,* 41 F.3d 1242 (8th Cir. 1994) ......................................23

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,*
  316 U.S. 203 (1942).................................................................... 42-44

*Monsanto Chemical Co. v. Perfect Fit Prods. Mfg. Co.,*
  349 F.2d 389 (2d Cir. 1965)...........................................................22, 44

*National Post Office Collaborate v. Donahoe,*
  No. 3:13-cv-1406 (JBA), 2014 WL 4544094 (D. Conn. Sept. 12, 2014).................9, 9 n.3

*Otsuka Pharma. Co. v. Sandoz, Inc.,*
  07-cv-1000 (MLC), 2015 WL 5921035 (D.N.J. Oct. 9, 2015).........................................26

*Precision Instr. Mfg. Co. v. Automotive Maint. Mach. Co.,*
  324 U.S. 806 (1945)................................................................... 35-36

*Romag Fasteners, Inc. v. Fossil, Inc.,*
  590 U.S.—, 140 S. Ct. 1492 (2020)...................................................... *passim*

*Romag Fasteners, Inc. v. Fossil, Inc.,*
  866 F.3d 1330 (Fed. Cir. 2017)........................................................ *passim*

*Romag Fasteners, Inc. v. Fossil, Inc.,*
  No. 3:10-cv-01827 (JBA), 2018 WL 3918185
  (D. Conn. Aug. 16, 2018) ...............................................................25, 31

*Romag Fasteners, Inc. v. Fossil, Inc.,*
  No. 3:10-cv-1827 (JBA), 2014 WL 3895905 (D. Conn. Aug. 8, 2014)................... *passim*

*Romag Fasteners, Inc. v. Fossil, Inc.,*
  29 F.Supp.3d 85, 105 (D. Conn. 2014) (JBA)
  (subsequent proceedings omitted)........................................................ *passim*

*RWP Consol., L.P. v. Salvatore,*
  534 F. Supp. 2d 364 (D. Conn. 2008).....................................................9 n.3

*Schrader v. CSX Transp., Inc.,*
  70 F.3d 255 (2d Cir. 1995)...................................................................9

*Seatrax v. Sonbeck,*
  200 F.3d 358 (5th Cir. 2000) ...............................................................31

*Texas Pig Stands, Inc. v. Hard Rock Café Intern., Inc.*,
    951 F.2d 684 (5th Cir. 1992) .......................................................... 14, 29-30, 33

*Tilghman v. Proctor*,
    125 U.S. 136 (1888)..............................................................................33

*United States v. Trupin*,
    606 F. Supp. 2d 268 (D. Conn. 2009) ...........................................9 n.3

*von Spee v. von Spee*,
    558 F. Supp. 2d 223 (D. Conn. 2008) ...........................................9 n.3

*W.E. Bassett Co. v. Revlon, Inc.*,
    435 F.2d 656 (2d Cir. 1970)................................................................22, 44

*Zdanok v. Glidden Co.*,
    327 F.2d 944 (2d Cir. 1964) ................................................................8

### Statutes and Rules

15 U.S.C. §1117 ................................................................................. *passim*

15 U.S.C. §1117(a) ........................................................................... *passim*

15 U.S.C. §1117(c) .................................................................................31

District of Connecticut Local Rule 7(c)(1) ...............................................8, 9

Fed. R. Civ. P. 52(a) ...........................................................................10, 11

### Other Authorities

Beita Kiser, Gabe.  "Most Profitable Cars of All Time:  The Ford F-150,"
    *CarBuzz*, Mar. 9, 2016, https://carbuzz.com/news/most-profitable-
    cars-of-all-time-the-ford-f-150 ...............................................................45 n.13

*"phantasmagorical,"* Merriam-Webster,
    *https://www.merriam-webster.com/dictionary/somewhat* ...........................................25 n.8

Defendants Fossil Group, Inc. and Fossil Stores I, Inc. ("Fossil") submit this brief in opposition to Plaintiff Romag Fasteners, Inc.'s attempt to meet its burden to establish that equitable principles justify disgorging the profits Fossil earned selling handbags inadvertently containing non-genuine Romag-branded snaps.  Under its findings and conclusions, this Court should reinstate the judgment denying Romag an award of Fossil's handbag profits.  Alternately, should this Court decide to award Romag some amount of the profits Fossil earned selling Fossil handbags, then any such amount should be capped at no more than 1% of those profits, the maximum part of Fossil's handbag profits conceivably attributable to Romag's trademark for magnetic snaps.

## PRELIMINARY STATEMENT

Unbeknownst to Fossil, an independent Chinese manufacturer (Superior) bought non-genuine Romag magnetic snaps from a company in China and used them in handbags it made and sold to Fossil.  Fossil resold the handbags in the United States.  More than six and one-half years ago, this Court presided over a seven-day jury trial and two-day bench trial during late March and early April 2014.  After carefully assessing the evidentiary record when still fresh in its mind, including witness demeanor and credibility, this Court found that the evidence established that Fossil did not know of, suspect, or play any role in effectuating the infringement.  This Court found that the infringement was, at most, negligence, an accident, and that Fossil had no intent to deceive consumers into believing the snaps were genuine or use Romag's good will and reputation.  Nor did Fossil benefit from the Romag mark or its reputation, as Fossil earned 99% of its profits from other factors.  Under this Court's findings, it is impossible to imagine equity requiring Fossil to account for any profits, let alone punishing Fossil by disgorging Fossil profits grossly in excess of the minimal profits, if any, plausibly attributable to the Romag mark.

It is also impossible to imagine equity coming to the aid of Romag; of equity rewarding

Romag's deception and calculated bad faith; and of equity conferring an enormous $6.7 million windfall grossly exceeding Romag's actual $37,000 loss, as Romag demands.  Romag quintessentially stands undeserving of the equitable disgorgement it seeks.  Yet, that is exactly the inequitable result Romag now demands.

A defendant's profits are not, as Romag seems to believe, automatically awarded in every trademark case.  Although Romag treats the jury's advisory profits calculation as a *fait accompli*, requiring only an equitable adjustment, Romag puts the cart before the horse.  Romag must first show that equity supports such an award.  Under the equitable balancing this Court must undertake, Fossil's lack of intent merges unvaryingly with the established record on the other equitable factors to fashion a seamless case against any disgorgement.

*First,* this Court agreed with the jury that Fossil's infringement was not willful.  But it went much further, finding *no evidence* Fossil knew about or had reason to suspect Superior's unauthorized use, or even a risk, of counterfeit snaps; and *no evidence* Fossil acted with willful blindness, recklessly, or in reckless disregard.  *At most*, the evidence could have supported a finding of negligence.  Fossil's established lack of intent, though no longer dispositive on its own, remains a *highly important consideration* against disgorgement. *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S.—, 140 S. Ct. 1492, 1497 (2020) ("*Romag v. Fossil*").  Because there is little danger the accidental use will reoccur, and Fossil did not intend to confuse consumers or steal Romag's goodwill, the deterrence rationale is not implicated.

*Second,* this Court found *no evidence* that Fossil played any role in effectuating the unauthorized use.  Unaware of Superior's use, Fossil did not make, buy or use, or direct anyone to make buy or use, the unauthorized snaps.  Fossil's lack of conscious planning and preparation cuts against any claimed need to deter it from inadvertently infringing again.

*Third*, the benefit to Fossil was minuscule, if any.  As this Court and jury common-sensibly agreed, no buyers bought Fossil-branded handbags because of a brand name—Romag—wholly unknown to them and faintly imprinted on tiny snaps largely hidden from their view.  At most, 1% of Fossil's handbag profits were attributable to the Romag snap fastener trademark; 99% were based on other factors.  Yet, Romag has no interest in being properly limited to profits remotely attributable to the use of its mark.  No, Romag grabs instead for all of the profits Fossil earned selling Fossil-branded handbags.  Either as an equitable factor or under the stand-alone profit attribution rules, Fossil's lack of real benefit precludes the massive disgorgement Romag seeks, which *at most*, should be limited to 1% of Fossil's total handbag profits.

*Fourth*, Romag stands undeserving of equity, as its sanctioned, bad faith and deceptive misconduct permeates these proceedings.  This Court sanctioned Romag for strategically timing its bad faith Black Friday filing to increase litigation leverage and for deceiving this Court.  Unwilling to come clean, at trial, Romag re-committed to its fraudulent tale, tendering *discredited* testimony that did not "ring true"; and it leveled a *misleading attack*, as the Federal Circuit held, against Fossil's patent defense.  Romag is the bad faith, deceptive party that needs to be reined in.  Certainly equity should not reward it and so encourage further misconduct.

*Fifth*, Romag's proven bad faith delay and laches cost millions.  As Romag schemed to delay suit until Black Friday, Fossil unwittingly ramped-up holiday supply.  That delay caused economic harm roughly matching the amount of Fossil profits Romag demands.

*Finally*, although Fossil's use was unintentional, payment of the jury's $66,000 royalty award will more than make Romag whole for its actual $37,000 loss.  Romag could have sought other monetary remedies under the Connecticut Unfair Trade Practices Act, or CUTPA, and the Lanham Act, including up to $200,000 in statutory damages, which this Court expressly gave

Romag the opportunity to elect to seek.  But Romag declined all of those in favor of its multi-million dollar profit stratagem.  Romag's protest that it has been uncompensated for some ethereal harm and that Fossil has not been held to account for its unintentional use is nonsense.  It doesn't seek compensation, but a massive windfall that inequitably punishes Fossil.  The long-standing injunction cost millions, serves as a strong deterrent and satisfies the equities here.

Accordingly, under this Court's findings, judgment denying profits should be reinstated.

## SUMMARY OF THE JURY'S VERDICT AND ADVISORY CALCULATIONS AND THIS COURT'S RELEVANT FINDINGS AND CONCLUSIONS

Because this Court has decided all the predicate issues relevant to its equitable balancing, Fossil is submitting Fossil's (I) Summary of Judicial Findings of Fact, Conclusions of Law and Rulings; And (II) Supplemental Proposed Findings of Fact and Conclusions of Law Relevant to Equitable Balancing, collating those rulings and setting forth limited supplemental *proposed* findings and conclusions.[1]  For context, we briefly summarize the jury's verdict and advisory profit calculations and several of the more salient findings.

This Court's Bifurcation Order ("Bifurcation Order") [Doc. # 360, ¶15], designated the jury to determine substantive liability, willfulness, attribution of profits, and Romag's entitlement to punitive damages, and to calculate profits; and it reserved for itself hearing of equitable evidence and determination of equitable issues—including Romag's laches and unclean hands, and the equitable balancing now before it.  After a seven day trial in spring 2014,

---

[1] This Court's extant findings are contained in its July 2, 2014 Findings of Fact and Conclusions of Law in its Memorandum of Decision [Doc. # 471], 29 F. Supp. 3d 85 (D. Conn. 2014) (subsequent proceedings omitted), cited as "*Findings/Conclusions*, __"; and its Aug. 8, 2014 Ruling on Post-Trial Motions [Doc. # 480], 2014 WL 3895905 (D. Conn. Aug. 8, 2014) (cited as "*Ruling*, *__").  Unless otherwise noted, any emphasis in quoted materials is added; and internal citations to the evidentiary record are omitted.  References to "SPFF ¶__" are to the referenced paragraph in Fossil's Supplemental Proposed Findings of Fact, and the cited record evidence.

the jury returned a verdict in relevant part:

- Finding Fossil liable for patent and trademark infringement.
- Finding no willful infringement, as Fossil did not know, suspect or turn a blind eye.
- Awarding Romag a 9 cent per snap royalty, nearly doubling the 5 cent per snap it regularly received and totaling roughly $66,000.
- On an advisory basis, calculating $90,759.36 in unjust enrichment profits and $6,704,046 in total net handbag profits, adopting that figure to the penny from Fossil's expert's calculation of the same in connection with the flawed deterrence instruction.
- Finding Fossil's conduct did not justify punitive damages, reflecting that Fossil did not act, recklessly, willfully or wantonly and that there was no need to award punitive damages to deter Fossil. Jury Inst. [Doc. # 408] at 28.
- Determining that only 1% of Fossil's profits were attributable to the use of Romag's trademark. *Findings/Conclusions*, 90.

After the jury trial, this Court presided over an equity trial and soon thereafter, issued its *Findings/Conclusions* deciding several issues directly relevant to this Court's equitable balancing. First, it found that Fossil established Romag's laches, finding that Romag *inexcusably, unreasonably and unjustifiably delayed* filing this case until the eve of Black Friday *to Fossil's multi-million dollar economic prejudice. Findings/Conclusions*, 93-95, 97-103. Next, this Court sanctioned Romag. *Findings/Conclusions*, 104-06. It found clear and convincing evidence that in seeking and obtaining emergency equitable relief in the form of a TRO, Romag deceived this Court. *Id.* at 105-06. Also, consistent with its "Black Friday" litigation playbook, Romag in "bad faith" "intentionally" delayed this suit "to orchestrate a strategic advantage" and maximize economic pressure, also warranting sanction. *Id.* at 102, 106

Separately, this Court issued the *Ruling* on the parties' post-trial motions, the following aspects of which are relevant to this Court's equitable balancing. This Court first rejected Romag's challenge that the jury charge on trademark willfulness—a charge Romag actually requested this Court give—failed to include the concept of recklessness. *Ruling*, **4-8. This Court found the charge legally correct, but also found that even if wrong, the jury's finding of no willfulness was factually correct, as there was *no evidence* that Fossil acted recklessly, with

5

reckless disregard or with a blind eye to suspected infringement or actual knowledge of infringement. *Ruling*, *8.  "At most," the evidence could possibly support a finding of negligence, "not that [Fossil] acted in reckless disregard, with willful blindness, or with actual knowledge of Superior's purchases of counterfeit snaps." *Ruling*, *8.  Next, this Court rejected Romag's attack on the jury's finding that 99% of Fossil's profits on handbags sales were attributable to factors other than Romag's mark for snap fasteners, finding that the jury's 99% finding was supported by the evidence. *Ruling*, **8-12.

## ARGUMENT

Responding to Fossil's argument that this Court's findings, which favor reinstating the judgment denying profits, obviated the need for remand, the Federal Circuit demurred, stating that Fossil's "arguments against an award of profits are best considered in the first instance by [this Court]." Fed. Cir. No. 18-2417 [Doc. # 50].  Fossil turns to those arguments.

## I.  LEGAL PRINCIPLES UNDERLYING THIS COURT'S EQUITABLE BALANCING

### A.  As a First Step, This Court Must Decide Whether Romag Is Entitled to Any Profits

The threshold question this Court must decide, as it and Romag acknowledge,[2] is whether Romag has shown that principles of equity justify awarding *any* profits.  The Lanham Act dictates that requested profit awards are "subject to the principles of equity"; must be determined "according to the circumstances of the case"; and "shall constitute compensation and not a penalty." 15 U.S.C. §1117(a).  Infringement does not automatically entitle a plaintiff to an award

---

[2] *See Ruling*, *13 (if profits denial overturned, Court must first "find after an analysis of the equitable factors governing an award of profits that Romag is entitled to such an award" before then needing to consider propriety of jury charge on profits); Doc. # 517, at 1 (briefing needed "concerning whether Romag is entitled to an award of Fossil's profits"); *accord* Doc. # 577, at 2; Romag's Supplemental Brief, Fed. Cir. Case No. 18-2417 [Doc. # 48] ("Fed. Cir. Supp. Br.") at 1 ("sole issue remaining" is "whether Romag []is entitled to an award of" profits); *id*. at 15 (remand needed to "determine whether profits award is appropriate").

of a defendant's profits. *See Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 131-32 (1947). *Romag v. Fossil* reaffirms that principle. So, only if Romag shows that equitable factors justify some disgorgement might this Court proceed to determine an amount of profits to award, subject to limit or elimination based on the profits, if any, attributable to the Romag mark.

Recognizing that it cannot make the threshold showing under the equitable balancing, Romag simply skips it. Its brief is wrongly premised on the idea that profits are always awarded once you establish liability, subject only to this Court's "adjustment." *E.g.*, Romag Br. 1, 14, 44. But Romag continues to bear the burden of showing that equitable principles justify disgorging the profits Fossil earned selling handbags that inadvertently contained non-genuine Romag snaps. And this Court remains responsible for balancing the equities relying on its existing findings and conclusions, and supplemental findings, if needed, to decide whether Romag deserves profits.

**B.   This Court Must Conduct Its Equitable Balancing Using Existing Findings and Conclusions, Supplemented to Fill Gaps, If Any**

**1.   This Court Thoroughly and Contemporaneously Reviewed the Trial Record and Made All the Findings and Conclusions Needed to Conduct the Equitable Balancing**

Following the spring 2014 jury and equity trial, this Court reviewed the complete trial record and prepared detailed findings, conclusions and rulings. Romag timely sought neither to reargue nor appeal those findings and conclusions, which stand as conclusive and invulnerable to challenge. Those findings and conclusions dovetail with consistent jury findings to form a broad mosaic encompassing *each factor* this Court must equitably balance. While this Court contemplated the possibility of "supplemental" findings in the current briefing, Tr. of Oct. 8, 2020 Conference ("Oct. 2020 Tr.") [Doc. # 584] at 6:5-8, the absence of any gaps in the findings averts the need to supplement. This Court can and must balance using its extant findings and

conclusions.  So, following the course this Court charted, Fossil's briefing "take[s] up the

Court's prior ruling[s] and recast[s] them" "under the equitable considerations" including *mens*

*rea.* Oct. 2020 Tr. at 7:3-13; *see also Findings/Conclusions*, 103 (holding that this Court's

trademark laches finding would be applied in the equitable balancing).

### 2.   Romag Cannot Wrongfully Erase, Rewrite and Supplant the Findings It Does Not Even Acknowledge, and Replace Them With New Findings to Its Liking

Romag has something else in mind.  Its brief reads as if the trial ended yesterday and this

Court is writing on a blank slate.  Knowing that this Court's existing findings foreclose any

profits award, Romag's brief disingenuously pretends they don't exist, and, in so doing,

dishonors this Court's rulings and the work of the parties, jurors, and the Court itself that they

reflect.  Basically, Romag is saying that this Court got every finding Fossil cites wrong.  As

Judge Friendly said, "[w]here litigants have once battled for the court's decision, they should

neither be required, nor without good reason permitted, to battle for it again." *Zdanok v. Glidden*

*Co.*, 327 F.2d 944, 953 (2d Cir. 1964).

Romag's gambit to engineer a wholesale reversal of findings and conclusions it does not

even bother to acknowledge cannot stand.  This Court's findings were not a dress rehearsal.

They enjoy not only legal finality—Romag's time to seek reconsideration, D. Conn. L.R. 7(c)(1),

or appeal has long passed—they have also earned the weighty imprimatur of correctness and

trustworthiness.  This Court produced them within months of presiding over the trial, with the

evidence and this Court's personal observation of Romag's witnesses' insincere demeanor and

incredible testimony fresh in its mind.  Those findings stem from this Court's careful review of

the same evidentiary record now before it. *See* Oct. 2020 Tr. at 8:4-6 (Court will not "reopen that

evidentiary record in any way").  Why then should this Court's hard work be summarily cast

aside and rewritten with a contradictory ending?  Romag never says.  The "law of the case"

doctrine posits that a court should generally adhere to its rulings "in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." *De Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (internal quotation marks omitted).  This is a "strict" standard. *Schrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *accord* D. Conn. L.R. 7(c)(1) (reconsideration standard is "strict" and "such motions will generally be denied unless the movant can point to controlling decisions or data that the court overlooked in the initial decision or order").  Where a party, like Romag, "simply reiterates the same arguments that the court previously rejected," the result should not change. *National Post Office Collaborate v. Donahoe*, No. 3:13-cv-1406 (JBA), 2014 WL 4544094, at *4 (D. Conn. Sept. 12, 2014) (Arterton, J.).[3] Romag does not even try to argue that this case involves one of the major grounds for revisiting any of this Court's many relevant decisions, and clearly none applies. *See De Johnson*, 564 F.3d at 99-100 (three major grounds are "an intervening change in law, availability of new evidence, or the need to correct a clear error or prevent manifest injustice").

Romag's advocacy for a complete reversal of this Court's salient findings pervades its brief, but several striking examples illustrate the depths Romag will plumb to do so:

| Existing Finding (discussed with citation below) | Romag's Claim Contrary To and Ignoring Finding (cites to Romag Br.) |
| --- | --- |
| • Fossil did not know of, suspect or turn a blind eye to Superior's use. | • "Fossil's claims of complete ignorance, while unbelievable and defiant of simple common sense, are contrived…." (15) |

---

[3] This Court regularly refuses demands by unhappy litigants to re-tread ground already traversed. *See, e.g.*, *National Post Office Collaborate*, 2014 WL 4544094 at *4 (denying rearguement that simply reiterated rejected ones); *United States v. Trupin*, 606 F. Supp. 2d 268, 271 (D. Conn. 2009) (refusing to revisit issue decided); *RWP Consol., L.P. v. Salvatore*, 534 F. Supp. 2d 364, 370 (D. Conn. 2008) (recognizing relation of law of the case to reconsideration; holding that movant failed to demonstrate "need to correct clear error or prevent manifest injustice"); *von Spee v. von Spee*, 558 F. Supp. 2d 223, 224, 226 (D. Conn. 2008); *Applera Corp. v. MJ Research Inc.*, 297 F. Supp. 2d 453, 455 (D. Conn. 2004) (reargument of previous positions showed no need to alter prior ruling) (all cases Arterton, J.)

|  | • "It was Fossil's choice to use Romag's trademark, and Fossil's choice to put its head in the sand while [Superior] used counterfeits." (4) |
|---|---|
| • Romag, for a bad faith and improper purpose, delayed five months during which Fossil did not know of the infringement. | • "Romag took all of five months to follow the concealed trail of breadcrumbs leading to Fossil's counterfeiting!" (3) |
| • Fossil litigated reasonably and in good faith. | • Fossil relied "on defenses without basis in fact or law," (32), and employed a "scorched earth litigation strategy," (14). |
| • 1% of Fossil's handbag profits were attributable to Romag mark on snaps. | • Use of Romag snaps "lead[] Fossil to reap millions in profit." (35) |

This Court got it right the first time. Nothing Romag says—even if this Court were to decide to

redo its painstaking work—mandates a 180 degree about-face.

## C. **The Jury's Advisory Profit Calculation is Not Binding, And this Court Must Rely On Its Own Independent Findings and Conclusions, Which it Has Already Made, as Supplemented by Any Additional Such Findings that May Be Needed, to Support Its Determination**

In conducting the equitable balancing, this Court has the ultimate responsibility for

making and supporting its own independent findings of fact and conclusions of law, even as to

issues on which the jury provided its advisory opinion. Fed. R. Civ. P. 52(a).  As acknowledged

by Romag, [Doc. # 574 at 1, 9], and this Court, Oct. 2020 Tr. at 7:5-13 ("everybody is in

agreement that the role of the jury's advisory profits calculation is advisory and may be taken

into account but is neither ignored nor deemed binding"; "We're just going to acknowledge them

as advisory."), while the jury performed advisory profits calculations under two of the three legal

rationales underlying profits awards, this Court is not bound by them; nor is it bound by some

implication Romag now urges this Court to squeeze from them, particularly some inference that

is directly at odds with this Court's own well-supported, long-standing findings.

While Romag treats this Court's *actual* findings—particularly where they don't fit with

the after-the-fact narrative Romag is trying to script—as a nullity, Romag wrongly treats the

jury's *advisory* profits calculation essentially as binding.  Irony aside, it would be error to enter

10

judgment upon the jury's advisory calculation. *Mallory v. Citizens Utilities Co.*, 342 F.2d 796, 797-98 (2d Cir. 1965). Whether this Court accepts or rejects the advisory calculation, it "retains the ultimate responsibility" for making its own findings and conclusions and "explain[ing] how it arrived at th[em]." *DeFelice v. Am. Int'l Life Assurance Co.*, 112 F.3d 61, 65 (2d Cir. 1997); Fed. R. Civ. P. 52. This Court's findings "alone form the basis for appeal," *4 Pillar Dynasty LLC v. New York & Co.*, 933 F.3d 202, 209 n.6 (2d Cir. 2019), and "review on appeal is from the court's judgment as though no jury had been present." *Mallory*, 342 F.2d at 797 (citations omitted).

## D.  The Relevant Equitable Factors

While the Supreme Court has found that willful infringement is no longer absolutely *required*, a defendant's mental state—in this case Fossil's non-culpability and lack of intent to confuse consumers or make use of Romag's reputation and good will—remains a "*highly important consideration* in determining *whether* an award of profits is appropriate." *Romag v. Fossil*, 140 S. Ct. at 1497 (emphasis added). Additional factors that this Court must balance include (1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) the availability and adequacy of other remedies; (3) the role of a defendant in effectuating the infringement; (4) plaintiff's laches; and (5) plaintiff's unclean hands. *4 Pillar Dynasty*, 933 F.3d at 214 (citing *George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir. 1992)).

This Court acknowledged not only this standard's continued vitality, but the parties' agreement that it governs the equitable analysis. Oct. 2020 Tr. at 6:13-7:2. Romag voiced no opposition then, nor would it have mattered if it had; and it said previously that *Romag v. Fossil* left that standard unchanged. Fed. Cir. Supp. Br. at 13-14. Recognizing now that such an equitable balancing under this Court's findings ends poorly for it, Romag sweeps the equitable precepts under the rug, next to this Court's findings, and posits ones more to its liking. As Fossil

now shows, however, under the existing findings and applicable standards—including the one

Romag posits—this Court should deny Romag any profits award.

## II. APPLYING THIS COURT'S FINDINGS AND CONCLUSIONS TO THE EQUITABLE FACTORS, THE BALANCE OF THE EQUITIES STRONGLY SUPPORTS DENYING THE MASSIVE PUNITIVE DISGORGEMENT ROMAG DEMANDS

### A. Fossil's Lack of Intent Either to Benefit from the Romag Mark or Deceive Consumers Is a Highly Important Consideration Weighing Against Disgorgement

The Supreme Court held that a trademark defendant's *mens rea* or intent remains a

"*highly important consideration* in determining whether an award of profits is appropriate."

*Romag v. Fossil*, 140 S. Ct. at 1497 (emphasis added).  Romag admits this. *See* Fed. Cir. Supp.

Br., at 7.  Fossil need not, and does not, as Romag warns, "exaggerate[e] the importance" of

Fossil's complete good faith intent, or place it on a pedestal. Romag Br. at 9, 10.  While not the

be all and end all, this Court's finding that, at most, Fossil's resale of handbags with nongenuine

Romag-branded snaps was accidental, and not knowing, willful or the result of recklessness or

reckless disregard, stands as a *highly important* factor militating strongly against disgorgement.

### 1. What this Court Found to Be Fossil's Unintentional and Non-culpable Conduct Weighs Against Disgorgement

"Fossil does not manufacture its products itself, but rather, contracts with independent

business entities to do so." *Findings/Conclusions*, 92.  Unbeknownst to Fossil, and without its

involvement, one of its independent handbag suppliers, Superior, purchased Romag-branded

magnetic snaps from an unauthorized source and placed them in Fossil-branded handbags.

*Findings/Conclusions*, 92.  Not before December 2, 2010, in response to Fossil's inquiries after

Romag finally chose to ring the alarm, did Fossil learn that Superior used Romag-branded snaps

it purchased from an unauthorized source.  "The evidence at trial established" that Fossil

"[d]idn't believe that counterfeits were being used," and that there was no objective reason for

them to do so. *Ruling*, *8; *see also id.* ("no other evidence to support a finding that Fossil knew or suspected there was a risk that Superior was using counterfeit snaps"); *id.* (evidence established that Fossil "had never been informed of any specific instances of Superior using counterfeit snaps").

The jury, in a *binding verdict*, determined that Fossil did not willfully infringe Romag's mark. *Findings/Conclusions*, 90.  Although that finding no longer absolutely bars an accounting, 140 S. Ct. at 1497, "[t]he relevant authorities" "show that *willfulness* is a *highly important consideration* in awarding profits." 140 S. Ct. at 1497 (Alito, J., with Breyer and Kagan, JJ., concurring) (emphasis added).  So, here Fossil's lack of willfulness, weighs as a *highly important consideration* against disgorgement.

This Court confirmed that Fossil's conduct was not willful. *Ruling*, **7-8.  But it went further.  It reviewed the entire trial record, carefully considered and emphatically rejected each of Romag's efforts—which it now simply regurgitates in the hope of a different conclusion—to pin some fault on Fossil.  Specifically, this Court found "*no evidence* to support a finding that Fossil knew or suspected there was a risk that Superior was using counterfeit snaps," *Ruling*, *8 and "*no evidence* that Fossil acted recklessly, with willful blindness, or with actual knowledge of a risk of counterfeit snaps." *Ruling*, *id.* (emphasis added).  No evidence.  "*At most*," this Court concluded, Romag's evidence "could have supported a finding that Fossil[] was negligent, *not* that it acted in reckless disregard, with willful blindness, or with actual knowledge of [Fossil's independent supplier's] purchases of counterfeit snaps." *Ruling*, *7 (emphasis added).

Fossil's good faith is further reflected in the little, if any, benefit—1%, attribution, at most—Fossil got from the Romag mark for snap fasteners, as Fossil would have had "little, if any, motivation for bad faith appropriation" of Romag's mark "to cause confusion or deception

13

[of handbag purchasers] or to profit from [Romag's] reputation." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, No. 94 CIV 2663(RPP), 1999 WL108739, at *1 (S.D.N.Y. March 3, 1999), *aff'd* 205 F.3d 1323 (2d Cir. 2000) (where the prominent use of defendant's name, initials and crest, not plaintiff's mark, drove sale, there could be little, if any motivation for bad faith appropriation).  Fossil, itself, is a famous brand, and the worldwide success of that brand militates against the existence of any motive to seek an association with the Romag name or use it to promote its handbag business. *Texas Pig Stands, Inc. v. Hard Rock Café Intern., Inc.*, 951 F.2d 684, 695 (5th Cir. 1992).  And, finally, Fossil's payment of the full branded price to its supplier when cheap generic snaps were available, *Ruling*, *8, further shows Fossil's lack of intent to benefit from the infringement.

The extraordinary award Romag seeks for an accidental use with no fraudulent intent would be against the "weight of authority" under which profits are "hardly, *if ever,* awarded for innocent infringement." 140 S. Ct. at 1498 (Sotomayor, J. concurring); *accord id.* at 1494 (majority opinion:  "innocent" infringer "often stands in very different shoes than an intentional one").  Fossil fits squarely within what Justice Sotomayor describes as "innocent" or good faith infringers through her parentheticals to the cases illustrating that "weight of authority"— that is, without "fraudulent intent" and not "deliberate" or "willful"—against whom equity constantly refused an award of profits. *See id.* at 1498 (citing case parentheticals).  So, requiring the unintentional user Fossil to disgorge its profits "would not be consonant with the 'principles of equity' referenced in §1117(a) and reflected in the cases the [Supreme Court] majority cites," or "with longstanding equitable principles which, after all, seek to deprive only wrongdoers of their gains from misconduct." *Id.* (Sotomayor, J. concurring) (citations omitted).

That makes sense, and is consonant with Romag's contrived "standard," as an infringer

14

who, unlike Fossil, intentionally tries to obtain the benefit of a rival's reputation and good will by deceiving consumers—and thereby seeks to frustrate the two aims of the Lanham Act that Romag highlights—should not keep that ill-gotten gain, but rather warrants deterrence. That is not Fossil, as this Court found in reaffirming the jury's "highly important" finding of non-willful infringement. *Ruling*, \*\*7-8.

## 2.   Romag Rehashes Losing Arguments in a Desperate Futile Effort to Erase, Rewrite and Supplant This Court's Long-Standing Findings and Conclusions That Fossil Was, At Most, Negligent, and Not Reckless

Understanding that this Court's *mens rea* findings doom its efforts to snatch Fossil's profits, Romag disingenuously ignores them. Instead, on the thin reed of a two-word phrase in an instruction on a non-binding, advisory jury profit calculation, Romag reargues points it already lost, frantically hoping for a different outcome. Whatever the import of the jury's advisory profit calculation, one thing is certain:  this Court is not bound by it. *See* Sec. I.C. Whether it simply shows acceptance of Fossil's expert's numbers over Romag's, *see Ruling*, \*10, or signals something else, this Court must make—and, indeed, already has made—its own assessment of Fossil's intent based on the evidentiary record before it, and then must balance it among other factors to determine, as it did, that Fossil, at most, was negligent and that its good faith, unintentional conduct does not need to be deterred or punished.

### a)   This Court's Findings That Fossil's Use Was, at Most, Accidental, and That There Was No Evidence Fossil Acted Recklessly or In Reckless Disregard, Obviates Romag's Claim That Fossil Acted in Callous Disregard

Romag first argues that the jury's profits calculations imply a finding of "callous disregard," which Romag itself calls a "recklessness standard," [Doc. # 479, at 10]. Romag has already lost that battle. With the documents and testimony fresh in mind, this Court parsed the entire trial record—the same one now before it—and rejected Romag's attempt to place Fossil within the bounds of recklessness, finding *no evidence* that Fossil acted *recklessly* or with

15

"*reckless disregard*," let alone knowledge or willful blindness.  At most, that evidence might possibly support a negligence finding.  Fossil did not disregard—"callously," recklessly or otherwise—Romag's trademark rights.  That ends the matter and unburdens this Court from a wasteful repeat.

To be sure, in reaching these conclusions, this Court not only vetted the same evidentiary record before it now, it expressly rejected the arguments Romag repackages that Fossil's awareness of circumstances in China[4] or commercial issues with Superior created what Romag now calls a "context," Romag Br. 21-24, in which Fossil knew or should have suspected Superior's use of counterfeit Romag snaps. *Ruling*, **7-8.  That argument is uncannily reminiscent of Romag's argument that Fossil "turned a blind eye," which both the jury and this Court addressed square on and rejected resoundingly.

Indeed, far from finding that those circumstances showed Fossil's bad faith, they showed its good faith.  For example, regarding another vendor's use in China of counterfeit zippers, "when Fossil discovered the use of counterfeit YKK zippers in its products by a vendor, rather than turning a blind eye, it quickly set up a quality control program in an attempt to avoid future issues." *Ruling*, 2014 WL 3895905, at *7.  That operates to Fossil's credit on the equitable scales.  This Court also has rejected Romag's argument that a few scattered commercial matters over Fossil's decades'-long relationship with Superior "would have alerted Fossil to the risk that Superior was using counterfeit snap fasteners." *Ruling*, *7.  Indeed, this Court found that the one instance Romag raises again showed Fossil believed the snaps Superior used *were genuine*, not counterfeit. *Id.*  There, in connection with a product cancellation, Fossil asked why it was

---

[4] Romag predicates its tale of Fossil's supposed indifference on use of Chinese manufacturing, neglecting to mention that Romag does too, because it is "a lot less expensive." SPFF ¶43.

reimbursing Superior *for branded snaps*, when generics were available. *Id.*  Fossil ultimately reimbursed for the branded snaps, proving that Fossil "[d]idn't believe that counterfeits were being used" and that "Fossil believed the snaps were genuine," as it would be "highly unlikely [for Fossil] to pay full price for a counterfeit, and then to continue to ignore that counterfeiting, opening itself up to liability." *Id.*  More broadly, this Court rebuffed the effort Romag renews to wrongly label Fossil reckless or willfully blind for not detecting the non-genuine snaps through visual inspection.  It refused to impugn Fossil when "the inventor of the snaps himself cannot always distinguish a counterfeit snap from an authentic snap via visual inspection." *Ruling*, *7 n.4.  In short, this Court has already rejected the exact arguments that Romag makes now that some purported "context" gave Fossil reason to suspect infringement.

Because Romag's predicate of a "context" for Fossil to have suspected Superior's unauthorized use crumbles, Romag also fails in trying to assail Fossil because its witnesses did not "look at the snaps." Romag Br. 18-21.  Romag's incessant carping that Fossil's team never looked at the snaps is curious given that per Reiter, visual inspection would not have detected the non-genuine snaps.  Nevertheless, without "context"—that is, without reason to suspect Superior was using counterfeits—there was no reason to look at the snaps.  There was nothing to regard or disregard, "callously" or otherwise.  The relationship was humming along.  Fossil signed a contract with Romag whereby Romag promised (ironically in retrospect) that if Fossil instructed its factories to use Romag snaps, and IP claims were brought against Fossil as a result, Romag would indemnify and defend Fossil from those claims.  From 2002 to 2008—and just before Black Friday 2010, from Fossil's perspective—Superior's relationship with Romag by all appearances was fine.  Fossil received handbags that *no one*—not even the snap's inventor (Reiter)—thought had counterfeits.

If anyone acted with "indifference," and far baser motives, it was Romag.  Romag's records showed a drop off in Superior's snap purchases in 2008.  Romag either did not bother to check why or was unmoved to do anything.  Indifference in either case.  Additionally, in spring 2010, Reiter (as he tells it) nonchalantly tossed roughly a dozen Fossil handbags—the ones that his General Counsel and sister-in-law had bought immediately after Reiter's receipt of a hot tip regarding Superior's use of counterfeit Romag snaps—into the closet, rather than analyze them and investigate.  He knew that Fossil expected to directly address intellectual property issues and that business "partners" would pick up the phone. SPFF ¶1.  Did Reiter call Fossil?  *No*, Reiter essentially says, throwing up his hands, *he was just too busy and there is nothing he could do; plus, he doesn't call customers casually*. SPFF ¶¶4-6.  Yet, several times Reiter called Doug Dyment "casually" to solicit watch and handbag donations for Reiter's charities. SPFF ¶7.  Reiter's weak "excuses" reek of something much worse than indifference.  Yet, it is Romag that says "Fossil did not care enough about establishing a partnership" with Romag. Romag Br. 16.  Quite a charge to be levied from a company that intentionally sandbagged its "partner" to extort a bigger settlement.

Romag smugly brands Fossil "callous" because, although it did not know of a problem, it did not look at the snaps or invoices and records of Superior's snap purchases.  But Reiter knew of counterfeiting and "callously," or worse, himself did neither, which this Court found "lack[ed] a good faith explanation." *Findings/Conclusions*, 102.  He talked with his business partner at Wing Yip in China, Timmy Cheung, every night, visited Wing Yip (Timake) in China in July 2010 and had a team of inspectors on the ground in China to serve as his eyes and ears. SPFF ¶¶8-10.  Reiter admitted there was no reason why he could not have made an investigation at Wing Yip in May 2010. SPFF ¶10.  Was he "too busy" to ask Timmy to check the snaps or

records of sales to Superior?  Apparently.  How could it possibly be fair or equitable to punish Fossil with a multi-million dollar profits disgorgement for, at most, just allowing a properly functioning relationship to continue, while at the same time rewarding Reiter's incredulous testimony, which established not just indifference, but bad faith?

Despite Romag's efforts to paint Fossil as indifferent to counterfeiting and IP rights, the evidence paints the portrait of a consumer brand at the forefront of protecting IP rights. Trademark and reputation are Fossil's bread and butter.  It has a strong incentive to ensure its goods don't contain counterfeits, which would hurt Fossil's reputation and business. SPFF ¶11. The idea that Fossil would risk its reputation by stampeding over IP rights under any circumstances—and particularly where it gets absolutely no benefit—flies in the face of common sense.

Fossil's General Counsel, Randy Hyne, Esq., and Fossil's Doug Dyment (Fossil's Director of Product Development for Men's and Women's Leathers) and Gail Stoke (Fossil's Senior Vice-President), all testified that while Fossil did not know of, or have any reason to suspect, Superior's use of non-genuine snaps, if and when it was told, it would have immediately investigated it, shut it down and found out why it happened to avoid it happening again. SPFF ¶¶12-14.  That is what it did both here and in connection with YKK zippers when it learned of possible counterfeiting.  Notably, Superior's use of Romag snaps on Fossil products had its genesis in Fossil's desire to respect snap-related intellectual property rights and steer clear of litigation.  Historically, though it disliked the stickers it had to use, in respect of Randolph-Rand's asserted IP rights, Fossil had paid that firm a per snap royalty evidenced by stickers affixed to the snaps. SPFF ¶15.  In 2002, when Dyment met Reiter, he "had expressed to [Reiter] that [Fossil] treat[s] intellectual property seriously and that [Fossil] didn't want any trouble."

19

SPFF ¶16.  So, they agreed that if Wing Yip supplied magnetic snaps for use in Fossil products, Romag would defend and indemnify Fossil against infringement claims.  Regarding snaps, Fossil has always acted in due regard to IP rights.

### b)  The Jury Was Not Asked To, And Did Not and Could Not, Conduct an Equitable Balancing or Assessment of Whether Fossil Needs to Be Deterred From Infringing Again

While Romag mischaracterizes it as such, the jury's profit calculation in no way reflects an equitable assessment that Fossil needed to be deterred from future infringement.  While Romag would like the jury's advisory views to substitute for the mandated equitable analysis, the jury did not have all the facts, was not instructed on the law, and was not asked to, and did not, conduct an equitable analysis to determine if Fossil needs to be deterred.  Its advisory finding deserve no weight in this regard.

As the Bifurcation Order delineates, the jury was charged only with "calculation of profits." Bifurcation Order ¶15.  It designated the jury to determine substantive liability, willfulness, attribution of profits, and Romag's entitlement to punitive damages; and to calculate profits. *Id.*  Equitable issues—including Romag's laches and unclean hands, and the equitable balancing to determine whether to disgorge Fossil's profits that is presently before this Court— were expressly reserved to this Court. *Id.*  The order precluded Fossil from introducing evidence concerning equitable issues and defenses—which it could not even mention, *id.* ¶¶, 10, 11, 15— thus denying the jury equity-related evidence essential to the equitable balancing.[5]  The jury also

---

[5] The jury did not hear much of the evidence cited herein balancing in Fossil's favor and against Romag.  For example, the jury did not hear Fossil's Senior Vice-President Gail Stoke testify about the herculean efforts to freeze sales and remove potentially infringing inventory.  It heard only limited evidence about Romag's deception and bad faith, intentional delay; and nothing about the tremendous, avoidable economic loses it imposed, which serves as a strong deterrent. It did not hear the full tale of Reiter's sanctioned deception and bad faith.  Nor did it hear that Superior saved only a penny per snap ($7,670), paltry savings, particularly given the tens of million in business Superior had been doing with Fossil, SPFF ¶17, versus landed costs of

did not have any of this Court's (then unformulated) findings and conclusions applicable to that equitable balancing; and did not know the other remedies Romag might obtain, including a permanent injunction, attorneys' fees and statutory damages.  Lastly, the jury was not charged with deciding, and did not know all the factors pertinent to determining, whether equity justifies a profits award under either *Romag v. Fossil* or Second Circuit law.  In short, the jury did not have the facts or directions needed to undertake a balancing it was not asked to do.

Additionally, even for the narrow task the jury was given, the instruction concerning deterrence was vague, overly broad and omitted a critical element.  Most fundamentally, it failed to define "callous disregard," and it invited the jury, without direction, to speculate and consider or reject anything in the case. Jury Inst. [Doc. # 410] at 23.  Only the jury knows what it interpreted the phrase "callous disregard" to mean, but it could not have meant that Fossil acted recklessly or with reckless disregard or that it had turned a blind eye because, as this Court found, there simply was *no evidence* in the trial record to support any of those standards.

Over Fossil's objection, the deterrence-based instruction also erred in failing to instruct the jury that such profits to deter could only be awarded against a willfully deceptive infringer that needed to be deterred from future infringement. *Ruling* ,*13.  Mere infringement or conduct that is, at most, negligent is not the type of willfully deceptive conduct that the Second Circuit has found may give rise to a need to award profits to deter.  Rather, intentional conduct is inherent in the deterrence rationale.  "The deterrence rationale for disgorgement of profits []

---

$30.00 per handbag, *Ruling*, *12, a savings that Superior did not pass on to Fossil, who paid full price, Ruling, *8.  And it did not hear that, but for Romag's wrongful delay, Fossil could have retooled the inventory with generic snaps, allowing for resale during the holiday season, which would have generated $6.5 million in profits; about Romag's prior J.C. Penney and DSW litigations and settlements, under which Romag, far from caring about the public, allowed the sell-off of visibly inferior quality Romag-branded snaps; and more.

focuses on the culpability of the willful infringer." *E.g., 4 Pillar Dynasty*, 933 F.3d at 202, 213.

So, it is the need "to deter a willful infringer from doing so again" that justifies deterrence-based profits. *See George Basch Co*., 968 F.2d at 1537 (*quoting Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 772 (2d Cir.1984); *id.* at 1539 (noting that awarding profits of *bad faith infri*nger who *fraudulently* used mark promotes deterrence); *accord Monsanto Chem. Co. v. Perfect Fit Prods. Mfg. Co.*, 349 F.2d 389, 396 (2d Cir. 1965) (deterrence-based award needed in "so blatant a case of deception" by commercial racketeer); *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir. 1970) (awarding profits "essential to deter companies from willfully infringing"); *Hilfiger*, 146 F.3d 66, 72 (2d Cir. 1998) (accounting available "if the accounting is necessary to deter a *willful infringer* from doing so again") (all emphasis supplied).  The jury was not, however, instructed that this concept of intentional infringement is inherent in the deterrence rationale, thus yielding advisory profits determination under that rationale in conflict with the jury's unequivocal findings that Fossil did not know of, suspect or turn a blind eye to possible infringement.  The impact of the erroneous instruction is obvious here, as there is no need to deter Fossil who did not know of the unauthorized use and thus could not have intend to deceive consumers or benefit from Romag's mark, which even Romag argues is the *sine qua non* of deterrence.

Romag wrongly argues that *Romag v. Fossil* left the deterrence rationale in place, but without any connection to willfulness. Romag Br. 10.  While the Supreme Court did rule that willful infringement was not generally required for a profits award, it expressed no view on deterrence-based profits specifically or the policy rationales that inherently tether deterrence-based profits to willfulness.  In any event, assuming for the sake of argument that willfulness is no longer an absolute essential for deterrence profits, willfulness still remains an essential,

logical part of deterrence: "As a matter of logic, deterrence is only effective if the infringer has acted willfully and in bad faith; that is, an innocent infringer cannot be 'deterred' from actions which were taken in good faith and without the intent to deceive." *Minnesota Pet-Breeders, Inc. v. Schell & Kampeter, Inc.*, 843 F. Supp. 506, 516-17 (D. Minn. 1993), *aff'd*, 41 F.3d 1242 (8th Cir. 1994) (citing and applying *George Basch Co.*).  As the cases above show, the deterrence rationale operates to protect against the infringer that intentionally uses the mark to steal the mark holder's goodwill; and against public harm when consumers are intentionally deceived as to the source of a product.  The jury instruction erroneously failed to include and explain that intent concept—in this case Fossil's lack of intent—even as just a "highly important" consideration.  That error renders the jury's advisory calculation of marginal, if any, value.

### c) Fossil's Diligent and Prompt Post-Suit Conduct Cuts In Favor of Denying Any Profits Disgorgement

Fossil's prompt and diligent response, when it first learned of possible unauthorized use shortly before Black Friday, cuts strongly in Fossil's favor and supports a denial of any profits award.  While Romag argues that Fossil's response demonstrates some type of bad faith on Fossil's part, the facts and this Court's findings are otherwise.

Once Romag raised the specter of counterfeiting,[6] Fossil sprang into action, investigated it and then moved to halt sales and remove the effected merchandise. *Findings/Conclusions*, 95.  As this Court found, "Fossil worked with its employees and retailers to put a hold on all of the

---

[6] Romag repeatedly tries to peg Fossil's awareness of possible counterfeiting to a Nov. 8, 2010 email Reiter sent to Douglas Dyment, which it argues shows that Fossil stonewalled.  However, Reiter's cryptic note inexplicably demanding Fossil to identify its manufacturers did *not* mention possible counterfeiting. *Findings/Conclusions*, 94; SPFF ¶47.  Dyment would have told Fossil legal immediately if Reiter had raised counterfeiting. *Id.* Plus, Reiter could have contacted Fossil's legal department himself, but did not. SPFF ¶48.  When the proven stonewaller, Romag, finally mentioned counterfeiting, Fossil identified Superior and launched into action; as it would have done on November 8—or May—if Reiter had just been honest.

affected products and to prevent items on the shelves from being sold to customers." *Id.* Immediately after Romag filed suit, and a week before the fraudulently obtained November 30, 2010 preliminary injunction issued, the small army that Fossil mobilized undertook a massive effort (compounded in difficulty by Romag's intentional Black Friday ambush) to freeze sales and remove potentially infringing inventory. *Id.*; SPFF ¶18.  As this Court found, "[b]ecause of the timing of the suit, this all had to be done during the busy holiday season," a frenetically busy time when retailers do 20 to 30% of their business, thus "diverting workers from their other holiday sales tasks."[7] *Findings/Conclusions*, 95.

Even Romag begrudgingly admits that, at minimum, after Fossil learned about the infringement, Fossil "did what it was told to do by the Court and what it admittedly had to do in light of" the circumstances Romag created. Romag Br. 28. Indeed, this Court, in another decision Romag ignores, found that Romag failed to present evidence showing that Fossil did not make reasonably diligent efforts to comply with this Court's TRO. *See* Order denying Motion for Contempt [Doc. # 28].  This record demonstrates Fossil's highest regard for Romag's IP rights, and certainly not "indifference."  That cuts in Fossil's favor equitably.

### d)  <u>As This Court and the Federal Circuit Ruled, Fossil Asserted Objectively Reasonable Defenses and, Unlike Romag, Litigated this Case In Good Faith</u>

In denying Romag's request for Patent and Lanham Act attorneys' fees, this Court and the Federal Circuit made findings and conclusions expressly rejecting the very same attacks on Fossil's litigation conduct that Romag relaunches in its most recent brief.  In final and

---

[7] Romag dictated the timing here, as it *stonewalled* and *stalled* for six months in bad faith to maximize Fossil's pain.  Unabashedly, Romag complains that Fossil's supposed delay was to blame for the fact that handbags "were in Fossil stores and other retailer stores with no court-ordered bar to sale for the entire" Thanksgiving and Black Friday weekend.  Romag Br. 27. Romag can't justify a massive profits disgorgement based on circumstances of its own making.

unchallenged findings, both courts concluded that Fossil litigated its patent invalidity defenses and its patent and trademark non-infringement positions in an objectively reasonable—not frivolous or unjustified—manner and not in bad faith to prolong this litigation vexatiously. *Romag Fasteners, Inc. v. Fossil, Inc.*, 2018 WL 3918185, *5 (D. Conn. Aug. 16, 2018) ("*Attorneys' Fees Remand*"); *Romag Fasteners, Inc. v. Fossil, Inc.*, 866 F.3d 1330, 1338-41 (Fed. Cir. 2017) ("*Fed. Cir. Fees Op.*").  Far from aiding Romag, those findings favor Fossil.

Romag again pretends those findings don't exist.  Instead, it restates losing arguments, dressed up with cherry-picked sound-bites, tacitly trying to reverse them.  For example, it is established that Fossil's non-infringement case did not rely on impermissible speculation and was reasonable. *Attorneys' Fees Remand*, 2018 WL 3918185, at *4 (stating that in its initial, 2014, attorneys' fee ruling, "the Court had already found that Fossil's 'arguments with respect to non-infringement were not entirely groundless' and that Fossil had not 'acted fraudulently or in bad... faith' in arguing Romag had not met its burden of proof on infringement.") (citing *Romag Fasteners, Inc. v. Fossil, Inc.*, 2014 WL 4073204, at *4 (D. Conn. Aug. 14, 2014)); *id.* at 4 (non-infringement position was not unreasonable; Fossil, having been sued, simply defended itself in a determined manner by requiring Romag to prove its case); *Fed. Cir. Fees Op.*, 866 F.3d at 1341. Yet, on the "strength" of an out-of-context word,[8] Romag's brashly says that Fossil lacked a "basis in fact or law" to present that defense based on "sheer speculation." Romag Br. 29-30, 32.

Similarly, Romag ignores findings that Fossil asserted and withdrew its patent invalidity

---

[8] Romag peppers the word "phantasmagorical" throughout its brief. *E.g.* Romag Br. 4, 29, 30, citing Tr. Vol. III, 742:12.  That offhand dicta came *before Fossil put on its evidence*, including Dr. Rice's testimony.  It commands none of the weight or importance Romag aspires for it.  In any event, that defense was found reasonable, and this Court actually said, "*somewhat* phantasmagorical"; that is, "slightly" or "somewhat," *Merriam-Webster*, https://www.merriam-webster.com/dictionary/somewhat.  Not surprisingly, Romag never quotes the modifier this Court used in its many cites to the word.

defenses reasonably and in good faith, to argue the opposite. Romag Br. 30-31. These issues, however, are long resolved in Fossil's favor. Amazingly, in making these claims, Romag cites a description of Fossil's indefiniteness defense as "woeful," as if that description was still valid. Romag Br. 4. What Romag fails to say is that the Federal Circuit thereafter *rejected*, as an "erroneous assessment of the record," those earlier descriptions that the defense was "woefully inadequate," "bordered on frivolous," lacked merit or was asserted for an improper purpose. *Fed. Cir. Fees Op.*, 866 F.3d at 1339, 1341. The Federal Circuit also found Fossil acted appropriately in withdrawing other invalidity defenses. It found that "Romag's claim that 'Fossil did not withdraw its invalidity defenses until after testimony was complete,' [ ] [wa]s misleading and contradicted by the record"; that there is no "support for the district court's finding that Fossil 'aggressively pursue[d] invalidity counter-claims in an attempt to prolong litigation'"; and no findings that "Fossil's defenses of anticipation and obviousness were objectively unreasonable." *Id.* at 1338. That makes sense, as the Federal Circuit has previously held that objectively reasonable defenses often do "not make the cut for consuming the precious time and attention of the jury." *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1301 (Fed. Cir. 2015). Indeed, Fossil's narrowing of issues for trial *supports its good faith. See Otsuka Pharma. Co. v. Sandoz, Inc.*, 07-cv-1000 (MLC), 2015 WL 5921035, at *7 (D.N.J. Oct. 9, 2015) (finding that reduction of prior art references before trial evidences good faith).

A clear-eyed assessment of the conduct of this litigation as a whole reveals that Romag deceived this Court, cites abrogated findings and burdens this Court by rearguing matters already decided. By contrast, Fossil in good faith narrowed the issues for trial, put the plaintiff to its proof and otherwise litigated reasonably. Again, the equitable balance tips in Fossil's favor.

**B. Fossil Played No Role in Effectuating the Infringement, A Factor Strongly Weighing Against Disgorging Its Profits**

The fact that Fossil played no role in bringing about the infringement weighs strongly against an award. *See 4 Pillar Dynasty*, 933 F.3d at 214.  Fossil did not make infringing snaps, buy them or install them.  It did not direct Superior to do so, nor did it know of, suspect, or turn a blind eye to the use.  It is infringers deeply immersed and invested in the infringement scheme, those who profit greatly from it and are likely to do it again, that need to be deterred; not inadvertent infringers like Fossil, who resell a genuine good that contains a small non-genuine component that neither it nor the component's inventor could tell was counterfeit.

**C. The Findings Establish Conclusively that Fossil Did Not Benefit, Or Benefitted at Most Only a Scant 1%, From Romag's Trademark**

A faint 3 millimeter stamping of a snap brand name unknown to consumers on a tiny, penny-sized (or smaller) fastener largely unseen by the consumer did not drive the $6.7 million in profits Fossil earned selling handbags prominently featuring Fossil's famous trademarks.  The jury found Fossil earned its handbag profits based 99% on factors *other* than the Romag brand on the snap, with only 1% attributed to Romag's trademark. *Ruling*, *1; *Findings/Conclusions*, 90.[9] This Court independently confirmed that the jury's 1% attribution finding was reasonably based on the evidence. *Ruling*, *12.  And, roughly in line with its 1% finding, the jury made an advisory award under an unjust enrichment rationale of $90,759.36.  *Findings/Conclusions*, 90.

In this Court's equitable balancing, the degree of certainty that in its sale of Fossil-branded handbags, Fossil, at most, got a small, 1% benefit from the Romag mark weighs heavily in Fossil's favor. *See Hilfiger*, 146 F.3d at 72.  "[L]ongstanding equitable principles" "seek to

---

[9] Additionally, this Court found that "the evidence at trial established that Fossil paid full price for the snaps used by Superior…." *Ruling*, *8.

27

deprive only wrongdoers of *their gains from misconduct*." *Romag v. Fossil*, 140 S. Ct. at 1498 (Sotomayor, J. concurring) (emphasis added) (citation omitted).  Fossil should not be made to disgorge profits that it earned from factors other than the obscure Romag mark.

While 1% should be the ceiling on any attribution finding, drilling down deeper, the overwhelming and uncontradicted evidence shows that Fossil earned its handbag profits *without any benefit* of the Romag mark on snaps.  That is common sense.  But, Fossil, did not rely simply on the obvious.  It presented overwhelming and uncontroverted evidence.  First, relying on the gold standard in trademark cases—a well-designed consumer survey of 839 handbag consumers, SPFF ¶19—Fossil's expert, Dr. E. Deborah Jay, confirmed empirically what common sense tells us:  consumers do not buy handbags based on whether the name "ROMAG" appears on the magnet snap or on any brand of magnetic snap it may contain.  "Fossil's expert Dr. Jay testified that the Romag mark played 'no role in the purchase of handbags with magnetic snaps.'" *Ruling*, *12; *see also* SPFF ¶20.  The survey also showed that no one wanted the Romag name printed on the magnetic snap on the handbags that they bought, SPFF ¶21; and that while most of those surveyed (91%) wanted no names on the snaps, the few who did, wanted handbag brand names like Coach and Dooney & Bourke, SPFF ¶22.  Romag produced no survey and no evidence that a customer might, let alone did, choose a handbag based on the Romag snap trademark; and no evidence that any consumers heard of Romag, associated any particular quality or cache to its snaps, or bought designer handbags based on the component, let alone the brand name of that component.

Trying to counter Fossil's crushing consumer survey evidence—and just plain good sense—Romag's principal, Reiter, offered his "belief" that Romag's "audience" is "not so much the end consumer," but rather other actors along the retailing chain.  Tr. Vol. I. 148:20-149:6.

Even if true, Romag cites no evidence that manufacturers or retailers knew about, let alone preferred, Romag snaps.  To the contrary, in the extensive experience of Romag's expert Lisa Steinberg designing handbags, she never heard of Romag, never directed her factories to use them; and could cite no case when the Romag name drove a handbag sale. SPFF ¶30.  Further, not a single downstream retailer—Macy's, Nordstrom, Dillard's, Belk, Bon-Tons or Zappos.com—purchased the Fossil-branded handbags based on the Romag name, only one had even heard of it, and all purchased handbags based on consumer preferences, such as the Fossil brand and its historical sales, style, color, trends, size, function and price. SPFF ¶31.

Industry-wide use of generic snaps further verifies that Fossil did not need Romag branded snaps for the success of its handbag line.  The uncontroverted testimony—including Romag's witnesses Reiter, Steinberg and Terry Van Winkle—and a trove of handbags, graphically show that well-respected, highly desirable, high-end brands, including Yves St. Laurent, Gucci, Burberry's, Michael Kors, Kate Spade and Tory Burch, along with Fossil, use unbranded, generic snaps or snaps with the retailer's own brand name. SPFF ¶32.  By 2006, "very cheap" generic snaps costing ten to twelve cents were available, SPFF ¶33, coming in whatever different styles, finishes, price points and other specifications designers want. SPFF ¶34.  Fossil did not need Romag's brand.  So, factories like Superior producing goods under contract to Fossil could determine for themselves whether to use generics or a branded snap. SPFF ¶35.

Presented with similar evidence that retailer Tommy Hilfiger's clothing "profits flowed overwhelmingly from" its own mark, while an infringed mark "didn't mean anything" and "conferred little benefit" on Hilfiger, a district court denied a profits award, judging that "entry of an injunction" was sufficient deterrence. *Hilfiger*, 1999 WL108739, at *4.  Similarly, in *Texas*

*Pig Stands*, the Fifth Circuit found that an injunction met the equities and that denial of "windfall" unjust enrichment profits was proper, as there was no evidence of palming off, diversion or that sales were attributed to plaintiff's mark, as Hard Rock, a global brand, would have sold just as many sandwiches by any name.  951 F.2d at 687, 695-96.

True to form, Romag completely ignores the findings and overwhelming evidence.  First, it argues that Fossil obviously benefitted because it sold handbags with snaps and it made profits, regardless of what those profits are attributable to. Romag Br. at 33.  Unfortunately for Romag, the issue is whether and to what extent, if any, the profits Fossil earned are attributable to the use of the Romag's *trademark*.  Second, lacking evidence, Romag is reduced to non-sensical speculation, proclaiming "there can be no argument that Fossil did not benefit in in some way" and citing "common knowledge that a brand has value" even if it "cannot be reduced to a monetary figure." *Id.* 33-34.  The evidence and findings say otherwise.  Finally, Judge Young's pre-trial speculation that branded components "may" play a subliminal role in a handbag purchase and a tire brand "may motivate" car purchasers, is neither a finding nor evidence.

### D.  Romag Has Been Awarded Many Powerful Substantial Remedies, and an Award of Fossil's Profits Would be an Inequitable Windfall and Penalty

Romag's "woeful" and imaginative tale of a family-owned business left high, dry and remediless unless it receives a huge windfall profits award is pure fiction.  Denying Romag a profits award does not leave it remediless, just without an inequitable and wildly disproportionate windfall.  Romag's economic loss has been fully compensated.  But it seeks neither equity nor compensation:  it covets a massive windfall, and wants to punish Fossil.  Equity will not aid Romag in either quest.

First, an avoidably costly and inequitable injunction against non-willful infringer Fossil has been in place since Romag's fraudulent Black Friday TRO filing. *Findings/Conclusions*, 95,

30

and 111-12.  That long-standing injunction serves as a strong deterrent, protects the public and serves the equities given the lack of fraud or palming off. *Champion Spark Plug*, 331 U.S. at 131-32; *see also Seatrax v. Sonbeck*, 200 F.3d 358, 372 (5th Cir. 2000) (injunction serves as an effective deterrent given absence of willful infringement, palming off, lack of intent to confuse or deceive).  But Romag has secured remedies well beyond.

In terms of Romag's actual economic loss, this Court expressly found that "the jury's nine-cent reasonable royalty rate"—yielding a more than $66,000 damage award, *Findings/Conclusions*, 90—"nearly doubled the five-cent royalty Romag earned from licensing its patent *and trademark*, *more than compensating Romag for lost royalties and any economic loss*…."[10] *Attorneys' Fees Remand*, 2018 WL 3918185, *10 (emphasis added).

Romag repeatedly claims that it "undoubtedly suffered" some "unquantified harm" for which only a deterrence profit award will compensate it. Romag Br. 11; *see also id.* 2 (Fossil "harmed Romag's business"), 3 (the unintentional use "cost Romag dearly"); 13 ("severe harm to Romag").  But it never explains how the evidence shows it was harmed, and this Court's finding that Romag's economic loss has been *more than* compensated makes Romag's "undoubtable" claim not just doubtable, but untrue.  Nonetheless, if Romag has some uncompensated harm, Congress has authorized statutory damages of up to $200,000 where actual damages are difficult to prove. 15 U.S.C. §1117(c).  This Court offered Romag the chance to seek this remedy, but, without so much as a polite, "No thank you," it declined.

Also, Romag's claim, again without explanation, of some difficulty in proving causation for harm from diverted sales or injured reputation, Romag Br. at 11, is misleading.  It never tried

---

[10]Add to that Romag's recovery of $2.5 million in attorneys' fees and costs under state law, a recovery to which Romag was not entitled under federal law. *Attorneys' Fees Remand*, at *10.

to prove diverted sales or injured reputation, let alone harm and causation, as it experienced neither.  Because Fossil does not sell snaps, it did not divert some unknown number of snap sales from Romag.  And, by Reiter's estimation, the snaps Superior used were of the same quality and indistinguishable from genuine snaps, *Ruling*, *7 n.4., and so there was no danger of damage to Romag's reputation from an inferior product.  Romag presented no evidence of lost good will or sales, and, as Fossil's expert Laura Stamm testified, there was no evidence that the unintentional use somehow tarnished Romag's reputation or that its customer relationships, sales or profits suffered. SPFF ¶¶ 49-50.  Actually, Romag's sales increased during the period of infringement, SPFF ¶51, negating possible claims of diverted sales or lost goodwill.

 Alternately, had Romag been undercompensated—it wasn't—a more plausible stand-in to reimburse Romag might be the jury's roughly $90,000 unjust enrichment-based advisory profits, reduced by the 1% attribution to $900, instead of millions and millions of dollars.  That award reflecting a benefit the defendant earned using the plaintiff's mark, is a closer proxy to true compensation.  Romag, amazingly, never even mentions the jury's unjust enrichment award.

The reasons for that is clear:  Romag has never been interested in, and has never sought, compensation.  It chose to shoot for the moon and a windfall of all of Fossil's nearly $7 million profit.  To put that in perspective, Romag's partner in China would have to *sell 134,000,000 snaps* for Romag to earn $6.7 million.  134 million.  In 14 years selling snaps, Romag sold a total of only 47 million snaps. SPFF ¶37.  $6.7 million is *186 times* in excess of Romag's actual $36,000 loss; $6.7 million is *100* times greater than the $67,000 in Fossil handbag profits, at most, attributable to the use of Romag's mark; $6.7 million is *74 times* more than $90,759.36 in unjust enrichment profits (before attribution) and *7,444* times more than post-attribution profits of $900.  As the stats show, such a massive disgorgement would grossly "overcompensate

[Romag's] injury and create a windfall judgment" at Fossil's expense. *See George Basch Co.*, 968 F.2d at 1540; *see also Bandag Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 917-18 (Fed. Cir. 1984) (denying windfall of profits; injunction alone satisfied equities); *Texas Pig Stands*, 951 F.2d at 696 (declining profits where granted permanent injunction adequately served as deterrent and award of "profits would be far from inequitable—it would be a windfall"); *Merck Eprova AG v. Brookstone Pharmaceuticals, LLC,*, 920 F. Supp. 2d 404, 431 (S.D.N.Y. 2013) (where infringement was deliberate and award would serve a strong deterrent role, declining to award windfall profits, where plaintiff did not make the product sold).

On the flip side, Romag's demanded recovery will have a "draconian" impact on Fossil, punishing it by imposing an inequitable penalty that the Second Circuit warned against, *see George Basch Co.*, 968 F.2d at 1540, and the Lanham Act expressly eschews, 15 U.S.C. §1117(a); *see also Getty Petr. Corp. v. Bartco Petr. Corp.*, 858 F.2d 103, 113 (2d Cir. 1988) (no Lanham Act punitive damages). "Equity never 'lends its aid to enforce a forfeiture or penalty.'" *Liu v. SEC*, 591 U.S.—, 140 S. Ct. 1936, 1943 (2020) (quoting *Marshall v. Vicksburg*, 14 Wall. 146, 149 (1873)). So, under the "equitable principle" the Supreme Court reaffirmed at the close of its last term, Fossil "should not be punished by 'pay[ing] more than a fair compensation'" to Romag. *Liu*, 140 S. Ct. at 1943 (quoting *Tilghman v. Proctor*, 125 U.S. 136, 145-146 (1888) (alteration in original).

Next, Romag pretends to take up the mantle of the consuming public to try to justify a massive payout. A payout to Romag, not consumers. Relying on an inapposite legal presumption—and ignoring evidence to the contrary—it argues that deterrence vindicates a supposed harm to consumers. Romag Br. at 2, 10-13. Initially, even if consumers were confused—and they were not—this Court has determined that Fossil did not know or suspect

33

infringement, so Fossil could not have intended to deceive or confuse, and thus is not in need of being deterred.  Nevertheless, there is no evidence that any consumer got anything less than what it expected.  Reiter himself was unable to see a quality difference between the genuine and non-genuine snaps, *Ruling*, *7 n.4, and consumers were oblivious to snap-manufacturer trademarks, as Fossil's survey data shows.  Romag could not muster a single consumer—out of 767,000 handbag purchases—who felt deceived by an inferior product.  Undeterred, Romag misplaces reliance on a rebuttable presumption, not applicable here, of likely consumer confusion when counterfeits are used.  That presumption, as Romag's own parentheticals describe, Romag Br. 12-13, applies solely to establishing liability for infringement, which requires not merely use of a registered mark, but also that "such use is likely to cause confusion, or to cause mistake, or to deceive," 15 U.S.C. §§1114(1)(a) and (b); 1125(a); *see also* Jury Instruction at 23 (cited by Romag) (instruction for establishing likelihood of consumer confusion to establish liability). There is no such presumption beyond that, and, if there was, Fossil has overcome it.

Finally, Romag's cares little about consumers.  Its actions make plain that Romag has only contrived supposed concern for the public to try to justify a huge profits award.  While consumers got what they bargained for, if Romag really cared about protecting the public, it would have immediately moved to stop the unauthorized use, not delayed half-a-year before raising the infringement.  It cared only about its own pocketbook, driving up potential recovery and increasing settlement leverage.  One could even say that Romag itself "open[ed] the floodgates" to counterfeits when it allowed J.C. Penney to sell off more than 500,000 handbags with counterfeit Romag snaps that Reiter said were visibly substandard. SPFF ¶44-46.  In doing so, Romag did not even warn Fossil or other retailers to be on the lookout for counterfeits. *Findings/Conclusions*, 94.  Romag's "effort to carry the flag of 'public interest' and guide the

34

profits of its competitor to its own coffers here must fail." *Retractable Technologies, Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 884 (5th Cir. 2019) (Higginbotham, C.J.) (applying balancing test and affirming denial of disgorgement of profits where, like here, plaintiff "elected not to test its proof of Lanham Act damages before the jury, but sought defendant's profits).

Ultimately, because Fossil did not intend to harm consumers by falsely making them believe the non-genuine snaps were real, the need to deter to protect the public is not present.

E.     **Romag's "Troubling," Bad Faith, Sanctioned Conduct In Previously Obtaining Equitable Relief "Weighs Heavily" Against Disgorging Fossil's Profits**

This Court sanctioned Romag for acting fraudulently, and gaining an advantage by deceit and unfair means the first time it sought equity.  Despite its unclean hands, Romag has darkened equity's door again, which should remain shut and securely barred.

"The equitable powers of this court can never be exerted in behalf of one"—like Romag—"who has acted fraudulently, or who by deceit or any unfair means has gained an advantage.  To aid a party in such a case would make this court the abetter [sic] of [Romag's] iniquity." *Precision Instr. Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945) (citing *Bein v. Heath,* 47 U.S. 228, 247 (1848)).  In recognition of this trans-substantive principle that "closes the doors" to equity to one, like Romag, "tainted with inequitableness or bad faith relative to the matter in which he seeks relief," *Precision Instr.*, *id* at 814, the Second Circuit expressly requires that this Court factor Romag's bad faith and deceit into its equitable balancing. *See 4 Pillar Dynasty*, 933 F.3d at 214.  Indeed, Because Romag's established misconduct "has already been sanction[ed, it] should be weighed more heavily" in this equitable assessment. *See Romag*, 866 F.3d at 1340 (analyzing "totality of circumstances").  It is "far more than a mere banality," that "he who comes into equity must come with clean hands," which requires that Romag shall have "acted fairly and without fraud or deceit" as to this matter at

35

issue. *Precision Instr.*, *id.* at 814.  It is hard to envision hands dirtier than those of one who lies to the federal judiciary and acts in bad faith to gain a tactical litigation advantage, as this Court found Romag did.

In sanctioning Romag, this Court found both that Romag deceived the Court; and that Romag acted in bad faith in timing its filing.  First, as to the deception, this Court found by *clear and convincing evidence*, that Reiter violated his declaration under penalty of perjury, 28 U.S.C. §1746, and purposefully signed and submitted to this Court a declaration in support of a TRO containing *sparse and misleading representations, omissions, contrived language and obfuscated the truth. Findings/Conclusion*, 105-06.  Though it may be uncomfortable, let's call it what it is: Reiter did not testify truthfully, and he intentionally withheld material information.

More specifically, this Court found that in his declaration—"which contains language that is nearly identical to the declaration filed in connection with the J.C. Penney Case"—Reiter "*relied on misleading representations* that *obfuscated* the months of delay, where full disclosure would have undermined its claim of irreparable harm." *Findings/Conclusion*s, 100 (emphasis added); *see also id*. 105 (Reiter Declaration "was misleading in several respects").  Reiter's sworn declaration's "limited contents," this Court found, "conveyed the impression that Mr. Reiter had just discovered the counterfeit ROMAG snaps and only by mere happenstance,[] contrary to his sworn trial testimony that he went to Macy's that day with the express purpose of confirming his suspicions that Fossil was using counterfeit ROMAG snaps in their handbags." *Findings/Conclusions*, 105.  Additionally, "the declaration implies that [Reiter's] November shopping trip was the result of 'habit and custom,'" and expresses "surprise" and "shock" to finding Fossil handbags with counterfeit snaps. *Findings/Conclusions*, 105.  However, as this Court found, *Reiter's own trial "testimony*[] *belies his sworn statements in his declaration* that

36

he was 'surprised' that the Fossil handbags contained ROMAG snaps and that he was 'shocked' to discover that they were counterfeits," *Finding/Conclusions*, 95, 105, rendering "[t]hese *statements* [] *inconsistent with Mr. Reiter's testimony at trial* that he went to Macy's in November 2010 with the specific purpose of confirming his suspicions that Fossil was using counterfeit ROMAG snaps." *Findings/Conclusions*, 95 (emphasis added)

This Court found "*[m]ore troubling*" "the absence in the [Reiter] declaration of any reference to Mr. Reiter's knowledge about this counterfeiting prior to his November shopping trip." *Findings/Conclusions*, 105. "Without mention of the May 19, 2010 ["Joe"] email, Romag's General Counsel's May 24, 2010 shopping trip, or Mr. Reiter's investigation in late October and early November, the import of the declaration was that Mr. Reiter had no knowledge of counterfeiting before the November trip to Macy's and his chance discovery of the counterfeit snaps at that time." *Findings/Conclusions*, 105-06. In turn, as this Court found, "the obvious significance of the *omissions and contrived language in the Reiter Declaration* was on Romag's claim of irreparable injury…," *Findings/Conclusions*, 106, as these "misleading representations [] obfuscated the months of delay, where full disclosure would have undermined its claim of irreparable harm." *Findings/Conclusions*, 100. "Thus, *Romag's sparse and misleading representations* deprived Judge Droney of the ability to accurately apply the appropriate standard in considering Romag's request for emergency injunctive relief," leading the Court, without an evidentiary hearing, to grant a TRO ordering Fossil and Macy's to cease selling the handbags at issue. *Findings/Conclusions*, 106 (emphasis added).

Second, this Court sanctioned Romag because its "delay before filing suit was inexcusable" and "without a colorable basis" and "in bad faith, *i.e.*, motivated by improper purposes." *Findings/Conclusions*, 104-06. First, this Court rejected Reiter's testimony "that

[Romag] did not know of" Superior's unauthorized use until "late fall of 2010," finding that

Romag knew—or should have known and turned a blind eye—of the use by June 2010.

*Findings/*Conclusions, 98-99.  Next, citing the taint of Romag's "prior track record of similarly

seeking emergency relief on the eve of Black Friday to maximize the economic pressure on

retailers," *Findings/Conclusions*, 99, 102; and "track record of issuing cease and desist letters

and seeking emergency relief on the eve of Black Friday, a time that is an obvious pressure point

for retailer defendants," *id.* 99, this Court found an "unmistakable pattern of relying on the

pressure of the holiday season when seeking to enforce its intellectual property rights."

*Findings/Conclusions*, 106.  Following that pattern here, Romag, this Court concluded, "acted in

bad faith by delaying its TRO filing until the beginning of the holidays"; "explicitly relied on the

fact that the holiday selling season was in full swing when it sought emergency injunctive relief,"

and "intentionally sat on its rights between late May 2010 and late November 2010 to orchestrate

a strategic advantage and improperly obtain emergency injunctive relief on a timetable of its

choosing." *Id.* at 106. This led to the " inescapable conclusion . . . that Plaintiff carefully timed

this suit to take advantage of the imminent holiday shopping season to be able to exercise the

most leverage over Defendants in an attempt to extract a quick and profitable settlement as it had

done twice before in the past three years." *Findings/Conclusions*, 100.  This Court sanctioned

Romag for this deception and bad faith.  Romag's sanctioned misconduct forecloses equity.

Unable to dispute the findings of its deception and bad faith, Romag makes several

specious responses.  First, trying to deflect, Romag grumbles that Fossil is making too big a deal

out of it.  Romag's charge—itself baseless—accusing Fossil of "repeatedly attack[ing]" Reiter

and of "groundless" "character assassination," Romag Br. at 35, does nothing to minimize the

gravity of Reiter's unclean hands or diminish its significance under the Second Circuit's

balancing.[11]  Next, Romag tries to minimize its six-month long pattern of intentional lying, deception and bad faith by euphemistically mislabeling it the "TRO proceeding," protesting that it only misbehaved that one time, and arguing that because the sanctioned misconduct supposedly did not go to the substance of this case, "there is no need to consider such conduct now." Romag Br. 38.  The Federal Circuit has already considered and rejected an identical attempt to exclude Romag's "TRO proceeding"—that is, it sanctioned misconduct—from an equitable balancing, holding that Romag's "sanctioned [misconduct] should be weighed more heavily, rather than excluded." *Fed. Cir. Fees Op.*, 866 F.3d at 1340.  Next, Romag's claim that this Court should consider Fossil's litigation conduct in the equitable balance, but not Romag's, exposes the hollow nature of Romag's position.  It would be bizarre if, as Romag contends, equity were to ignore the unclean hands of the party seeking refuge in equity, while evaluating whether the respondent has unclean hands though it seeks no equitable remedy.  It would turn equity on its head to scrutinize how Fossil litigated, while giving Romag a pass on its inequitable, bad faith litigation.

Additionally, while Romag's pulling the wool over this Court's eyes and acting in bad faith towards Fossil by delaying, even if only that one time to get undeserved equitable relief, standing alone, tips, the "unclean hands" factor heavily against the massive disgorgement it seeks, Romag's deception permeated the case.  For one thing, the relative minor sanction for the "TRO proceeding" did little to deter Romag, who advanced a claim about the timing of Fossil's withdrawal of invalidity defenses that the Federal Circuit found "[wa]s misleading and contradicted by the record." *Id.*, 866 F.3d at 1338.  That led this Court to *erroneously* cite Fossil

---

[11] Romag works hard to try to rehabilitate Reiter, citing his engineering and business acumen and successes. Romag Br. 35-36.  Regardless of his accomplishments, he deceived this Court, acted in bad faith towards a commercial counterparty and is undeserving of equity.

and its counsel for bad faith litigation conduct.

But, more fundamentally, Romag and Reiter refused to come clean at trial, instead sinking deeper into deception.  Reiter doubled-down on his declaration, swearing to its veracity from the witness stand. SPFF ¶38.  He persevered in his claim that he did not know of Superior's use of non-genuine snaps in May 2010, not only repeating his declaration's falsehood, but further embellishing the story with falsehoods when pressed.  This Court rejected Reiter's trial testimony "that [Romag] did not know of" Superior's unauthorized use until "late fall of 2010, finding that Romag knew—or should have known and turned a blind eye—of the use by June 2010. *Findings/*Conclusions, 98-99; *id.* at 100 ("Romag knew or should have known by June 2010 of its good faith basis for believing that Fossil was infringing.").  So, this Court refused to believe a central feature of Reiter's trial testimony, which certainly goes to the substance of this case.  And this Court expressly called Reiter out on specific aspects of that story.

"Mr. Reiter's testimony does not ring true"; and "the Court does not credit Mr. Reiter's testimony…." *Findings/Conclusions*, at 99, 102.  That was this Court's blunt assessment of Reiter's trial testimony that it was his "epiphany" out of the blue in October 2010, not the evidence from May, that prompted him to haul the handbags his wife (and Romag General Counsel) purchased out from the back of a closet and examine them. *Findings/Conclusions*, at 94, 99.  As another example, this Court also *refused to "credit" Reiter's "inexplicabl[e]"* denial of a link between the "Joe" email and the Romag General Counsel's purchase of Fossil handbags, finding those events "simply too close in time." *Findings/Conclusions*, 99, 102.  This Court found "*it defies belief*" that, knowing what he did in May, Reiter "would have stopped any further investigation, especially in light of Romag's prior record of aggressive enforcement of its intellectual property rights." *Findings/Conclusions*, 102.  As two final illustrations, this Court

"called into doubt" Reiter's testimony that he did not think to search for emails referencing Superior until October, *Findings/Conclusions*, 93, 102, and questioned his feigned ignorance of "Black Friday," *Findings/Conclusions*, 99.  How much more deception and bad faith must federal courts stomach before barring the doors of equity to Romag?  Enough is enough.

## F.  Romag's Laches Caused Economic Loss In the Millions and Strongly Cuts Against Romag in the Equitable Balancing

Romag's counsel boasted that all IP plaintiffs intentionally delay suing to let damages accumulate. SPFF ¶39.  That is exactly what, in bad faith, Romag did.  And, as Romag intended, Fossil "suffered material economic prejudice as a result of [Romag's] unreasonable delay in bringing suit," *Findings/Conclusions*, 101. While Fossil handbags gathered dust in Reiter's office, Fossil's inventory ballooned, more than doubling to a wholesale value of $4,148,093.39. *Findings/Conclusions*, 95, 100-01.  Had Romag spoken up even by September 2010, instead of losing the entire $4 million inventory, Fossil could have profitably sold handbags fit with generics. *Findings/Conclusions*, 95-96, 100-01.  Romag's laches weigh firmly against disgorging Fossil's profits.

As with other findings that undercut Romag's position, Romag tries to minimize them. First, it argues wrongly that this Court has already all but found that laches "in no way bars an award to Romag of Fossil's profits" and "should not bar Romag from pursuing its rights." Romag Br. 36.  In language Romag omits, this Court expressly "conclude[d] that based on the balance of the equities, laches should be applied in this case," and that "the Court will consider [Romag's] laches as a factor" in the equitable balancing, *Findings/Conclusions*, 103.[12]

---

[12] This Court previously miscalculated the laches period—6 months of Jun.-Nov. 2010—to be 18% of the 28 month infringement period. *Findings/Conclusions*, 101.  Romag's damages expert Beutel testified that infringement commenced September 2008, Tr. Vol. IV. 774:10-22, making the infringement period 26, not 28, months, and making the laches period 23% of the total.

Next, Romag predictably argues that its laches are not that big a deal.  Well, at bottom, Romag's bad faith pattern of intentionally harming a trio of businesses is no small potatoes. Equity should encourage commercial partners to act reasonably, not intentionally harm counterparties to increase litigation leverage.  A large profit award would reward Romag's bad faith, incentivizing commercial parties to follow suit.  Moreover, Romag's bad faith delay inflicted loss in the millions of dollars.  Fossil had to destroy handbags that, had Romag come clean, it could have refitted with generics and sold wholesale for over $4.1.million.  Even if Romag is credited for the $2.8 million Fossil withheld from Superior—and there is no reason it should—Fossil still lost $1.3 million there.  Also, based on retail profit markups averaging 58%, that $4 million in inventory yanked from stores was worth about $9 million on the shelves, reflecting a $5 million retail profit that Romag deprived Fossil and the retailers from earning. SPFF ¶41.  All in, lost revenue totaled about $6.5 million. SPFF ¶40.  That nearly equals the amount of profits Romag seeks to recover.  As a matter of equity, that economic harm Romag caused, regardless of who bore it, cuts against a profits disgorgement.

## III.   ANY PROFIT AWARD IS CAPPED, AT MOST, AT 1% OF FOSSIL'S HANDBAG PROFITS BASED ON THE ATTRIBUTION FINDING

Fossil earned the profits Romag seeks to strip from it—at least 99%—based on its own brand and reputation, not use of Romag's mark.  That finding factors against awarding Romag any profits.  Even disregarding the equities to allow Romag some award, controlling law caps Romag's profits recovery, at most, at 1% of $90,759, or $907.50; or of $6,704,046, or $67,040.

Under §1117(a) and Supreme Court authority, Romag "of course, is not entitled to profits demonstrably not attributable to the unlawful use of [its] mark." *Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 206 (1942); 15 U.S.C. §1117(a) (mandating reduced profits based on proven deductions); *Hilfiger*, 146 F.3d at 72 (citing *Mishawaka Rubber* and 15

U.S.C. §1117; directing, if requisite bad faith was shown, consideration of evidence that defendant Hilfiger's profits were attributable to its well-known mark and reputation). So, a plaintiff can recover a defendant's profits "only when the defendant's sales 'were attributable to its infringing use' of the plaintiff's mark" and is denied profits where "'the infringement had no relationship' to those earnings." *George Basch Co.*, 968 F.2d at 1538-39 (citation omitted). The Supreme Court's guidance on equitable principles in *Romag v. Fossil* "thus reflects the teachings of equity treatises that identify a defendant's *net profits* as a remedy for wrongdoing." *Liu*, 140 S. Ct. at 1944 (emphasis added). "These works on equity jurisprudence reveal two principles" including that "to avoid transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's *net profits.*" *Id*. at 1940 (emphasis added).

As is established, the Romag mark has no meaning or value to handbag buyers, assuming any of them saw the tiny, hard-to-read letters indented on a penny-sized piece of metal attached to the underside of a pocket flap. Because Fossil has "shown that the infringement had no relation to profits by the defendant [Fossil], that some [99% of] purchasers bought goods bearing the infringing mark because of the defendant[ Fossil's] recommendation or [its] reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol," Romag, therefore, "of course is not entitled to profits demonstrably not attributable to the unlawful use of [its] mark." *Mishawaka Rubber*, 316 U.S. at 206. Thus, if any profits are awarded, they should be limited to 1%, at most. *See*, *e.g.*, *Hilfiger*, 1999 WL108739, at *4 (denying profits where the Hilfiger mark, not the infringed mark, drove sales).

Romag drops a footnote, its only reference to attribution, arguing that Judge Young held, and this Court somehow agreed, that attribution does not apply to deterrence-based profits under the facts here. Romag Br. 34 n.9. Neither Judge Young nor this Court went so far: Judge Young

denied Fossil summary judgment on attribution, allowing Romag to live to fight another day based on the possibility that Romag might—though it failed to—prove that Fossil's conduct was egregious; this Court had no reason to decide whether to apply it, as it denied profits. Regardless, it would be reversible error to deny Fossil attribution here based on two outlier cases involving the poster children for racketeering and pirating that are the antithesis of Fossil.

To begin with, neither *Mishawaka Rubber* nor §1117(a) contain any exception to the attribution principle, even for highly egregious infringement. Thus, Second Circuit authority creating an exception—particularly Romag's bright-line rule—is of dubious vitality.

Even if viable, the Second Circuit's extremely narrow attribution exception might apply *only for exceptionally egregious or malicious conduct. See Hilfiger*, 146 F.3d at 72-73. That is not Fossil or this case. That narrow exception had its genesis in two cases galaxies away from this one. First, in *Monsanto Chemical v. Perfect Fit*, unlike here, the "commercial racketeer" Perfect Fit "deliberately infringed [Monsanto's Acrilan] mark" "wilfully [sic]" and "as part of a pre-conceived plan to trade upon [Monsanto's] goodwill" "by selling mattress pads falsely labeled as Acrilan-filled," that were stuffed with "secondhand waste materials, floor sweepings and dust," not Acrilan. 349 F.2d at 390-91. Perfect Fit had "taken up trademark infringement as its principal line of business" and "carried out" similar "schemes" at least three times and violated an injunction. *Id.* at 390, 391, 396-97. Similarly, in *Bassett v. Revlon*, the defendant had been held in contempt; acted with "bad faith," "wrongful intent," "deliberately and fraudulently," with a "smug willingness" to determine unilaterally to treat plaintiff's goodwill as a nullity, all reflecting a "callous disregard" of the "rights of a competitor and for the mandates of the federal courts." *Bassett*, 435 F.2d at 662, 664. That conduct needing to be deterred was not mere infringement or even negligence that, at most, is involved here. Rather, the commercial pirates

calculated in cold-blood that the risk of being tagged with infringement outweighed the benefit. Disgorging only profits attributable to the infringement would not deter them. Not by a long stretch is that Fossil or this case.

The prospect that legitimate businesses would, under Romag's massive overreach, see their whole profit wiped out if a non-genuine component unknowingly found its way into its product is not only inequitable, it would chill legitimate commerce. It is common sense that no one buys a Ford F-150 pickup—identified as a Romag customer starting in 2014, SPFF ¶42— based on the Romag name on map pocket snaps. Yet, if a non-genuine snap slipped into that truck, even though Ford did not intend to benefit from Romag's goodwill or intend to deceive the public as to the source—Romag ravenously would seek to strip Ford of every penny of the more than $12 *billion* Ford earned annually.[13] That is perverse.

To award all the profits Fossil earned independent of Romag's mark—or anything more than a *de minimis* amount—would be punitive and contrary to equitable principles and the Lanham Act. *Liu*, 140 S. Ct. at 1940 (under equitable principles, awards exceeding the wrongdoer's net profits are penalties contrary to equity); *Getty Petr.*, 858 F.2d at 113.

Indeed, Romag's demand for more than 670 times that amount is not only an unfair penalty on its face, but is more outrageous considering that section 1117(a) allows courts at most to treble *actual damage* awards deemed inadequate. 15 U.S.C. § 1117(a). How could it be that if a court finds the profits attributable to be inadequate it can choose to award, or "disgorge," essentially 700 times that amount by (disgorging) all the profits made on goods for which the defendant does not have a trademark registration, goods that defendant does not make or sell,

---

[13] The $13,000 Ford earns on each of the 2,605 F-150s its sells daily earns it $12 billion a year in profit. Beita Kiser, Gabe. "Most Profitable Cars of All Time: The Ford F-150," *CarBuzz*, Mar. 9, 2016, https://carbuzz.com/news/most-profitable-cars-of-all-time-the-ford-f-150.

offer for sale, distribute or license, i.e., handbags.

Alternately, separate from the attribution rule, section 1117(a) grants this Court discretion, given the circumstances of this case, to reduce or eliminate an excessive profit award to a sum this Court finds just. 15 U.S.C. § 1117(a).  Even if, attribution does not formally operate here, under that discretion, Romag should be limited, at most to 1% of Fossil's profits.

## <u>CONCLUSION</u>

Romag has failed to meet its burden.  Under this Court's findings, Romag is undeserving and unentitled to a massive punitive windfall transfer of Fossil's profits, and Fossil has done nothing to mandate stripping its handbag profits.  In fairness, no profits should be disgorged, or, at most, should be limited to 1% of the jury's "unjust enrichment" profits.

Respectfully submitted,

Dated: December 16, 2020

/s/ Nicholas Geiger
Nicholas A. Geiger, ct28060
ngeiger@cantorcolburn.com
CANTOR COLBURN LLP
20 Church Street, 22nd Floor
Hartford, CT 06103
Telephone: (860) 286-2929
Facsimile: (860) 286-0115

*Of Counsel:*
Lawrence Brocchini
Jeffrey E. Dupler
Lauren S. Albert

*Counsel for Fossil Group,*
*Inc. and Fossil Stores I, Inc.*

46

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____*/s/ Nicholas Geiger*_____
Nicholas Geiger (ct28060)

*Counsel for Defendants Fossil Group, Inc. and Fossil Stores I, Inc.*

47